ORAL ARGUMENT NOT YET SCHEDULED
CASE NOS. 15-1072 and 15-1073

IN THE

# UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

NATIONAL BIODIESEL BOARD,

*Petitioner,*

v.

ENVIRONMENTAL PROTECTION AGENCY,

*Respondent.*

ON PETITION FOR REVIEW FROM THE UNITED STATES
ENVIRONMENTAL PROTECTION AGENCY

## INITIAL BRIEF OF PETITIONER
## NATIONAL BIODIESEL BOARD

Sandra P. Franco
Bryan M. Killian
David B. Salmons
Morgan, Lewis & Bockius LLP
2020 K Street, N.W.
Washington, D.C.  20006
(202) 373-6000

*Counsel for National Biodiesel Board*

**Dated:      October 8, 2015**

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | | |
|---|---|---|
| NATIONAL BIODIESEL BOARD, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. 15-1072 |
| | ) | |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, | ) | |
| | ) | |
| Respondent. | ) | |
| NATIONAL BIODIESEL BOARD, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. 15-1073 |
| | ) | |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, | ) | |
| | ) | |
| Respondent. | ) | |

**CERTIFICATE AS TO PARTIES, RULINGS UNDER REVIEW AND RELATED CASES**

The following list of parties to this case, rulings under review, and related cases are provided pursuant to Circuit Rule 28(a)(1):

C-1

(A)    ***Parties and Amici***

This is a matter on petition for review of agency actions undertaken by the United States Environmental Protection Agency. There was no action in the district court, and so there were no parties in the district court. The parties are:

Petitioner:           National Biodiesel Board

Respondent:          U.S. Environmental Protection Agency

(B)    ***Rulings Under Review***

Case Number 15-1072 requests review of two related final actions of the United States Environmental Protection Agency: (1) the Approval of CARBIO's Alternative Biomass Tracking Program, dated January 27, 2015; and (2) a Letter from Byron Bunker, Director, Compliance Division, EPA, to Anne Steckel, Vice President of Federal Affairs, National Biodiesel Board, dated January 27, 2015, denying a request for public notice and comment on the CARBIO Alternative Biomass Tracking Program.

The agency actions challenged in Case Number 15-1072 were done pursuant to 40 C.F.R. § 80.1454(h), a regulation under the Renewable Fuel Standard program and promulgated under the Clean Air Act. To the extent these actions are authorized by the regulation, the petition in Case Number 15-1073 requests review of 40 C.F.R. § 80.1454(h), which was promulgated by the United States Environmental Protection Agency in a final rule entitled "Regulation of Fuels and

Fuel Additives: Changes to Renewable Fuel Standard Program; Final Rule," published at 75 Fed. Reg. 14,670 (Mar. 26, 2010).

The parties moved to coordinate briefing of these petitions for review.  On August 12, 2015, this Court ordered a joint briefing format and schedule to apply to Case Numbers 15-1072 and 15-1073.

(C)     ***Related Cases***

Petitioner is not aware of any pending cases involving the same underlying agency actions at issue in Case Number 15-1072 or the specific regulation at issue in Case Number 15-1073.  Cases consolidated under Case Number 10-1070 and Case Number 10-1107 sought review of other aspects of the final rule entitled "Regulation of Fuels and Fuel Additives: Changes to Renewable Fuel Standard Program; Final Rule."

Respectfully submitted,

/s/ Sandra P. Franco

_____

Sandra P. Franco
Bryan M. Killian
David B. Salmons
Morgan, Lewis & Bockius LLP
2020 K Street, NW
Washington, D.C. 20006
(202) 373-6000 (telephone)
(202) 373-6001 (facsimile)

*Counsel for National Biodiesel Board*

Dated:  October 8, 2015

C-3

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | | |
|---|---|---|
| NATIONAL BIODIESEL BOARD, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. 15-1072 |
| | ) | |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, | ) | |
| | ) | |
| Respondent. | ) | |
| NATIONAL BIODIESEL BOARD, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. 15-1073 |
| | ) | |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, | ) | |
| | ) | |
| Respondent. | ) | |

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, Petitioner National Biodiesel Board makes the following disclosures:

The National Biodiesel Board has no parent companies, and no publicly-held company has a 10% or greater ownership interest.  It has not issued shares or debt securities to the public.

C-4

The National Biodiesel Board is a trade association as defined in D.C. Circuit Rule 26.1(b).  It is the national trade association for the biodiesel industry, and its mission is to advance the interests of its members by creating sustainable biodiesel industry growth.

Respectfully submitted,

/s/ Sandra P. Franco

_____
Sandra P. Franco
Bryan M. Killian
David B. Salmons
Morgan, Lewis & Bockius LLP
2020 K Street, NW
Washington, D.C. 20006
(202) 373-6000 (telephone)
(202) 373-6001 (facsimile)

*Counsel for National Biodiesel Board*

Dated:  October 8, 2015

## TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS UNDER REVIEW AND
        RELATED CASES..................................................................................C-1

CORPORATE DISCLOSURE STATEMENT ....................................................C-4

TABLE OF AUTHORITIES .................................................................................iv

GLOSSARY OF ACRONYMS AND ABBREVIATIONS ...................................x

JURISDICTIONAL STATEMENT .........................................................................1

STATEMENT OF ISSUES ......................................................................................2

STATUTES AND REGULATIONS ........................................................................3

STATEMENT OF THE CASE.................................................................................3

STATEMENT OF FACTS .......................................................................................6

        A.      History of the Renewable Fuel Standard Rulemaking ..............6

        B.      CARBIO's Submission for an Alternative Tracking
                Approach ..................................................................................12

        C.      EPA's Denial of the Public's Request for Comment and
                Transparency of the CARBIO Proposal ..................................14

SUMMARY OF ARGUMENT ..............................................................................16

STANDING ...........................................................................................................17

ARGUMENT ..........................................................................................................20

        I.      STANDARD OF REVIEW .......................................................20

# TABLE OF CONTENTS
## (cont.)

Page

II.   EPA DID NOT PROVIDE THE PUBLIC WITH ADEQUATE NOTICE
      AND OPPORTUNITY TO COMMENT ....................................................... 21

      A.   EPA Was Required to Provide Public Notice and
           Comment on the CARBIO Proposal ........................................ 21

      B.   EPA's Denial of Request for Notice and Opportunity to
           Comment was Arbitrary and Capricious ................................. 27

      C.   EPA Has Arbitrarily Refused to Respond to the Concerns
           of the Public ........................................................................... 30

III.  EVEN IF PUBLIC NOTICE AND COMMENT WAS NOT REQUIRED,
      THE APPROVED ALTERNATIVE TRACKING APPROACH FOR
      CARBIO DOES NOT COMPLY WITH EPA'S OWN REGULATIONS,
      RENDERING THE APPROVAL ARBITRARY AND CAPRICIOUS ................ 33

      A.   The CARBIO Proposal Does Not Follow the Biodiesel
           Through Importation ............................................................... 33

      B.   The CARBIO Proposal Does Not Clearly Identify the
           Survey Area or Participants and, Thus, Cannot Be
           Representative of the Feedstock Producers as Required ........ 35

      C.   The CARBIO Proposal is Not Designed to Achieve the
           Same Level of Quality Assurance as the Map and Track
           or Aggregate Compliance Approach ...................................... 38

           1.   A review of waybills for zip codes does not ensure
                the farm was in production in 2007 or that the
                feedstock has been properly segregated ....................... 38

           2.   The CARBIO proposal does not ensure that "go
                areas" meet the definition of existing "agricultural
                lands." ......................................................................... 41

# TABLE OF CONTENTS
## (cont.)

                                                                        **Page**

    3.    EPA provides no explanation of its determination that the CARBIO proposal provides an adequate level of assurance, much less a rational one..................44

IV.    TO THE EXTENT EPA CONTENDS THAT THE APPROVED ALTERNATIVE TRACKING APPROACH FOR CARBIO IS CONSISTENT WITH EPA'S REGULATION, THIS COURT MUST REVIEW THE EFFICACY OF THE REGULATIONS AS IT RELATES TO FOREIGN PRODUCTION ......................................................47

    A.    EPA's Approval of the Alternative Tracking Approach for CARBIO is a New and Unexpected Modification to 40 C.F.R. §80.1454(h) ............................................48

    B.    Petitioner's Claims Were Not Ripe for Review Until EPA Approved the CARBIO Proposal....................................50

    C.    EPA Reopened 40 C.F.R. §80.1454(h) Through its Approval of the CARBIO Proposal .........................................53

CONCLUSION...................................................................................55

CERTIFICATE OF COMPLIANCE...............................................................57

CERTIFICATE OF SERVICE ................................................................58

ADDENDUM

    DECLARATION OF ANNE STECKEL

    STATUTORY ADDENDUM

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

*Alaska Dep't of Envtl. Conservation v. EPA*,
    540 U.S. 461 (2004)..................................................................20

*Am. Radio Relay League, Inc. v. FCC*,
    524 F.3d 227 (D.C. Cir. 2008) ................................................31

*Am. Trucking Ass'ns v. EPA*,
    283 F.3d 355 (D.C. Cir. 2002) ................................................20

*Ass'n of Am. Railroads v. I.C.C.*,
    846 F.2d 1465 (D.C. Cir. 1988) ..............................................51

*Coalition for Responsible Regulation, Inc. v. EPA*,
    684 F.3d 102 (D.C. Cir. 2012), *aff'd in part, rev'd in part sub nom.*
    *Util. Air Regulatory Grp. v. EPA*, 134 S. Ct. 2427 (2014)..........50, 52

*\*Daimler Trucks N. Am. LLC v. EPA*,
    737 F.3d 95 (D.C. Cir. 2013) ............................................21, 55

*Delta Const. Co. v. EPA*,
    783 F.3d 1291 (D.C. Cir. 2015) .........................................18, 50

*Devia v. Nuclear Regulatory Comm'n*,
    492 F.3d 421 (D.C. Cir. 2007) ................................................52

*Diamond Shamrock Corp. v. Costle*,
    580 F.2d 670 (D.C. Cir. 1978) ................................................51

*Eagle-Picher Indus. Inc. v. EPA*,
    759 F.2d 905 (D.C. Cir. 1985) ................................................49

*Envtl. Integrity Project v. EPA*,
    425 F.3d 992 (D.C. Cir. 2005) ................................................21

*Ethyl Corp. v. EPA*,
    306 F.3d 1144 (D.C. Cir. 2002) ..............................................19

iv

## TABLE OF AUTHORITIES
### (cont.)

**Page(s)**

*Honeywell Int'l Inc. v. EPA,*
    374 F.3d 1363 (D.C. Cir. 2004), *withdrawn in part on other*
    *grounds,* 393 F.3d 1315 (D.C. Cir. 2005) .......................................................... 18

*Kennecott Utah Copper Corp. v. U.S. Dep't of the Interior,*
    88 F.3d 1191 (D.C. Cir. 1996) ............................................................................ 53

*Louisiana Envtl. Action Network v. Browner,*
    87 F.3d 1379 (D.C. Cir. 1996) ............................................................................ 51

*Mack Trucks, Inc. v. EPA,*
    682 F.3d 87 (D.C. Cir. 2012), *reh'g en banc denied* (Aug. 15, 2012) ............... 18

*Massachusetts v. EPA,*
    549 U.S. 497 (2007) ............................................................................................ 19

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto Ins. Co.,*
    463 U.S. 29 (1983) .............................................................................................. 20

*Nat'l Ass'n of Clean Water Agencies v. EPA,*
    734 F.3d 1115 (D.C. Cir. 2013), *reh'g en banc denied* (Oct. 24, 2013) ........... 37

*Nat'l Ass'n of Mfrs. v. U.S. Dep't of the Interior,*
    134 F.3d 1095 (D.C. Cir. 1998) ................................................................... 54, 55

*\*Nat'l Envtl. Dev. Ass'n's Clean Air Project v. EPA,*
    752 F.3d 999 (D.C. Cir. 2014) ........................................................... 18, 20, 33

*Nat'l Mining Ass'n v. Dept. of Interior,*
    70 F.3d 1345 (D.C. Cir. 1995) ..................................................... 48, 49, 53

*Nat'l Parks Conservation Ass'n v. EPA,*
    __F.3d__, 2015 WL 5692605 (3d Cir. Sept. 29, 2015) .............................. 40, 46

*Nat'l Parks Conservation Ass'n v. EPA,*
    788 F.3d 1134 (9th Cir. 2015) .................................................................... 43, 44

## TABLE OF AUTHORITIES
### (cont.)

**Page(s)**

*Nat'l Petrochemical & Refiners Ass'n v. EPA*,
   630 F.3d 145 (D.C. Cir. 2010), *reh'g denied*, 643 F.3d 958
   (D.C. Cir. 2011), *cert. denied*, 132 S. Ct. 571 (2011) ........................................28

*Reno v. Catholic Social Servs. Inc.*,
   509 U.S. 43 (1993) ........................................................................50

*Sierra Club v. EPA*,
   551 F.3d 1019 (D.C. Cir. 2008), *cert. denied*, 559 U.S. 991 (2010) ......53, 54, 55

*Sierra Club v. EPA*,
   699 F.3d 530 (D.C. Cir. 2012) ..........................................................55

*Sugar Cane Growers Coop. of Fla. v. Veneman*,
   289 F.3d 89 (D.C. Cir. 2002) ............................................................19

*Toilet Goods Ass'n, Inc. v. Gardner*,
   387 U.S. 158 (1967) .......................................................................51

*Weyerhaeuser Co. v. Costle*,
   590 F.2d 1011 (D.C. Cir. 1978) .............................................21, 30, 31

### FEDERAL STATUTES AND LEGISLATIVE MATERIALS

5 U.S.C. §551(4) ...............................................................................22

5 U.S.C. §553(b)(3)............................................................................22

*5 U.S.C. §553(c) ..............................................................................22

42 U.S.C. §7545(o) ............................................................................3

42 U.S.C. §7545(o)(1)(B) ...................................................................18

42 U.S.C. §7545(o)(1)(D) ...................................................................18

42 U.S.C. §7545(o)(1)(I) ...................................................................3, 7

# TABLE OF AUTHORITIES
## (cont.)

**Page(s)**

42 U.S.C. §7545(o)(1)(J) ............................................................1, 3

42 U.S.C. §7545(o)(2)(A) .................................................................1

42 U.S.C. §7545(o)(2)(B) ................................................................18

42 U.S.C. §7545(o)(5)(A) ...............................................................18

42 U.S.C. §7607(b) .....................................................................1, 48

42 U.S.C. §7607(d) .........................................................................21

42 U.S.C. §7607(d)(1)(V) ...............................................................27

42 U.S.C. §7607(d)(7)(B) ...............................................................27

42 U.S.C. §7607(h) .........................................................................21

Energy Policy Act of 2005, Pub. L. No. 109-58, §1501,
     119 Stat. 1067 (2005) ...............................................................6

Energy Independence and Security Act of 2007, Pub. L. No. 110–140,
     121 Stat. 1492 (2007) ..........................................................7, 18

Energy Independence and Security Act of 2007, Pub. L. No. 110-140,
     §§201, 202, 121 Stat. 1521 (2007) .............................................7

S. Rep. No. 110-65 (2007) .........................................................7, 18

## ADMINISTRATIVE MATERIALS

40 C.F.R. §80.68 .......................................................................24, 37

40 C.F.R. §80.69 .......................................................................24, 26

40 C.F.R. §80.127 ...........................................................................37

40 C.F.R. §80.613 .....................................................................24, 26

## TABLE OF AUTHORITIES
### (cont.)

**Page(s)**

*40 C.F.R. §80.1401 .................................................................................10, 41

40 C.F.R. §80.1416 .........................................................................................29

40 C.F.R. §80.1425 ...........................................................................................4

40 C.F.R. §80.1426 ...............................................................................4, 10, 29

40 C.F.R. §80.1427 ...........................................................................................4

40 C.F.R. §80.1450(g) .....................................................................................46

40 C.F.R. §80.1454(c) ...........................................................................4, 9, 39

40 C.F.R. §80.1454(d)(3) ...........................................................................9, 39

40 C.F.R. §80.1454(g) ...............................................................................9, 10

*40 C.F.R. §80.1454(h) ........................................................4, 9, 11, 47, 52

*40 C.F.R. §80.1454(h)(1).....................................................................12, 52

*40 C.F.R. §80.1454(h)(2)...........................................................5, 26, 34, 35

*40 C.F.R. §80.1454(h)(3).............................................................................12

*40 C.F.R. §80.1454(h)(4)...............................................................................5

40 C.F.R. §80.1454(h)(5).............................................................................26

40 C.F.R. §80.1454(h)(8).............................................................................12

*40 C.F.R. §80.1457 .......................................................................11, 28, 47

40 C.F.R. §80.1464 .........................................................................................37

40 C.F.R. §80.1466 .........................................................................................34

40 C.F.R. §80.1467 .........................................................................................34

# TABLE OF AUTHORITIES
## (cont.)

**Page(s)**

40 C.F.R. §80.1469 ................................................................................47

40 C.F.R. §80.1471 ..........................................................................46, 47

40 C.F.R. §80.1472 ................................................................................47

40 C.F.R. §80.1502 ................................................................................24

*74 Fed. Reg. 24,904 (May 26, 2009) ......................................4, 7, 8, 9, 23, 24, 25

*75 Fed. Reg. 14,670 (Mar. 26, 2010)......................... 7, 10, 11, 23, 24, 25, 27, 28,
................................................................ 33, 34, 35, 36, 37, 41, 42, 43, 45, 49

75 Fed. Reg. 42,238 (July 20, 2010)......................................................25, 28

76 Fed. Reg. 14,007 (Mar. 15, 2011)......................................................11, 28

76 Fed. Reg. 76,974 (Dec. 9, 2011) ...........................................................30

78 Fed. Reg. 12,158 (Feb. 21, 2013) ..........................................................25

79 Fed. Reg. 42,078 (July 18, 2014)....................................................15, 16, 34

EPA, *Determination on Government of Canada Petition for an
    Aggregate Compliance Approach for Canadian Planted Crops and
    Crop Residues* (Sept. 27, 2011) (EPA-HQ-OAR-2011-0199-0015)......11, 37, 42

EPA, *Renewable Fuel Petition Review Process*,
    http://www2.epa.gov/renewable-fuel-standard-program/renewable-
    fuel-petition-review-process (last updated Sept. 28, 2015)................................29

*Guidance for Geospatial Data Quality Assurance Project Plans*,
    EPA QA/G-5G (Mar. 2003), *available at*
    http://www2.epa.gov/quality/guidance-geospatial-data-quality-
    assurance-project-plans-epa-qag-5g ................................................................45

AUTHORITIES CHIEFLY RELIED UPON ARE INDICATE D BY AN ASTERISK (*)

## GLOSSARY OF ACRONYMS AND ABBREVIATIONS

Pursuant to Circuit Rule 28(a)(3), the following is a glossary of acronyms and abbreviations used in this brief:

| | |
|---|---|
| CARBIO | Argentine Chamber of Biofuels (*Camara Argentina de Biocombustibles*) |
| EPA | U.S. Environmental Protection Agency |
| GHG | Greenhouse gas emissions |
| INTA | National Agricultural Technology Institute |
| RFS | Renewable Fuel Standard |
| RIN | Renewable Identification Number |
| QAP | Quality Assurance Plan |
| SSM | Startup, Shutdown and Malfunction |
| USDA | U.S. Department of Agriculture |

x

## JURISDICTIONAL STATEMENT

Under the Renewable Fuel Standard program of the Clean Air Act, EPA is charged with ensuring that specified volumes of fuel produced from "renewable biomass" be sold or introduced into commerce in the United States.  42 U.S.C. §7545(o)(1)(J), (2)(A)(i).  In 2012, the Argentine Chamber of Biofuels (CARBIO) submitted a proposal to EPA, seeking a determination that Argentinian biodiesel produced from soybean oil qualifies as renewable biomass under the Renewable Fuel Standard.  EPA approved CARBIO's proposal without providing public notice of it and without soliciting (or responding to) public comments on it.

Petitioner National Biodiesel Board filed two petitions for review on March 30, 2015, which are being coordinated in this Court.  This Court has jurisdiction over these petitions for review under 42 U.S.C. §7607(b)(1).  In the first case (Case No. 15-1072), Petitioner seeks review of two final actions of EPA— (1) EPA's approval of CARBIO's proposal and, thus, its determination that soybean oil used to produce biodiesel in Argentina constitutes "renewable biomass" under the Renewable Fuel Standard and (2) the denial of Petitioner's request for public notice and comment on the CARBIO proposal.  In the second case (Case No. 15-1073), Petitioner challenges 40 C.F.R. §80.1454(h) to the extent EPA contends that the regulation authorizes it to approve, without public notice and comment, a proposal like CARBIO's—one that lacks *pre-approval* assurances

1

that federal requirements are being met, in a country where EPA has no *post-approval* enforcement authority. While the initial (non-jurisdictional) window for challenging that regulation has passed, EPA's actions on the CARBIO proposal ripened Petitioner's claims, raised new grounds for review, and reopened the underlying regulation, all of which opened a new window for judicial review at this time. *See* Section IV.

## STATEMENT OF ISSUES

1.    Whether EPA was required to provide public notice and comment on a proposal for establishing feedstock used to produce biodiesel in Argentina originated from agricultural land cleared or cultivated prior to December 19, 2007 that fundamentally changed the compliance requirements in its regulations?

2.    Whether, knowing the public's concerns regarding EPA's ability to enforce its land use restrictions in countries with expanding agricultural lands like Argentina, it was arbitrary and capricious and an abuse of discretion for EPA to deny a request to give the public an opportunity to review and comment on the first ever proposal to implement an alternative compliance approach?

3.    Whether EPA's failure to respond to public comments regarding the use of quality assurance programs by biodiesel producers overseas, where EPA has recognized "unique challenges" in enforcing its regulations, was arbitrary and capricious?

2

4.      Whether EPA's failure to ensure the proposal for an alternative compliance approach complied with the requirements of its own regulation, 40 C.F.R. §80.1454(h), rendered its approval thereof arbitrary and capricious?

5.      Whether EPA's promulgation of 40 C.F.R. §80.1454(h), to the extent it allows an alternative compliance approach for production of biofuels in countries where EPA has no jurisdiction and where agricultural land has been in expansion that does not provide sufficient quality assurance, was arbitrary and capricious?

## STATUTES AND REGULATIONS

Relevant statutes and regulations appear in an addendum to this brief.

## STATEMENT OF THE CASE

The Renewable Fuel Standard requires specified volumes of "renewable fuel" be sold in the United States.  42 U.S.C. §7545(o).  Renewable fuel is defined as "fuel that is produced from renewable biomass."  *Id.* §7545(o)(1)(J).  In 2007, Congress amended the definition of "renewable biomass" to provide that feedstock from planted crops be from crops "harvested from agricultural land cleared or cultivated at any time prior to December 19, 2007, that is either actively managed or fallow, and nonforested."  *Id.* §7545(o)(1)(I).  This provision works to protect against destruction of forestland for conversion into agricultural lands and greenhouse gas emissions associated with land use changes.

3

EPA understood this. In its proposal to implement the 2007 amendments to the program, EPA stressed that it "must consider potential issues related to implementation and enforcement to ensure that renewable fuel for which RINs are generated is produced from qualifying renewable biomass."[1]  74 Fed. Reg. 24,904, 24,936 (May 26, 2009) (JA__).  And EPA specifically recognized the "unique challenges" it faces enforcing these requirements outside the United States in places where the agency lacks direct supervisory power to ensure that fuels purporting to come from renewable biomass actually use feedstock that was not harvested on recently cleared land.  *Id.* at 24,941 (JA__).

For imports of renewable fuel, EPA ultimately required that the renewable fuel producer identify the lands from which its feedstock originated, and obtain and maintain records that establish such lands were in production in 2007, tracking that feedstock throughout the supply chain, *i.e.,* "map and track."   40 C.F.R. §80.1454(c)(1).  EPA, however, also provided the option of complying through an "alternative renewable biomass tracking requirement," which requires "funding" of a survey plan, including annual surveys and audits, that must be approved by EPA (referred to hereinafter as "alternative tracking approach").  *Id*. §80.1454(h).  EPA

---

[1]     RINs, or Renewable Identification Numbers, are generated upon production of renewable fuel for purposes of showing compliance with the volume mandates for renewable fuel, advanced biofuel, biomass-based diesel and cellulosic biofuel under the Renewable Fuel Standard program.  40 C.F.R. §§80.1425-80.1427.

told the public that it would not approve an alternative tracking approach that does not provide the same level of "quality assurance" as the map and track requirements. *Id.* §80.1454(h)(2)(iv), (4)(iv).

CARBIO is a trade association representing biodiesel producers in Argentina. In 2012, CARBIO proposed an alternative tracking approach for Argentina. R-1 at 1 (JA__). EPA did not provide the public with notice of the proposal. Reports of the proposal were in the marketplace, and it came to the attention of Petitioner. So in 2013, Petitioner submitted a letter to EPA, expressing concerns about EPA's ability to enforce an alternative tracking approach in Argentina and requesting EPA give the public an opportunity to review and comment on the proposal. R-40 (JA__-__). Also in 2013, EPA had begun development of a "Quality Assurance Program" rule for the Renewable Fuel Standard program, and the public similarly raised concerns about EPA's ability to enforce its regulations overseas. R-40 at 1-2, 12-13 (JA__-__, JA__-__).

EPA never published the CARBIO proposal or took public comments on it. On January 27, 2015, EPA approved the proposal, R-38 (JA__-__), and notified Petitioner that it was denying its request to provide for public comment. R-39 (JA__-__).[2] These petitions for review followed. Aside from a general description

---

[2]    A timely petition for reconsideration and request for administrative stay was filed with EPA. EPA has, to date, declined to respond.

from EPA, the first time Petitioner obtained details about CARBIO's proposal was when EPA submitted the administrative record in Case Number 15-1072 on June 17, 2015 (a supplement was received on August 31, 2015). The record includes no analysis by EPA, but comprises merely correspondence between EPA and CARBIO representatives, including correspondence showing EPA staff were concerned with gaps in CARBIO's proposal.

This case challenges EPA's interrelated actions on CARBIO's proposal. EPA has abdicated its authority to third-parties, and done so behind closed doors. In 2010, the public relied on EPA's assurances about the alternative tracking approach, but EPA has not kept them. EPA's approval of CARBIO's proposal is arbitrary, capricious, and contrary to law. The same goes for 40 C.F.R. §80.1454(h) to the extent EPA claims that regulation authorizes what it has done.

## STATEMENT OF FACTS

### A.   History of the Renewable Fuel Standard Rulemaking

The Energy Policy Act of 2005 established the Renewable Fuel Standard program at Section 211(o) of the Clean Air Act, 42 U.S.C. §7545(o), requiring certain amounts of renewable fuel, including biodiesel, be sold or introduced into commerce in the United States. Pub. L. No. 109-58, §1501(a)(2), 119 Stat. 1067 (2005). The Energy Independence and Security Act of 2007 amended the Renewable Fuel Standard program to include, among other things, a separate

6

biomass-based diesel volume mandate within a new advanced biofuel mandate. Pub. L. No. 110-140, §§201, 202, 121 Stat. 1521 (2007).  The purpose of the program was to increase domestic production of renewable fuels, which provides environmental, economic, and energy security benefits.  *See* Pub. L. No. 110–140, 121 Stat. 1492; S. Rep. No. 110-65, at 2-3 (2007).

The 2007 amendments included "new limits on renewable biomass feedstocks" under a revised definition of "renewable biomass."  75 Fed. Reg. 14,670, 14,670 (Mar. 26, 2010) (JA__).  Under the revised definition, renewable biomass includes "[p]lanted crops and crop residue harvested from agricultural land cleared or cultivated at any time prior to December 19, 2007, that is either actively managed or fallow, and nonforested."  42 U.S.C. §7545(o)(1)(I)(i).

In its proposal to implement the 2007 amendments, EPA discussed various methods of establishing the renewable biomass requirements.  74 Fed. Reg. at 24,937-24,941 (JA__-__).  First, EPA reviewed existing programs that track, certify or verify agricultural products or land use, and, for third-party programs, found "none of the existing third-party systems had definitions or criteria that perfectly matched the land use definitions and restrictions" in the definition of "renewable biomass."  *Id.* at 24,937-24,938 (JA__-__).  Then, EPA described possible compliance approaches for "domestic renewable fuel," but proposed

recordkeeping requirements to verify and track the feedstock from point of production to the point of consumption.  *Id.* at 24,938-24,941 (JA__-__).

One alternative compliance approach noted by EPA "could bring together renewable fuel producers and renewable fuel feedstock producers and suppliers to develop an industry-wide quality assurance program for the renewable fuel production supply chain, following the model of the successful Reformulated Gasoline Survey Association."[3]  74 Fed. Reg. at 24,939-24,940 (JA__-__).  Parties would participate in and fund a "nationwide verification program for renewable fuel producers and renewable feedstock producers and handlers" implemented by an independent surveyor that would include "any other elements that EPA determines are necessary to achieve the same level of quality assurance as the requirement included in the RFS2 regulations at the time."  *Id.* at 24,940 (JA__).

Finally, EPA discussed the renewable biomass requirement as it might apply to foreign production of biofuels, proposing to apply the same requirements on foreign producers as it proposed for domestic producers.  74 Fed. Reg. at 24,941 (JA__).  EPA recognized the "unique challenges related to the implementation and enforcement of the definition of renewable biomass for foreign-produced

---

[3]     Other approaches noted included a chain-of-custody tracking system; a company-specific quality assurance program; use of satellite imagery to create an interactive map; and setting not-to-be exceeded baseline production levels.  74 Fed. Reg. at 24,939-24,941 (JA__-__).

renewable fuel," and requested comment on "whether [foreign producers] should have the same option to use an approved survey consortium in lieu of implementing their own individual quality assurance programs." *Id.* The public commented that any requirements for foreign producers, particularly in countries with different land use trends than the United States, should "provide additional measures necessary to afford the same degree of enforceability and certainty that renewable feedstocks from foreign countries meet the definition of renewable biomass as those from American biomass suppliers." EPA, *Renewable Fuel Standard Program (RFS2) Summary and Analysis of Comments*, at 3-117-3-118 (2010) (EPA-HQ-OAR-2005-0161-3188) (JA__-__); *see also id.* at 3-115 (JA__).

EPA ultimately finalized three approaches to establish that feedstock from planted crops comes from "existing agricultural land" to constitute "renewable biomass": (1) individual map and track requirements, 40 C.F.R. §80.1454(c)(1), (d)(3); (2) aggregate compliance, *id.* §80.1454(g); and (3) an alternative tracking approach, *id.* §80.1454(h).[4] EPA, however, limited the definition of "existing agricultural land" to "cropland, pastureland, and land enrolled in the Conservation

---

[4]     EPA engaged in "extensive dialogue with USDA" in developing the final rule, particularly the aggregate compliance approach. EPA-HQ-OAR-2005-0161-3188 at 3-94, 3-104 (JA__, JA__). "USDA obtains and maintains valuable data from agricultural land owners, producers, and forest owners for assessing the status of agricultural land, forest land, and other types of land that could be used for renewable fuel feedstock production." 74 Fed. Reg. at 24,937 (JA__).

9

Reserve Program (administered by the U.S. Department of Agriculture's Farm Service Agency)" that was nonforested on December 19, 2007, and required documentary evidence that these lands were "actively managed" or fallow on December 19, 2007. 40 C.F.R. §80.1401; *see also* 75 Fed. Reg. at 14,692-14,694 (JA__-__).

Under the first approach, the renewable fuel producer is required to identify the boundaries of the land where the feedstock was produced through maps and/or electronic data, maintain records to establish the location where the crops were grown constituted existing agricultural land, and provide transfer documents through the chain of custody. 75 Fed. Reg. at 14,699-14,700 (JA__-__).

Under the second approach, EPA allows for "aggregate compliance" in that, so long as the total amount of agricultural land in the United States remains below the baseline amount in 2007, feedstock from crops grown in the United States are "deemed" to be renewable biomass. 40 C.F.R. §§80.1454(g), 80.1426(a)(1)(ii)(A). EPA carefully reviewed government data to determine the baseline amount of agricultural lands as defined in its regulations, and reviews the total eligible lands each year. *Id.* at 14,701-14,703 (JA__-__).

In 2010, EPA also finalized a petition process to allow other countries to seek a similar aggregate compliance approach, which requires the petitioning country to identify the boundaries of the land for which the petitioner seeks

approval through maps or electronic data, determine the "total amount of land that is cropland, pastureland, or land equivalent to U.S. Conservation Reserve Program land" as demonstrated by "[l]and use data," provide historical land use data and a description of the factors that may have an effect on the use of agricultural land, and include a plan for submitting data to EPA to make an annual determination whether the approach remains applicable. 40 C.F.R. §80.1457. The petition also would be subject to public notice and comment. *Id.* §80.1457(c). Canada, which has had steady or declining amounts of cropland, is the only other country to have sought and obtained an approved aggregate compliance approach. 76 Fed. Reg. 14,007 (Mar. 15, 2011) (JA__); EPA, *Determination on Government of Canada Petition for an Aggregate Compliance Approach for Canadian Planted Crops and Crop Residues* (Sept. 27, 2011) (EPA-HQ-OAR-2011-0199-0015) (JA__-__).

The third approach, which is at issue here, provides for an industry-funded quality assurance program to identify eligible lands and track feedstock from those lands. 40 C.F.R. §80.1454(h). Under this alternative tracking approach, EPA indicated that it was finalizing the proposed alternative option that was "similar to the model of the successful Reformulated Gasoline Survey Association." 75 Fed. Reg. at 14,700 (JA__). This option requires funding for an independent third party to conduct a "comprehensive program of annual compliance surveys" to be carried out in accordance with a "survey plan which has been approved by EPA."

40 C.F.R. §80.1454(h)(1).   The annual compliance surveys are required to be conducted by an independent surveyor at renewable fuel production and import facilities and their feedstock suppliers.  *Id.* §80.1454(h)(2).  The surveys must be representative of all producers and importers in the survey area and their feedstock suppliers and "[d]esigned to achieve at least the same level of quality assurance required" by the map and track and aggregate compliance approaches.  *Id.*  Reports must be submitted to EPA thirty days after the surveys are conducted, and EPA may revoke the approval of a survey plan for cause.  *Id.* §80.1454(h)(3), (8).  Participation in the funding of the plan qualifies to meet the renewable biomass requirements.  *Id.* §80.1454(h)(1).

### B.     CARBIO's Submission for an Alternative Tracking Approach

Argentina is a leading producer of soybean and exporter of soybean oil in the world.  EPA-HQ-OAR-2005-0161-3124 at 7 (JA__); R-1, App. G at 3 (JA__); R-40 at 3 (JA__).  It has so much crushing capacity that it imports soybeans from other South American countries.   EPA-HQ-OAR-2005-0161-3090 at 76 (JA__) and 81 (JA__).  The agricultural lands in Argentina where soybeans are planted have grown at a rapid pace.  EPA-HQ-OAR-2005-0161-0011 at 6 (JA__); R-40 at 3, 7-8 (JA__, __-__).  "Argentina has lost 70 percent of its natural forest, much of it in the last 20 years, with increased soy production."  R-40 at 8 (JA__).  Unlike the United States, the World Bank has noted that "[a]griculture (including land use

change and forestry) is the largest contributor to GHG emissions in [Argentina], while contributing less than 6% of GDP…."  R-40 at 3 (JA__).

At the same time, Argentina has moved to expand its biodiesel production, focusing on exports.  EPA-HQ-OAR-2005-0161-3090 at 66 (JA__); EPA-HQ-OAR-2005-0161-3124 at 7-8 (JA__-__).  Until recently, however, Argentinian exports were not focused on the United States.  Argentina had concerns with the lifecycle emissions and land use issues in EPA's proposed regulations to implement the 2007 amendments to the Renewable Fuel Standard.  EPA-HQ-OAR-2005-0161-3124 at 9 (JA__).  At that time, eighty-five percent of total biodiesel exports from Argentina went to the European Union, which was viewed as "the natural market" for its biodiesel.  *Id.* at 8-9 (JA__-__).

On August 29, 2012, EPA received an application to approve an alternative tracking approach under 40 C.F.R. §80.1454(h) from the Argentine Chamber of Biofuels (*Camara Argentina de Biocombustibles or CARBIO*).  R-38 at 1 (JA__).  The application proposed to qualify lands as cultivated prior to December 19, 2007 based on satellite imagery ("go areas") and to have an independent third party conduct a review of zip codes on product transfer documents, which include "waybills" issued upon shipment of grain, "to make a determination that the renewable biomass originated in pre-identified and pre-approved lands."  R-1 at 3

13

11 (JA__, JA__).  CARBIO's proposal purports to cover the soybean biodiesel supply chain from soybean production to biodiesel production.  *Id.* at 4 (JA__).

On January 27, 2015, EPA notified CARBIO by letter that it had approved its alternative tracking approach.  R-38 (JA__-__).  EPA attached a five-page decision document, which provides a brief description but no explanation as to EPA's assessment of the level of quality assurance or effectiveness of the approved approach.  R-98 (JA__-__).  The decision document also states that CARBIO may provide EPA with notice by September 1 of each year that it intends to continue to implement the approved plan in the forthcoming calendar year, but that "[n]o additional EPA approval will be necessary, unless CARBIO seeks EPA approval of amendments to its approved plan."  *Id.* at 7 (JA__).

### C.    EPA's Denial of the Public's Request for Comment and Transparency of the CARBIO Proposal

In its initial submission to EPA, CARBIO expressed that it will "maintain an open communication policy with regard to this Program, its Members and Surveyor Companies."  R-1 at 7 (JA__).  EPA informed CARBIO that it might "seek stakeholder/public input given it is the first plan of its kind."  R-20 (JA__).  Even though the record shows CARBIO did not object, EPA never provided the public with any notice of the CARBIO proposal or of EPA's proposed approval.

On November 13, 2013, after learning generally of CARBIO's application, Petitioner submitted a letter to EPA, requesting an opportunity for the public to see

and comment on CARBIO's proposal and for transparency with respect to its implementation.  R-40 (JA__-__).  Petitioner raised concerns about applying the alternative tracking approach in a foreign country that has rapidly expanded its agricultural lands since 2007.  *Id.* at 3, 7-9 (JA__, JA__-__) Petitioner also questioned whether CARBIO's proposal was consistent with the voluntary Quality Assurance Program EPA was then developing to provide more rigorous oversight of RIN generation, including the requirements to promote transparency and protect against conflicts of interests.  *Id.* at 1, 6-7, 9-10 (JA__, JA__-__, JA__-__).  In that rule, EPA specifically recognized that quality assurance requires more for foreign production and foreign auditors, because EPA lacks jurisdiction overseas.  79 Fed. Reg. 42,078, 42,091, 42,097 (July 18, 2014) (JA__, JA__).

EPA ignored Petitioner's concerns.   On January 27, 2015, EPA denied Petitioner's request for an opportunity to review and comment on the CARBIO proposal.  R-39 (JA__-__).  To date, the public remains in the dark as to key aspects of the approved approach, including what lands are "go areas," the number of farms and grain elevators to be "surveyed," the methodology for determining that number, and who actually is participating.

The administrative record sheds little, if any, light on these fundamental questions.  Apparently, CARBIO has not yet identified the "go areas," *despite that its application has been approved.*  Apparently, CARBIO will develop the survey

methodology and identify the participants *after the production of the biodiesel and generation of RINs*.  All we know for sure is that a surveyor[5] will annually review paperwork at each participating biodiesel production facility and quarterly conduct "desk audits."  R-97 at 3 (JA__-__).  The record does not indicate how EPA assessed the level of quality assurance or the effectiveness of CARBIO's approach.

## SUMMARY OF ARGUMENT

Administrative rulemaking requires meaningful public notice and comment. EPA failed to provide any notice of the CARBIO proposal it purports provides sufficient quality assurance to ensure that soybean oil from Argentina, a country that has seen a rapid expansion of agricultural lands, came from lands that were in production prior to December 19, 2007.  Public comments were necessary for the first plan of its kind.

EPA's review of the CARBIO proposal was arbitrary and capricious in that it did not comply with its own regulations.  There was no explanation or analysis to

---

[5]     Although the "Survey Plan" identifies "Control Union" as the independent surveyor company "who may work for the Program," R-97 at 2 (JA__), EPA indicated it "approves" the CARBIO proposal "with Peterson Control Group as the independent surveyor."  R-98 at 7 (JA__).  EPA claims that CARBIO submitted information "demonstrating that Peterson Control Union meets the independence criteria in 40 C.F.R. 80.68(c)(13)(i)."  R-98 at 6 (JA__).  EPA appears to be relying on "CVs" from 2012 and conclusory statements from CARBIO.  R-1, App. E (JA__-__); R-65 at 2-3 (JA__-__).  Moreover, EPA found more was required to ensure independence with respect to the Quality Assurance Program rule.  79 Fed. Reg. at 42,092-42,095 (JA__-__).

16

support the identification of "go areas" as "existing agricultural lands," to ensure feedstock producers, handlers or importers are in compliance, or to even understand the scope of the program. Indeed, EPA appears to have handed its authority over to third parties, one of which has clear conflicts of interest. Thus, EPA could not have ensured that the CARBIO proposal provides the adequate level of quality assurance in clear contravention of its regulations.

To the extent EPA contends its approval is allowed under 40 C.F.R. §80.1454(h), then the underlying the regulation is called into question and must be vacated with respect to providing such an alternative tracking approach for countries with expanding agricultural lands. The approval of the CARBIO proposal raises new grounds for review and ripened Petitioner's claims regarding 40 C.F.R. §80.1454(h). It also has fundamentally changed the compliance methods under the regulation and altered the stakes for judicial review, thereby constituting a reopener. The approval cannot stand.

## STANDING

Petitioner is the national trade association for the U.S. biodiesel industry, and its mission is to advance the interests of its members by creating sustainable biodiesel industry growth. Steckel Decl. ¶3. It has standing to bring this suit on behalf of its members and has also suffered a procedural injury for standing purposes.

17

Petitioner's members own and operate biodiesel facilities, and participate in EPA's Renewable Fuel Standard program. Steckel Decl. ¶4. Its members utilize renewable biomass to produce biodiesel, which qualifies as advanced biofuel under the program. *Id.*; 42 U.S.C. §7545(o)(1)(B), (D). In establishing the Renewable Fuel Standard, Congress sought to promote domestic production of renewable fuel, including biodiesel. *See* 42 U.S.C. §7545(o)(1)(D), (2)(B)(i)(IV), (5)(A)(ii); Pub. L. No. 110-140, 121 Stat. 1492; S. Rep. No. 110-65 at 2.

EPA's approval of the alternative tracking approach for CARBIO directly impacts Petitioner's members. It reduces regulatory burdens on their competitors and thus allows for more imports of biodiesel from Argentina. *See Delta Const. Co. v. EPA,* 783 F.3d 1291, 1299 (D.C. Cir. 2015) ("The law of the circuit is clear that 'any one competing for a governmental benefit ... [may] assert competitor standing when the Government takes a step that benefits his rival and therefore injures him economically.'") (quoting *Sherley v. Sebelius*, 610 F.3d 69, 72 (D.C. Cir. 2010)); *see also Nat'l Envtl. Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1006 (D.C. Cir. 2014); *Mack Trucks, Inc. v. EPA*, 682 F.3d 87, 91 (D.C. Cir. 2012), *reh'g en banc denied* (Aug. 15, 2012); *Honeywell Int'l Inc. v. EPA*, 374 F.3d 1363, 1369-70 (D.C. Cir. 2004), *withdrawn in part on other grounds*, 393 F.3d 1315 (D.C. Cir. 2005). Marketers and trade reports indicate that producers in Argentina were awaiting EPA's approval to increase exports to the

United States.  Steckel Decl. ¶¶19-20.  Because the U.S. biodiesel industry can utilize renewable biomass from other countries, detailed information about the CARBIO approach could also facilitate approval of similar programs.  *See Ethyl Corp. v. EPA*, 306 F.3d 1144, 1148 (D.C. Cir. 2002).

Due to the potential impacts of EPA's decision on its members, Petitioner submitted a letter to EPA on November 13, 2013, raising objections and seeking to participate in the agency proceedings, which EPA denied.  R-40 (JA__-__); R-39 (JA__-__).  Petitioner routinely participates in regulatory proceedings relating to the Renewable Fuel Standard program to protect the interests of its members and has consistently raised concerns with respect to EPA's ability to enforce the renewable biomass requirements for planted crops in countries with expanding agricultural lands, such as Argentina, which EPA has to date ignored.  Steckel Decl. ¶¶5-6, 8, 11-12.  It also has long sought to protect the integrity of the program, which provides substantial benefits to its members.  *Id.* ¶6.  In failing to provide the public with sufficient notice of its implementation of the program and declining to take any action to respond to the concerns raised by the domestic biodiesel industry, EPA has violated public participation requirements, affecting Petitioner's ability to advocate on behalf of its members.  *See Massachusetts v. EPA*, 549 U.S. 497, 518 (2007); *see also Sugar Cane Growers Coop. of Fla. v.*

*Veneman*, 289 F.3d 89, 94–95 (D.C. Cir. 2002) (finding standing based on claimed "deprivation of a right to notice-and-comment rulemaking").

## ARGUMENT

### I.    STANDARD OF REVIEW

The standard of review for actions under the Clean Air Act requires the Court to determine whether the agency's actions were arbitrary and capricious, an abuse of discretion, in excess of statutory authority, or otherwise not in accordance with law. *See Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461, 496-97 (2004). The arbitrary and capricious standard requires the agency to examine the relevant data and articulate a satisfactory explanation for its action, including a "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983) (citation omitted). Failure to consider "an important aspect of the problem" also renders an agency action arbitrary and capricious. *Id.*

The agency also must "comply with its own regulations." *Nat'l Envtl. Dev. Ass'n's Clean Air Project*, 752 F.3d at 1009 (quoting *Environmentel, LLC v. FCC*, 661 F.3d 80, 85 (D.C. Cir. 2011)).

While deferential, the Court must still "'undertake a 'substantial inquiry' into the facts' underlying challenged agency actions." *Am. Trucking Ass'ns v. EPA*, 283 F.3d 355, 364 (D.C. Cir. 2002) (citation omitted). Moreover, the D.C.

Circuit has stated that it will defer to an agency "so long as we are assured that its promulgation process as a whole and in each of its major aspects provides a degree of public awareness, understanding, and participation commensurate with the complexity and intrusiveness of the resulting regulations." *Weyerhaeuser Co. v. Costle*, 590 F.2d 1011, 1028 (D.C. Cir. 1978).

## II.    EPA DID NOT PROVIDE THE PUBLIC WITH ADEQUATE NOTICE AND OPPORTUNITY TO COMMENT.

### A.    EPA Was Required to Provide Public Notice and Comment on the CARBIO Proposal.

The importance of public participation in agency proceedings cannot be overstated. "Notice of agency action is 'crucial to ensure that agency regulations are tested via exposure to diverse public comment, ... to ensure fairness to affected parties, and ... to give affected parties an opportunity to develop evidence in the record to support their objections to the rule and thereby enhance the quality of judicial review.'" *Daimler Trucks N. Am. LLC v. EPA*, 737 F.3d 95, 100 (D.C. Cir. 2013) (quoting *Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 626 F.3d 84, 95 (D.C. Cir. 2010)) (internal quotation omitted); *see also Envtl. Integrity Project v. EPA*, 425 F.3d 992, 996 (D.C. Cir. 2005).

In the Clean Air Act, Congress recognized the importance of public participation. *See, e.g.,* 42 U.S.C. §7607(d), (h). The Administrative Procedure Act similarly directs agencies to provide notice and an opportunity for public

comment on new rules.  5 U.S.C. §553(b)(3), (c).  Rules include agency actions "designed to implement, interpret, or prescribe law or policy."  5 U.S.C. §551(4).

The alternative tracking approach is the kind of agency action for which notice and comment rulemaking is required.  The approach is "designed to implement" the renewable biomass requirements of the Clean Air Act.  *See* R-38 at 1 (JA__).  It is binding on the participants generating RINs, and is enforceable by EPA.  R-38 at 2 (JA__).

EPA, however, did not provide public notice and an opportunity to comment on the CARBIO proposal prior to its approval.  In denying Petitioner's request for such an opportunity, EPA did not contend that public notice and comment was not required.  Rather, EPA contended that it *already* provided notice and comment in the rulemaking proceeding for 40 C.F.R. §80.1454(h), the regulation that generally identified alternative tracking as one approach to establishing the renewable biomass requirements.  R-39 at 1 (JA__).

EPA's contention lacks merit for several reasons, explained in greater detail below.  EPA mischaracterizes the rulemaking, what the notice entailed and what the final rule provides.  Public commenters had no notice that a program like CARBIO's could be approved under 40 C.F.R. §80.1454(h) without further notice-and-comment rulemaking.  When an agency adopts a rule, it cannot reasonably expect the public to provide comments on the agency's future applications of the

22

rule.  The public therefore deserves notice of CARBIO's proposal and a chance to comment on it.

EPA mischaracterizes the notice provided in the rulemaking that culminated with the promulgation of 40 C.F.R. §80.1454(h).  That provision was not included in the proposed rule, so the public had no opportunity to comment on it.  The alternative was first included in the final rule.  *Compare* 74 Fed. Reg. at 25,113 (proposed 40 C.F.R. §80.1401) (JA__), and 25,129 (proposed 40 C.F.R. §80.1451(b)(6)(i), (c)(5)) (JA__), *with* 75 Fed. Reg. at 14,890-14,891 (finalized 40 C.F.R. §80.1454(h)) (JA__-__).

While the preamble to the proposed rule described different approaches to addressing the renewable biomass requirements, the CARBIO proposal was not among them.  And the CARBIO proposal looks nothing like any alternative the preamble described.  The closest alternative described there was for "the possibility for a partial affirmative defense," referencing "*a nationwide verification program* for renewable fuel producers and renewable feedstock producers and handlers designed *to provide independent oversight of the feedstock designations and handling processes*."  74 Fed. Reg. at 24,940 (emphasis added) (JA__). (CARBIO's proposal neither is nationwide nor does it have independent oversight over feedstock designations and handling processes.)  EPA explained that the

compliance surveys would require "a *detailed survey plan* submitted to EPA for approval" that included:

> a methodology for determining when the survey samples would be collected, the locations of the surveys, the number of inspections to be included in the survey, and any other elements that EPA determines are necessary to achieve the same level of quality assurance as the requirement included in the RFS2 regulations at the time.

*Id.* (emphasis added).  (CARBIO's proposal is not remotely detailed.)

Key elements of what such a program might entail were not explained in the preamble but left for EPA to work out in the future:

• EPA did not give the public sufficient information to determine the efficacy of such quality assurance programs.

• EPA identified no "sampling" or "testing" for determining if feedstock originated from land in production or fallow in 2007 (EPA stated only that the compliance surveys would be conducted by an independent third party).[6]

• EPA did not describe what surveys or inspections would be conducted along the supply chain and, for imported fuel, through importation.

---

[6]      EPA indicated this alternative tracking approach is modeled after the "Reformulated Gasoline Survey Association."  74 Fed. Reg. at 24,940 (JA__).  The Reformulated Gasoline Survey Association, however, surveys gasoline retail stations through sampling and testing to ensure the gasoline meets various fuel requirements.  *See* 40 C.F.R. §§80.68, 80.69, 80.613, 80.1502.  Whether feedstock used to produce biofuel came from existing agricultural land in 2007 cannot be sampled or tested.  75 Fed. Reg. at 14,713 (JA__).

This stands in stark contrast to the detailed explanation provided regarding the Quality Assurance Program for RINs where the public was able to consider and comment on the specific elements of the programs and how audits were to be conducted. *See* 78 Fed. Reg. 12,158, 12,170-12,171, 12,181 (Feb. 21, 2013) (feedstock related components) (JA__-__, JA__); *see also id*. at 12,191-12,192 (audit requirements) (JA__-__); 75 Fed. Reg. 42,238, 42,262-42,265 (July 20, 2010) (describing criteria EPA would consider, requirements and procedures for petitioning for an aggregate compliance approach) (JA__-__).

Moreover, the final rule differed from the proposal in significant ways. EPA indicated that it was still requiring a "program of compliance surveys." 75 Fed. Reg. at 14,700 (JA__). In the proposed rule, this program of compliance surveys was discussed in context of a company-specific quality assurance program that EPA indicated would have required inspections of feedstock producer's facilities "at least once per quarter or once every 15 deliveries." 74 Fed. Reg. at 24,939 (JA__). EPA also stated that the "independent surveyor would be required to visit renewable feedstock producers and suppliers to determine if they are properly designating their product and adhering to adequate chain of custody requirements." *Id*. at 24,940 (JA__). The final rule provided only general parameters for such a

program, and did not specifically outline the sampling and testing methodology.[7] It also moved away from a "nationwide" program, referring only to an undefined "survey area," and requires that renewable fuel producers or importers ensure that parties along the supply chain "cooperate[]."  40 C.F.R. §80.1454(h)(2)(iii), (h)(5). EPA provided no explanation for these changes.

Further, the CARBIO proposal does not follow from the final regulatory language.  The "surveys" of the farms and grain elevators only consist of reviewing paperwork to ensure it reflects a zip code for a "go area."  R-98 at 6 (JA__).  There is no indication that the surveyor will actually verify the lands were actually in production in 2007.  Nor does the surveyor review the feedstock handling procedures to ensure the feedstock is not mixed with non-compliant feedstock.  In addition, the approved alternative tracking approach does not follow the entire supply chain, stopping at the biodiesel production facility.  EPA also stated that:  "where the survey finds improper designations or handling, the renewable fuel producers would be responsible for identifying and addressing the root cause of the problem.  The renewable fuel producers would have to take corrective action to retire the appropriate number of invalid RINs depending on the

---

[7]     The regulation outlining a similar survey program and "affirmative defense" as noted by EPA in the proposed rule is at 40 C.F.R. §80.613, which provides details as to the survey methodology, but the final regulation at 40 C.F.R. §80.1454(h) resembles more the language at 40 C.F.R. §80.69(a)(11), which is more general and not limited to only providing an affirmative defense.

violation."   75 Fed. Reg. at 14,700 (JA___).   The approved approach merely requires *CARBIO* to notify EPA if *CARBIO* determines "there is evidence that the feedstocks do not meet the definition of renewable biomass."  R-98 at 6 (JA___).

Thus, the CARBIO proposal so significantly diverges from the final rule and EPA's explanation to the public that EPA cannot contend that its consideration and approval of the proposal merely implement the regulations on which the public had an opportunity to comment.   *See also*  42 U.S.C. §7607(d)(7)(B) (requiring reconsideration to provide same procedural rights "as would have been afforded had the information been available at the time the rule was proposed").  If this is what passes for an alternative tracking approach, EPA has fundamentally changed the renewable biomass requirements in the regulation and the public deserves a new opportunity to comment.

## B.    EPA's Denial of Request for Notice and Opportunity to Comment was Arbitrary and Capricious.

Even if not required, EPA has authority to provide public notice and comment on "such other actions as the Administrator may determine."  42 U.S.C. §7607(d)(1)(V).   Across the Renewable Fuel Standard program, EPA has consistently provided the public with notice and an opportunity to comment on its determinations on the eligibility of feedstocks.   EPA has not explained why CARBIO's proposal is materially different, so EPA's denial of the request for public notice and comment on the CARBIO proposal was arbitrary and capricious.

Implementing the 2007 amendments to the Renewable Fuel Standard program is a complex task. *See Nat'l Petrochemical & Refiners Ass'n v. EPA*, 630 F.3d 145, 156 (D.C. Cir. 2010), *reh'g denied*, 643 F.3d 958 (D.C. Cir. 2011), *cert. denied*, 132 S. Ct. 571 (2011) (citing 74 Fed. Reg. at 24,909). EPA's implementation decisions often are "heavily informed by the many public comments" it receives. 75 Fed. Reg. at 14,673 (JA__). EPA thus often solicits public comment (even when it arguably is not required to do so). For instance, when Canada petitioned for approval of its aggregate compliance approach, the public was "specifically invited to comment on [the factors to be considered by EPA], whether Canada has met all submission requirements specified in the regulations, and on any other issue that could inform EPA's evaluation of the petition." 76 Fed. Reg. at 14,009 (JA__). EPA sought to make the petition process for an aggregate compliance approach "robust," and determined it would be "important to incorporate a public comment component into EPA's deliberations on a petition made to incorporate an aggregate compliance approach for a new area." 75 Fed. Reg. at 42,264-42,265 (JA__-__).

EPA may contend that its regulation on the alternative tracking approach are different because, unlike the regulation for petitioning for an aggregate compliance approach (40 C.F.R §80.1457), it does not expressly require notice and comment. But, that has not kept EPA from providing public notice and comment on related

matters even when not required by the governing regulation. For example, after EPA outlined the modeling used to determine the lifecycle greenhouse gas emissions for fuel pathways,[8] it still seeks public comments on petitions for new feedstocks. 40 C.F.R. §80.1416 (describing petition process for new pathways); 75 Fed. Reg. at 14,680 (JA__); EPA, *Renewable Fuel Petition Review Process*, http://www2.epa.gov/renewable-fuel-standard-program/renewable-fuel-petition-review-process (last updated Sept. 28, 2015). EPA does so to provide the public with the opportunity to comment on the specific application of the modeling to the new feedstock. 75 Fed. Reg. at 14,680 (JA__).

The same holds here. How the "alternative renewable biomass tracking requirement" outlined in 40 C.F.R. §80.1454(h) will work depends on the particular supply chain and area being covered. R-40 at 8 (JA__). CARBIO's application admits the novelty of its proposal: "[T]he Survey Program described herein differs from other Compliance Survey Programs approved by the EPA where a geographical area is identified and sites within the region are selected for a survey. The feedstock suppliers thus selected may source their supply from various regions in Argentina." R-1 at 14 (JA__).

---

[8]    This assessment is used to determine the fuel's lifecycle greenhouse gas emission reductions as compared to the baseline petroleum fuel for purposes of determining if the fuel qualifies as renewable fuel, advanced biofuel, biomass-based diesel or cellulosic biofuel. 40 C.F.R. §80.1426(f), Table 1.

Other examples of extra notice-and-comment rulemaking abound, especially where the regulatory action is novel. EPA has provided it when approving compliance plans for other feedstocks. *See* 76 Fed. Reg. 76,974 (Dec. 9, 2011) (JA__). EPA solicited public comment on a separation plan for municipal solid waste simply because it was "the first such plan to be submitted to EPA for approval." *Id.* at 76,975 (JA__). The CARBIO proposal is equally novel and thus equally deserves notice-and-comment rulemaking.

The significant public concern about EPA's ability to enforce its regulatory requirements overseas sharpens the arbitrariness of EPA's decision not to take public comments here—its first truly international approval of a non-North American compliance program. A more rigorous upfront vetting and examination of CARBIO's proposal would go a long way toward solving the problem that EPA lacks clear and direct means to enforce and monitor compliance in Argentina. EPA is not familiar with agriculture production in foreign countries, and the public could provide invaluable assistance to EPA to ensure that the proposed plan will be effective. R-40 at 6 (JA__).

## C. EPA Has Arbitrarily Refused to Respond to the Concerns of the Public.

EPA cannot argue that its response to Petitioner's letter counts as providing public notice and comment. Petitioner did not have the underlying supporting documentation or explanation as to key elements of the program. *Weyerhaeuser*

*Co.*, 590 F.2d at 1030 ("Absent a coherent discussion in the record of the factual 'basis' and legislative 'purpose' underlying EPA's conclusion, ... we are unable to rely on our usual assumption that the Agency, when relying on supportable facts and permissible policy concerns and when obligated to explain itself, will rationally exercise the duties delegated to it by Congress.") (citation omitted). "Moreover, the Agency's procedures in this limited instance improperly denied petitioners the opportunity to comment on a significant part of the Agency's decisionmaking process as required by section 553." *Id.* (citation omitted). Access to the underlying support for an agency action, including technical studies and data, is necessary for meaningful opportunity to comment. *See Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 236-37 (D.C. Cir. 2008).

Petitioner's concerns are substantial and apt. Petitioner cautioned EPA against heedlessly implementing the renewable biomass regulations in countries with a recent history of expanding their agricultural land base. EPA-HQ-OAR-2005-0161-2249 at 27-29 (JA__-__); R-40 at 3, 8 (JA__, __). Nothing in the administrative record, however, discusses these land use trends in Argentina, or even provides a description of the land base in Argentina.

Petitioner also urged EPA to ensure any alternative tracking program, which was intended to provide quality assurance, follows the entire chain-of-custody

through importation into the United States, as provided in the regulation.[9]  R-40 at

7-8 (JA__-__).  The record, and EPA's response, is silent on what happens with

Argentinian biodiesel after production.

Petitioner also asked EPA to consider the CARBIO proposal in light of the

Quality Assurance Program it was developing for RIN generation under the

Renewable Fuel Standard program, where EPA recognized the need for

transparency to allow stakeholders to "notify EPA of concerns or deficiencies"

with the program.  R-40 at 6 (citing 78 Fed. Reg. at 12,189) (JA__).  EPA, again,

provided no response to these comments.

EPA's only response is that there is "an independent third party surveyor

[to] assist the EPA in auditing relevant records and provide periodic reporting to

the EPA."  R-39 at 2 (JA__).  But, the oversight by an *independent* third-party

appears limited to a review of waybills to check for zip codes.  It does not address

the concerns regarding the identification of eligible lands or the segregation of

qualifying feedstock from non-qualifying feedstock.  As such, the mere reference

to an independent third party does not respond to the comments raised.

For these reasons, EPA's minimal response to Petitioner's letter does not

meet its notice and comment obligations.  This Court should vacate EPA's

---

[9]      This includes concerns Petitioner raised with respect to elements of the RIN
Quality Assurance Program.  R-40, Attachment (JA__-__).

approval of CARBIO's program, order the agency to publish the proposal, and accept public comments on it.

### III.   EVEN IF PUBLIC NOTICE AND COMMENT WAS NOT REQUIRED, THE APPROVED ALTERNATIVE TRACKING APPROACH FOR CARBIO DOES NOT COMPLY WITH EPA'S OWN REGULATIONS, RENDERING THE APPROVAL ARBITRARY AND CAPRICIOUS.

EPA's approval of the CARBIO proposal cannot stand because it does not meet the requirements of EPA's own regulation. "It is 'axiomatic … that an agency is bound by its own regulations. … 'Although it is within the power of [an] agency to amend or repeal its own regulations, [an] agency is not free to ignore or violate its regulations while they remain in effect.'"  *Nat'l Envtl. Dev. Ass'n's Clean Air Project*, 752 F.3d at 1009 (citations omitted).   Moreover, it appears that EPA ignored important aspects of the problem, taking the word of CARBIO rather than ensuring the level of quality assurance required.

### A.    The CARBIO Proposal Does Not Follow the Biodiesel Through Importation.

EPA recognizes that following the fuel through importation is necessary to ensure that the fuel is compliant with EPA's regulations.  Because of the difficulty in enforcing U.S. regulations overseas, EPA has included additional compliance mechanisms in the Renewable Fuel Standard program for foreign entities and imported renewable fuel that follow the product through importation.  75 Fed. Reg. at 14,713 (JA__).  These include, for example, certificates of fuel transfer, port of

33

entry testing, English translations of documents, and recordkeeping and bond requirements under 40 C.F.R. §§ 80.1466 and 80.1467.  EPA noted that the strict segregation of renewable fuel with RINs "ensures that RINs entering the U.S. appropriately represent the renewable fuel imported into the U.S. both in terms of renewable fuel type and volume."  75 Fed. Reg. at 14,713 (JA__).  Under the Quality Assurance Program rule, EPA determined that "RINs generated from imported fuel will only be considered verified under the quality assurance program if both the associated foreign renewable fuel production facility, and the corresponding importer, are audited under the same EPA-approved QAP."  79 Fed. Reg. at 42,091 (JA__).  Similarly, EPA specifically has required that alternative tracking approaches include surveys and audits of import facilities.  *See* 40 C.F.R. §80.1454(h)(2)(ii) (annual compliance surveys must be "[c]onducted at renewable fuel production *and import facilities* and their feedstock suppliers") (emphasis added), (3)(i) (independent surveyor must "Conduct feedstock audits of renewable fuel production *and import facilities*") (emphasis added).

Yet the CARBIO proposal stops monitoring fuel at the biodiesel facility. Nothing in the record describes what happens to the biodiesel after it leaves the plant or how CARBIO members will ensure that only compliant biodiesel is

imported with RINs for the Renewable Fuel Standard program.[10]  The failure to track the biodiesel through importation under the approved tracking approach violates the plain terms of the regulations.

### B.      The CARBIO Proposal Does Not Clearly Identify the Survey Area or Participants and, Thus, Cannot Be Representative of the Feedstock Producers as Required.

As noted above, EPA's final rule on alternative tracking changed its focus from a "nationwide verification program" to a smaller "survey area."  40 C.F.R. §80.1454(h)(2)(iii).   Surveys must be "representative" of "all renewable fuel producers and importers in the survey area" and their feedstock suppliers.  *Id.* at §1454(h)(2)(iii).   Annual compliance surveys, moreover, must be funded by "a participating renewable fuel producer and its feedstock suppliers and handlers" and, thereby, must identify all participants.  75 Fed. Reg. at 14,700 (JA__).  The survey plan must include "a statistically supportable methodology."  *Id.* (JA__).

The CARBIO proposal fails those requirements.  CARBIO has not identified the survey area and the participants and, thus, has not ensured that the compliance surveys will be representative of feedstock producers and handlers.  Argentina is about the size of the United States east of the Mississippi River.  *See* R-65 at 4

---

[10]     Although CARBIO's August 2012 submission refers to the foreign RIN-generator requirements (listed in §80.1466), R-1 at 19 (JA__), EPA did not refer to those requirements in its decision document (R-98, JA__-__), nor are they mentioned in in the survey plan submitted for 2014-2015 (R-97, JA__-__).

(noting there are "over 70,000 farmers nationally totaling over 247.1 million acres for soybean production alone").  CARBIO has not identified which area in the country is the "survey area"; CARBIO will not identify feedstock suppliers until *after* reviewing the documentation from the biodiesel producer and the crushing facilities.  R-97 at 1 (JA__).  Since the survey areas had not been defined, the population size cannot be determined, and EPA cannot rationally assess CARBIO's sampling methodology to ensure it will be "representative" of the feedstock suppliers.  Not only that, but since feedstock producers and grain elevators will not be identified until after feedstock suppliers, CARBIO has not articulated a methodology for auditing the feedstock producers and grain elevators.

CARBIO asserts that it will identify the sample sizes using a "95 percent confidence level."  R-98 at 6 (JA__).  The record does not clearly explain the process that will be used to ensure such a confidence level.[11]  There is no identification of "each relevant population" or any error rate such as the expected or maximum tolerable error rate, which EPA has required in its regulations

---

[11]     At best, the record indicates that the survey design will utilize a random sampling methodology with probability proportional to size of feedstock amounts used.  R-1 at 15 (JA__) (asserting that such an approach "improves accuracy for given samples size by concentrating samples on large elements that have the greatest impact on population estimates").  Given the size of the country; legal, economic, and environmental considerations, and varying land classifications, CARBIO's conclusory assertion does not explain why surveying farms and grain elevators based on volume alone is a "statistically supportable methodology."  75 Fed. Reg. at 14,700 (JA__).

involving sampling under the Renewable Fuel Standard program. *See* 40 C.F.R. §80.127, incorporated by reference in §80.1464; *see also id.* §80.68(d)(13)(iii). Nor is there any assessment by EPA as to why this approach is better than another, just a conclusory statement by CARBIO that this confidence level has been recognized "for statistical studies in Agriculture." R-65 at 3 (JA__). *See Nat'l Ass'n of Clean Water Agencies v. EPA*, 734 F.3d 1115, 1145 (D.C. Cir. 2013), *reh'g en banc denied* (Oct. 24, 2013) ("We are hesitant to rubber-stamp EPA's invocation of statistics without some explanation of the underlying principles or reasons why its formulas would produce an accurate result….")

CARBIO's approach stands in stark contrast to the aggregate compliance approach. For the latter, surveys are conducted by government entities and enforceable by law. And EPA reviewed the quality control measures undertaken by the government in conducting those surveys to ensure reliance on reliable, credible data. 75 Fed. Reg. at 14,701-14,703 (JA__-__); EPA-HQ-OAR-2011-0199-0015 at 7, 13, 16, 18 (JA__, JA__, JA__, JA__); *see also* R-40 at 9 (JA__).

In sum, CARBIO's "survey plan" does not provide the detailed information that is required to ensure the surveys are being conducted on a representative sampling of feedstock producers based on sound statistics. Indeed, it is not much of a "program of compliance surveys," but a promise to develop and implement one. That is not sufficient under EPA's regulations.

### C.    The CARBIO Proposal is Not Designed to Achieve the Same Level of Quality Assurance as the Map and Track or Aggregate Compliance Approach.

A review of the CARBIO proposal shows that it will not have an adequate level of quality assurance.  EPA appears to have taken CARBIO's conclusory statements at face value.  Without its own analysis or any independent oversight, EPA cannot claim that the approved alternative tracking approach provides adequate safeguards.

### 1.    A review of waybills for zip codes does not ensure the farm was in production in 2007 or that the feedstock has been properly segregated.

The map and track requirements seek to ensure that only feedstock from lands actively managed or fallow in 2007 are used to produce biodiesel for generation of RINs.  The "surveys" under the CARBIO proposal, however, only consist of reviewing paperwork to ensure it reflects a zip code for a "go area."  R-98 at 6-7 (JA__-__).

Assuming CARBIO applies a statistically sound methodology to identify the feedstock producers and grain elevators that will be surveyed, the record is lacking in explaining what those surveys will entail, aside from merely checking if the farm is in an appropriate zip code and if it had one copy of a waybill from 2007.

38

R-1 at 15, 18-19 (JA__, JA__-__); R-97 at 1 (JA__).[12]  The bulk of the feedstock

suppliers will only be subject to "desk audits" of waybills.  R-97 at 1 (JA__).  The

waybill, however, only notes if grain was ever shipped from that site, not if

soybean was ever grown on the land.[13]  R-1 at 11 (JA__).  The problem with such

an approach is that the purpose of the renewable biomass regulations is to ensure

the *farm from which the soybean was grown* was in production in 2007.  The

record shows, for example, that Argentina is a large importer of soybean from

other countries, and the survey plan merely checks if grain was shipped from a

particular zip code, not that the soybean was actually grown there.  EPA-HQ-

OAR-2005-0161-3090 at 66, 76, 81 (JA__, JA__, JA__).  Thus, the record is

simply not clear whether, much less how, the surveyor will assess production

either in 2007 or in the compliance year.

─────────────────

[12]    While referring to collecting GPS points on the audited farms, R-97 at 1 (JA__), the size of a "go area" remains a mystery.  The initial submission indicates an "area" is "considered an officially recognized administrative or legal land unit, such as a district, town, or parcel(s)."  R-1 at 29 (JA__).  EPA's decision document, moreover, relies on the zip codes entered in "waybills," R-98 at 7 (JA__), but there is no explanation how the zip code on the waybills can adequately reflect these potential various sizes of "go areas" or the different land classifications within those areas.  *See* Section III.C.2.

[13]    There is reference to a requirement for a farmer declaration, but the model declaration provided has no description of the history of production on the applicable land.  R-67 (JA__); R-16 at 2 (JA__).  *Cf.* 40 C.F.R §80.1454(c), (d) (requiring certifications from feedstock suppliers that feedstock meets renewable biomass definition).

In addition, the individual map and track requirement ensures that non-compliant biomass from ineligible lands is not mixed with compliant feedstock from eligible lands.  CARBIO's initial submission does not address this,[14] and EPA appears to have considered it only as an afterthought.  R-21 (JA__); R-24 (JA__).  The record contains only conclusory statements that the eligible soybean, soybean oil, and biodiesel will be kept separate.  R-28 at 1-2 (JA__).  There is no discussion of *how* that will happen.  *See Nat'l Parks Conservation Ass'n v. EPA*, __F.3d__, 2015 WL 5692605, at *8 (3d Cir. Sept. 29, 2015) (finding EPA's approval of SIP arbitrary where court could not "discern from the administrative record the specifics of Pennsylvania's analysis or why it rejected certain upgrades or combinations" and EPA "failed to satisfactorily explain why the SIP's conclusory listings are acceptable").  Rather, the facilities along the supply chain (only to the biodiesel plant) will only be reviewed to check zip codes on paperwork.  R-97 (JA__-__).  There is nothing in the record to suggest that the independent surveyor will review the feedstock handling procedures to ensure the feedstock is not mixed

---

[14]    CARBIO's submissions refer to using a mass balance approach to ensure RIN generation is only done for the amount of biodiesel that should be produced based on the amount of eligible feedstock received.  R-1 at 12, 34 (JA__, JA__); R-22 (JA__).  To our knowledge, EPA has not allowed a mass balance approach to be used with respect to establishing the renewable biomass requirements for planted crops, requiring compliant feedstock to be segregated from non-compliant feedstock.

with non-compliant feedstock.  Thus, it cannot be said that the CARBIO proposal provides the same level of assurance as the map and track requirements.

### 2. The CARBIO proposal does not ensure that "go areas" meet the definition of existing "agricultural lands."

Identification of "go areas" is a key element of CARBIO's alternative tracking approach.  R-98 at 6 (JA__).  But, what may constitute a "go area" remains unclear.  *See supra* n.12.  Importantly, the record does not include an assessment of how these "go areas" comport with the definition of agricultural land in the regulations.

Existing agricultural land includes only "cropland, pastureland, and land enrolled in the Conservation Reserve Program," not all agricultural lands. 40 C.F.R. §80.1401.  Cropland includes land used for production of crops for harvest and includes cultivated cropland and non-cultivated cropland.  *Id.* Pastureland is land managed for the production of select indigenous or introduced forage plants for livestock grazing or hay production.  *Id.*  The Conservation Reserve Program is administered by the USDA's Farm Service Agency.  *Id.*

Existing agricultural land thus excludes a variety of land types.  Despite public comments urging the contrary, EPA excluded "rangeland," which includes a variety of ecosystems, such as native grasslands, shrublands, savannas, wetlands, dessert and tundra.  75 Fed. Reg. at 14,692 (JA__).  EPA excluded lands that may fall under this definition from being counted in the baseline for purposes of both

41

the U.S. and Canadian aggregate compliance approach. *Id.* at 14,702 (JA__); *see also* EPA-HQ-OAR-2011-0199-0015 at 6-7, 12-14 (JA__-__, JA__-__).

CARBIO's proposal does not clearly define or explain how the land classifications being used compare to EPA's definitions or U.S. land classifications. R-1, App. B, at 15 (JA__). The proposal states that four classes of land will be considered—urban, water, other (native) vegetation, and cultivated land. *Id.* Other vegetation appears to be a catchall that includes, among other things, "native forest." *Id.* Forested land should be excluded—after all, the whole point of the statutory land-use requirement is to stop conversion of lands into farmlands—yet the satellite imagery of a "go area" in the record appears to include "other vegetation" as part of the "go area."[15]  R-69 (JA__). It also appears to include other classes not previously identified, such as a "floor class." *Id.* The "water class" in CARBIO's proposal presents similar problems, as it does not clearly indicate where wetlands fall, yet "water class" is also included.[16]  *Id.*; R-1, App. B, at 15 (JA__). Without a clear understanding of what will be designated as "go areas," EPA cannot ensure that the CARBIO proposal will not include the types of lands EPA excluded from the definition of agricultural lands.

---

[15]  As noted, the actual size of the go area remains unclear. *See, supra* n.12.

[16]  CARBIO again makes only conclusory statements that the "water" type "could not be further cleared for cultivation" and generally references sustainability criteria. R-1, App. B, at 1, 18 (JA__).

There also is no assessment by EPA as to the efficacy of the satellite imagery being used to assess these land classifications. While Petitioner does not necessarily object to the use of satellite imagery, EPA's final rule distinguished the compliance surveys from satellite imagery. 75 Fed. Reg. at 14,699 (JA__). Satellite imagery is a check, not the main source for identifying existing agricultural lands. 75 Fed. Reg. at 14,703 (JA__); R-40 at 9 (JA__). EPA also may have used satellite imagery as a component of its lifecycle greenhouse gas emission modeling to fill in gaps regarding land conversions, but it was not used to identify the lands that actually have been converted and EPA recognized and accounted for the uncertainty in its data. *See* EPA, *Renewable Fuel Standard Program (RFS2) Regulatory Impact Analysis*, at 317, 500 (2010) (EPA-HQ-OAR-2005-0161-3187.2) (JA__, JA__), *cited in* R-1 at 10 (JA__) and R-1, App. B. at 8 (JA__). The record in this case provides no explanation of this inconsistency, which is "the hallmark of arbitrary action." *Nat'l Parks Conservation Ass'n v. EPA*, 788 F.3d 1134, 1145 (9th Cir. 2015) (quoting *Sierra Club v. EPA*, 719 F.2d 436, 459 (D.C. Cir. 1983) and citing *Gen. Chem. Corp. v. U.S.*, 817 F.2d 844, 846 (D.C. Cir. 1987) (finding analysis arbitrary and capricious because it was "internally inconsistent and inadequately explained")).

43

### 3.     EPA provides no explanation of its determination that the CARBIO proposal provides an adequate level of assurance, much less a rational one.

A review of the record leaves the reader "wondering what metric, if any, EPA used to determine [the level of quality assurance provided by the CARBIO proposal], or if EPA employed no metric, why not."  *Nat'l Parks Conservation Ass'n*, 788 F.3d at 1143.  There was simply no analysis done by EPA, except for a mere recitation of the purported elements of an alternative tracking approach.  "But the law does require EPA to 'cogently explain why it has exercised its discretion in a given manner.'"  *Id.* (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 48).

The only real explanation by EPA as to why the CARBIO proposal provides quality assurance is that there is "an independent third party surveyor [to] assist the EPA in auditing relevant records and provide periodic reports to the EPA."  R-39 at 2 (JA__).  But, as described above, the role of the *independent* third party is essentially limited to reviewing zip codes entered on waybills.

In particular, EPA appears to be allowing CARBIO, who is *not* an independent party, to decide how "go areas" are identified.  While there is a passing reference to the maps used to identify the "go areas" as being "verified by an independent third party," R-1 at 31 (JA__), no third party is identified in the record (nor is their independence established); *see also* R-1, App. B. at 6 (JA__).  EPA also states in its decision document that "*CARBIO* will use land cover data

44

from satellite imagery to identify [existing agricultural land]" and that "*CARBIO* would then classify these lands as 'go areas' from which feedstocks may be used to produce qualifying RFS fuel and 'no go areas' from which feedstocks may not be used to make qualifying RFS fuels."  R-98 at 6 (JA__) (emphasis added).  But, the identification of eligible lands is key to assuring compliance under the CARBIO proposal.  EPA, however, has left that determination solely to CARBIO.

Moreover, there appear to be inconsistencies in the record and key pieces of information omitted from the record, indicating that EPA did not fully assess the efficacy of the CARBIO proposal.[17]  For example, the August 2012 submission states that the "maps shall be developed by CARBIO based on an INTA (National Agricultural Technology Institute) methodology."  R-1 at 31 (JA__).  There is no further description of this methodology or explanation as to how it differs from the "Maps Methodology" in Appendix B.  R-1, App. B, at 6 (JA__).  While referring to Landsat data, there also is no explanation as to the coverage of the available Landsat satellite data from 2007 for Argentina.[18]  75 Fed. Reg. at 14,775 (noting,

---

[17]    EPA states it is "approving the CARBIO Alternate Biomass Tracking Program, as submitted, including addenda dated December 10, 2012, April 24, 2013, June 11, 2013, July 18, 2013, November 22, 2013, September 1, 2014, and November 26, 2014."  R-98 at 3 (JA__).  Several of these "addenda" appear to be clarifications or additions that appear to be inconsistent with the initial submission.
[18]    EPA has issued guidance on the use of satellite imagery for projects.  *See* EPA, *Guidance for Geospatial Data Quality Assurance Project Plans*, EPA QA/G-

in 2010, Landsat data does not currently provide global coverage) (JA__).  Indeed, the Maps Methodology states that satellite data post-2013 will be used for identifying "annual" go areas, "the major route for identifying compliant areas," and from a variety of sources, which will be compared to a "reference map of 2007 land cover" using specified software.  R-1, App. B., at 18-19 (JA__).  It is unclear why CARBIO could not have submitted the "reference map" for 2007 with its application or why EPA did not ask for it.

Petitioner also cautioned EPA to ensure that the alternative tracking approach be done by a truly independent third party.  The August 2012 submission references a "Code of Conduct/Agreement on Confidentiality and Conflict of Interest" that must be signed by the surveyor, R-1 at 22 (JA__), but a copy of such document is not in the record.  *Cf.* 40 C.F.R. §80.1450(g) (registration requirements for independent third-party auditor under 40 C.F.R. §80.1471, including affidavit regarding independence).

EPA's failure to provide any independent assessment of the CARBIO proposal or to question clear inconsistencies and gaps renders its approval arbitrary and capricious.  *See Nat'l Parks Conservation Ass'n*, 2015 WL 5692605, at *7 (finding EPA "arbitrarily approved Pennsylvania's SIP given the multiple flaws in

---

5G (Mar. 2003), *available at* http://www2.epa.gov/quality/guidance-geospatial-data-quality-assurance-project-plans-epa-qag-5g.

Pennsylvania's BART analysis and the EPA's insufficient explanation as to why it could overlook them").

## IV. TO THE EXTENT EPA CONTENDS THAT THE APPROVED ALTERNATIVE TRACKING APPROACH FOR CARBIO IS CONSISTENT WITH EPA'S REGULATION, THIS COURT MUST REVIEW THE EFFICACY OF THE REGULATIONS AS IT RELATES TO FOREIGN PRODUCTION.

If, somehow, CARBIO's alternative tracking approach is consistent with the underlying regulation (40 C.F.R. §80.1454(h)), then the underlying regulation is invalid as applied to foreign production of biofuels. Based on the approval of the CARBIO proposal, it is apparent that EPA's regulation does not provide the quality assurance EPA explained would be required. The regulation stands in contrast to other quality assurance programs EPA has promulgated, which provide the regulated community (and EPA) with clearer guidelines and criteria to be considered. *See* 40 C.F.R. §§80.1457, 80.1469, 80,1471, 80.1472. Moreover, the lack of transparency ignores the benefit that public input can provide in ensuring the efficacy of such programs. For these, and the reasons outlined above, the approval must be vacated until EPA promulgates a new rule for foreign-produced biofuel.

As explained below, Petitioner's contingent challenge to the regulation is timely. Because EPA has not ensured the level of quality assurance it told the public it would require, EPA's approval of the alternative tracking approach for CARBIO in 2015 has necessitated a challenge to its 2010 regulation as it relates to

foreign production of biofuels. While Section 307 of the Clean Air Act includes a requirement that such challenges be brought within 60 days of promulgation, 42 U.S.C. §7607(b), Congress did not intend to permanently immunize all regulations from review. Instead, Congress "struck a careful balance between the need for administrative finality and the need to provide for subsequent review in the event of unexpected difficulties." *Nat'l Mining Ass'n v. Dept. of Interior*, 70 F.3d 1345, 1350 (D.C. Cir. 1995). To ensure that balance, Clean Air Act regulations may be reviewed whenever new grounds for review arise or whenever EPA changes the stakes for judicial review.

To the extent the Court must review the underlying regulation in this case, judicial review is warranted here because: (1) EPA's approval of the alternative tracking approach for CARBIO significantly modifies 40 C.F.R. §80.1454(h); (2) 40 C.F.R. §80.1454(h) was not ripe for challenge during the review period because it did not appear to authorize a program like the one proposed by CARBIO; and (3) EPA reopened 40 C.F.R. §80.1454(h) through its approval of the CARBIO proposal.

A. **EPA's Approval of the Alternative Tracking Approach for CARBIO is a New and Unexpected Modification to 40 C.F.R. §80.1454(h).**

Section 307 allows for challenges to Clean Air Act regulations based on "grounds arising after" the sixty-day review period. 42 U.S.C. §7607(b)(1).

EPA's approval at issue here provides such grounds because it involves a novel interpretation of 40 C.F.R. §80.1454(h) that dramatically departs from how Petitioner and the public understood it. In fact, as discussed above, EPA directly violated the regulation when it approved the CARBIO proposal. Thus, the approval of the CARBIO proposal is exactly the type of new development that "essentially create[s] a challenge" to the regulation "that did not previously exist." *Eagle-Picher Indus. Inc. v. EPA*, 759 F.2d 905, 913 (D.C. Cir. 1985).

EPA's approval of the CARBIO proposal has created numerous "unexpected difficulties" in the implementation of 40 C.F.R. §80.1454(h). *Nat'l Mining Ass'n*, 70 F.3d at 1350. For example, while the regulation provided for "surveys" and for an independent surveyor "to visit participating renewable feedstock producers and suppliers," 75 Fed. Reg. at 14,700 (JA__), the CARBIO proposal largely relies on "desk audits" that include no meaningful verification. Additionally, EPA explained in its final rule that there must be a "statistically supportable methodology" for surveying agricultural land, *id.*, but the survey plan here contains glaring uncertainties such as poorly-defined "go areas" that are as large as zip codes and currently undefined. The CARBIO proposal also fails to hold producers "responsible for identifying and addressing the root cause" upon finding a potential violation. *Id.* These are but a few of the issues that became apparent from EPA's decision document; together, these issues make the alternative tracking approach

49

approved for CARBIO entirely different than what Petitioner and its members envisioned when EPA first promulgated the regulation.

Because all of these issues arose for the first time when EPA approved the CARBIO proposal, Petitioner cannot be faulted for not predicting them. Petitioner's challenge is analogous to that in *Coalition for Responsible Regulation, Inc. v. EPA*, where the petitioners sought review of EPA's interpretations of Clean Air Act permitting triggers based on its unforeseen subsequent decision to regulate greenhouse gases. 684 F.3d 102, 131 (D.C. Cir. 2012), *aff'd in part, rev'd in part sub nom. Util. Air Regulatory Grp. v. EPA*, 134 S. Ct. 2427 (2014). This Court held that the challenge in *Coalition for Responsible Regulation* was timely, in part because EPA's rule regulating greenhouse gases "had the effect of expanding the PSD program to never-regulated sources." *Id.* at 130. Likewise, EPA's approval of the CARBIO proposal presents problems that could not have been anticipated when 40 C.F.R. §80.1454(h) was passed.

**B.    Petitioner's Claims Were Not Ripe for Review Until EPA Approved the CARBIO Proposal.**

Not only did Petitioner lack the information necessary to challenge 40 C.F.R. §80.1454(h) until EPA approved the CARBIO proposal, it *could not* have brought such a challenge in 2010 because it would not have been ripe for review. Claims are not ripe for judicial review when there is no concrete and imminent injury. *Reno v. Catholic Social Servs. Inc.*, 509 U.S. 43, 57–58 (1993);

*see also Toilet Goods Ass'n, Inc. v. Gardner*, 387 U.S. 158, 164 (1967) (finding matter unripe because judicial review would be "on a much surer footing in the context of a specific application"); *Ass'n of Am. Railroads v. I.C.C.*, 846 F.2d 1465, 1469 (D.C. Cir. 1988) (matters may be unripe when "review would significantly benefit from waiting for the issue to arise in a more concrete form"). Indeed, this court has previously dismissed challenges to EPA regulations that are brought before EPA has applied them in a specific context.  *E.g.*, *Louisiana Envtl. Action Network v. Browner*, 87 F.3d 1379, 1385 (D.C. Cir. 1996) (declining to review EPA Clean Air Act regulations because of "the classic institutional reason to postpone review: [it] need[s] to wait for 'a rule to be applied [to see] what its effect will be'") (citation and internal quotations omitted); *Diamond Shamrock Corp. v. Castle*, 580 F.2d 670, 672 (D.C. Cir. 1978) (declining to review EPA regulations that had "not been felt in a concrete way by the appellants").

Due to the abstract nature of 40 C.F.R. §80.1454(h), Petitioner did not have a concrete injury that it could point to in 2010.  Petitioner did not know how EPA would apply the alternative renewable biomass tracking requirements in 40 C.F.R. §80.1454(h), let alone for which countries and for which biofuels.  EPA's rule was short on details, and its requirement of a "comprehensive program of annual compliance surveys" to be conducted by "an independent third party" could potentially have been applied by EPA in a manner that would not have injured

51

Petitioner or its members. *Id.* §80.1454(h)(1). It was not until EPA approved the CARBIO proposal that it became clear EPA would interpret its regulation in an arbitrary way. If challenged earlier, the Court would have spent significant "'resources on what amounts to shadow boxing.'" *Devia v. Nuclear Regulatory Comm'n*, 492 F.3d 421, 424–25 (D.C. Cir. 2007) (quoting *McInnis–Misenor v. Me. Med. Ctr.*, 319 F.3d 63, 72 (1st Cir. 2003)).

Because Petitioner did not have a concrete claim in 2010, the sixty days in Section 307 did not start running until the approval of the CARBIO proposal ripened Petitioner's claims. Again, this type of delayed ripening is exactly what this Court found in *Coalition for Responsible Regulation*, 684 F.3d at 131. There, this Court held that industry petitioners could not have challenged EPA's interpretation of the Clean Air Act permitting triggers when they were promulgated because "their alleged injuries were only speculative" at that time. *Id.* (citation omitted). The petitioners' challenge "ripened" when EPA's regulation of greenhouse gases created a "substantial probability" of injury. *Id.* (citation omitted). Petitioner's injuries would have been equally speculative prior to the approval of the CARBIO proposal. Moreover, in *Coalition for Responsible Regulation*, the legal theories that the petitioners raised were at least known when EPA interpreted its permitting triggers. *See id.* at 130. Petitioner would have thus had *even less* of a ripe claim in 2010 than the petitioners in *Coalition for*

*Responsible Regulation* because it could not have envisioned in 2010 that EPA would violate its own regulations.

### C.    EPA Reopened 40 C.F.R. §80.1454(h) Through its Approval of the CARBIO Proposal.

The alternative tracking approach under 40 C.F.R. §80.1454(h) as it applies to foreign producers may be reviewed now for an additional, independent reason—EPA reopened the regulation when it approved the CARBIO proposal. *Kennecott Utah Copper Corp. v. U.S. Dep't of the Interior*, 88 F.3d 1191, 1213 (D.C. Cir. 1996) ("[J]udicial review of a long-standing regulation is not barred when an agency reopens an issue covered in, or changes its interpretation of, that regulation."). An agency reopens a regulation when it "either explicitly or implicitly—undertake[s] to 'reexamine its former choice," *Nat'l Mining Ass'n*, 70 F.3d at 1351 (citation omitted), or its subsequent action changes the regulatory context. *Sierra Club v. EPA*, 551 F.3d 1019, 1025 (D.C. Cir. 2008), *cert. denied*, 559 U.S. 991 (2010). EPA has done both of those things here.

First, EPA effectively reexamined 40 C.F.R. §80.1454(h) when it applied it to the CARBIO proposal. EPA's approval of the CARBIO proposal, with its ill-defined and arguably less stringent quality assurance mechanisms than were indicated in 2010, constitutes a re-evaluation of 40 C.F.R. §80.1454(h). For example, EPA apparently determined that primary reliance on satellite imagery was sufficient, which it previously rejected that notion. EPA also apparently chose

to move away from the agricultural land classifications it utilized in the 2010 rule. EPA further apparently decided that the entire supply chain no longer needed to be part of the annual compliance surveys. These are just some examples of how the approved alternative tracking approach for CARBIO fundamentally changed the underlying regulations. The fact that EPA chose to reconsider its prior rule through administrative action rather than using proper rulemaking procedures should not allow it to evade review of its actions.

Second, EPA's approval of the CARBIO proposal changed the regulatory context by "significantly alter[ing] the stakes of judicial review" for Petitioner and its members. *Sierra Club*, 551 F.3d at 1025 (citation omitted). The impact of 40 C.F.R. §80.1454(h) on Petitioner's members was uncertain in 2010 because the rule's language "did not give adequate notice or incentive to contest the agency's decision." *Nat'l Ass'n of Mfrs. v. U.S. Dep't of the Interior*, 134 F.3d 1095, 1104 (D.C. Cir. 1998). Now, the approval of the CARBIO proposal has made it clear that the U.S. biomass-based diesel market will soon experience a flood of imported biomass-based diesel subject to minimal quality assurance mechanisms. The adverse impact of the approval is magnified by EPA's separate proposal under the Renewable Fuel Standard program to waive the statutorily-required volumes for advanced biofuels and decline to meaningfully increase the biomass-based diesel volumes. Thus, U.S. biodiesel producers are now faced with both increased

competition from loosely-regulated foreign producers and lower-than-anticipated incentives for production.  This Court has previously concluded that such changed regulatory circumstances amount to a reopening of prior regulations.  *See Sierra Club*, 551 F.3d at 1025 (finding that EPA's elimination of certain requirements for Startup, Shutdown and Malfunction (SSM) plans reopened a previously promulgated exception to emissions standards during SSM periods); *Nat'l Ass'n of Mfrs.*, 134 F.3d at 1104 (finding that Department of the Interior's revisions to scope of Natural Resource Damage Assessment procedures reopened issues with models used in those procedures).  Thus, to the extent EPA purports its approval of the CARBIO proposal is consistent with its underlying regulation, the stakes for judicial review have fundamentally changed from 2010, warranting this Court's intervention.

## CONCLUSION

This Court "typically vacates rules when an agency 'entirely fail[s]' to provide notice and comment."  *Daimler Trucks N. Am.*, 737 F.3d at 103 (quoting *Shell Oil Co. v. EPA*, 950 F.2d 741, 752 (D.C. Cir. 1991)); *see also Sierra Club v. EPA*, 699 F.3d 530 (D.C. Cir. 2012) (vacating and remanding determination made without required notice and comment).  Moreover, EPA's approval of the CARBIO proposal was arbitrary and capricious, and did not comport with its own regulation.  For the foregoing reasons, the approval of the alternative tracking

approach for CARBIO should be vacated. To the extent necessary, 40 C.F.R. §80.1454(h) also should be remanded for further consideration by EPA.

Respectfully submitted,

/s/ Sandra P. Franco

_____

Sandra P. Franco
Bryan M. Killian
David B. Salmons
Morgan, Lewis & Bockius LLP
2020 K Street, NW
Washington, D.C. 20006
(202) 373-6000 (telephone)
(202) 373-6001 (facsimile)

*Counsel for National Biodiesel Board*

Dated: October 8, 2015

## CERTIFICATION PURSUANT TO FRAP 32(a)(7)

Pursuant to Federal Rule of Appellate Procedure 32(a)(7), the undersigned hereby certifies that the foregoing Initial Brief of Petitioner National Biodiesel Board is 12,784 words in compliance with this Court's order dated August 12, 2015, establishing a briefing schedule and stating that the Principal Brief for National Biodiesel Board not exceed 17,500 words.

Respectfully submitted,

/s/ Sandra P. Franco

_____
Sandra P. Franco
Bryan M. Killian
David B. Salmons
Morgan, Lewis & Bockius LLP
2020 K Street, NW
Washington, D.C. 20006
(202) 373-6000 (telephone)
(202) 373-6001 (facsimile)

*Counsel for National Biodiesel Board*

Dated:  October 8, 2015

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 8th day of October, 2015, I caused to be electronically filed the foregoing Initial Brief of Petitioner National Biodiesel Board with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the Court's CM/ECF system.

The following participants in the case are registered CM/ECF users and will be served by the Court's CM/ECF system:

Perry M. Rosen
U.S. Department of Justice
Environment & Natural Resources Division
Environmental Defense Section
P.O. Box 7611
Washington, DC 20044
Email: perry.rosen@usdoj.gov
Phone: 202-353-7792
Fax: 202-514-8865

*Counsel for Respondent Environmental
Protection Agency*

　　　　/s/ Sandra P. Franco　　　
Sandra P. Franco

58

CASE NOS. 15-1072 and 15-1073

IN THE

# UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

NATIONAL BIODIESEL BOARD,

*Petitioner,*

v.

ENVIRONMENTAL PROTECTION AGENCY,

*Respondent.*

ON PETITION FOR REVIEW FROM THE UNITED STATES
ENVIRONMENTAL PROTECTION AGENCY

## ADDENDUM TO
## INITIAL BRIEF OF PETITIONER
## NATIONAL BIODIESEL BOARD

Sandra P. Franco
Bryan M. Killian
David B. Salmons
Morgan, Lewis & Bockius LLP
2020 K Street, N.W.
Washington, D.C.  20006
(202) 373-6000

*Counsel for National Biodiesel Board*

**Dated:       October 8, 2015**

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | | |
|---|---|---|
| NATIONAL BIODIESEL BOARD, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. 15-1072 |
| | ) | |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |
| NATIONAL BIODIESEL BOARD, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. 15-1073 |
| | ) | |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, | ) | |
| | ) | |
| Respondent. | ) | |

**DECLARATION OF ANNE STECKEL**

I, Anne Steckel, hereby attest as follows:

1.    I am over 21 years of age and competent to make this declaration. The facts set forth in this declaration are based on both my personal knowledge and information gathered in the course of my business activities.

2.      I am the Vice President of Federal Affairs for the National Biodiesel Board, spearheading its federal regulatory efforts.  In this capacity, I am familiar with the Renewable Fuel Standard program and EPA's implementation thereof.  I submit this Declaration in support of the Petitions for Review filed by the National Biodiesel Board of the following actions by EPA:  (1) the Decision Document: Approval of CARBIO's Alternative Biomass Tracking Program, January 2015 (referred to herein as EPA's "Decision Document") (R-98); (2) the Letter from Byron Bunker, Director, Compliance Division, EPA, to Anne Steckel, Vice President of Federal Affairs, National Biodiesel Board, dated January 27, 2015, denying a request for public notice and an opportunity to comment (R-39); and (3) the "Alternative renewable biomass tracking requirement" at 40 C.F.R. § 80.1454(h), which was promulgated by EPA in a final rule entitled "Regulation of Fuels and Fuel Additives: Changes to Renewable Fuel Standard Program," published at 75 Fed. Reg. 14,670 (Mar. 26, 2010).

3.      The National Biodiesel Board is the national trade association representing America's first advanced biofuel.  The group works to create sustainable biodiesel industry growth through education, communication, governmental affairs, technical, and quality assurance programs.  Serving as the coordinating body for research and development in the United States, the National Biodiesel Board is comprised of state, national, and international feedstock and

feedstock processor organizations, biodiesel suppliers, fuel marketers and distributors, and technology providers. It advocates on behalf of its members before the legislature, agencies and the courts.

4.    Members of the National Biodiesel Board own and operate biodiesel facilities in the United States, and are registered to participate in the Renewable Fuel Standard program. They use renewable biomass to produce biodiesel, including, but not limited to, soybean oil, canola oil, corn oil from dry mill ethanol plants, waste cooking oil, and animal fats.

5.    On behalf of its members, the National Biodiesel Board has commented on EPA's implementation of the Renewable Fuel Standard program and advocated for a practical, yet enforceable program. Most recently, it submitted comments on EPA's proposal to implement the 2014, 2015 and 2016 Renewable Fuel Standards and to set the biomass-based diesel volume for 2017. (EPA-HQ-OAR-2015-0111-1953).

6.    The National Biodiesel Board has also worked toward ensuring the integrity of the Renewable Fuel Standard program, given the substantial benefits it provides to its members. Among other things, the National Biodiesel Board commented on the Quality Assurance Program rule for generation of Renewable Identification Numbers (EPA-HQ-OAR-2012-0621-0069), and the requirements for foreign producers (*id.* at 21-23, 41; EPA-HQ-OAR-2012-0401-0166 at 2-5).

### *EPA's Implementation of the Renewable Biomass Requirements*

7.     First enacted in 2005, the Renewable Fuel Standard requires specified volumes of fuels produced from "renewable biomass" be sold or introduced into commerce in the United States.  42 U.S.C. § 7545(o).  The Energy Independence and Security Act of 2007 amended the Renewable Fuel Standard program, including revising the definition of "renewable biomass."  *Id.* § 7545(o)(1)(I).  The revised definition includes:   "Planted crops and crop residue harvested from agricultural land cleared or cultivated at any time prior to December 19, 2007, that is either actively managed or fallow, and nonforested."  *Id.* § 7545(o)(1)(I)(i).

8.     In May of 2009, EPA proposed a rule to implement the 2007 amendments, including enforcing the statutory volumes required by Congress under the program.   74 Fed. Reg. 24,904 (May 26, 2009).  With respect to implementing the renewable biomass definition for planted crops, EPA proposed individual tracking requirements but also noted various possible compliance approaches.  *Id.* at 24,938-24,941.  The National Biodiesel Board submitted comments, noting the land use trends in the United States showing contraction of agricultural land and requesting EPA ensure adequate protections with respect to renewable biomass from countries that have expanding agricultural land.  EPA-HQ-OAR-2005-0161-2249 at 25-29.

9.      In the final rule, EPA finalized individual reporting and recordkeeping requirements (often referred to as "map and track") for feedstock from planted crops, but also finalized an "aggregate compliance" approach for feedstock from U.S. crops, which requires that total agricultural land in the United States not exceed a baseline representing the amount EPA determined was existing agricultural land in 2007, 75 Fed. Reg. 14,670, 14,888-14,892 (Mar. 26, 2010) (40 C.F.R. § 80.1454(c)(1), (d)(3), (g)).

10.     EPA also finalized an "alternative renewable biomass tracking program" under 40 C.F.R. § 80.1454(h).  75 Fed. Reg. at 14,890-14,891.  EPA explained that it would require that any approved program have the same level of quality assurance as the individual reporting and recordkeeping requirements.  *Id.* at 14,700.  EPA's final rule made no mention of any entity seeking to utilize the alternative tracking program.

11.     In July of 2010, EPA proposed a petition process for countries that sought a similar aggregate compliance approach as that applicable to U.S. crops. 75 Fed. Reg. 42,238, 42,262-42,265 (July 20, 2010).  EPA indicated that it "received several inquiries regarding the process, criteria, and data for EPA to approve the aggregate compliance approach for planted crops and crop residue grown in areas outside the U.S."  *Id.* at 42,263.  EPA also noted that it "will be important to incorporate a public comment component into EPA's deliberations on

5

a petition." *Id.* at 42,264. EPA finalized this regulation at 40 C.F.R. § 80.1457. *See* 75 Fed. Reg. 76,790, 76,829 (Dec. 9, 2010). To date, only Canada has sought, 76 Fed. Reg. 14,007 (Mar. 15, 2011), and obtained, such approval. *See* EPA, *Determination on Government of Canada Petition for an Aggregate Compliance Approach for Canadian Planted Crops and Crop Residues* (Sept. 27, 2011) (EPA-HQ-OAR-2011-0199-0015). The National Biodiesel Board submitted comments in support of the Canadian petition, but cautioned that the use of such approach in other countries should be carefully considered. (EPA-HQ-OAR-2011-0199-0008).

12. In February of 2013, EPA proposed a voluntary Quality Assurance Program with respect to Renewable Identification Numbers (RINs) used to show compliance with the Renewable Fuel Standard to "provide regulated parties a structured way to assure that RINs entering commerce are valid." 78 Fed. Reg. 12,158, 12,160 (Feb. 21, 2013). The National Biodiesel Board submitted comments on the proposed rule, again noting concerns with respect to enforcing the renewable biomass requirements in foreign countries, such as Argentina. (EPA-HQ-OAR-2012-0621-0069 at 22).

13. The Quality Assurance Program rule was finalized on July 18, 2014, 79 Fed. Reg. 42,078. The Quality Assurance Program includes feedstock-related components, including verifying "that feedstocks meet the definition of 'renewable biomass.'" *Id.* at 42,089. Applicable to foreign producers, EPA found that the

elements for implementing the Quality Assurance Program may vary considerably to ensure the requirements for importing the fuel are met, including protecting against conflicts of interest by the auditors. *Id.* at 42,091, 42,096-42,097. EPA made no mention of the proposed alternative renewable biomass tracking program for Argentina biodiesel in this rulemaking.

### The Biodiesel Industry in Argentina and the CARBIO Program

14. According to EPA, *Camara Argentina de Biocombustibles* (CARBIO), also referred to as the Argentine Chamber of Biofuels, submitted a proposal to EPA for an alternative renewable biomass tracking program under 40 C.F.R. § 80.1454(h) on August 29, 2012. EPA Decision Document at 3 (R-98). EPA states that the plan "is to use the compliance surveys to demonstrate that fuel produced by CARBIO's members qualifies for RIN generation because it is made from feedstock that is 'renewable biomass' as that term is defined in § 80.1401" *Id.* at 5.

15. In 2010, CARBIO indicated that its members account "for 95% of biodiesel production" in Argentina. CARBIO, *Argentine Biodiesel Market Overview*, Presentation Oct. 2010, slide 2, *available at* http://www.argentine-embassy-uk.org/docs/economia_comercio/files/networking/carbio.pdf. In 2015, the U.S. Department of Agriculture (USDA) estimated Argentina has 5.2 billion liters (1.37 billion gallons) in production capacity for biodiesel. *See* USDA

Foreign Agricultural Service, *Argentina:  Biofuels Annual 2015*, GAIN Report, July 1, 2015, at 2 (referred hereinafter as "GAIN Report"), *available at* http://gain.fas.usda.gov/Recent%20GAIN%20Publications/Biofuels%20Annual_Buenos%20Aires_Argentina_7-1-2015.pdf.  The USDA also recognized that, for the soybean biodiesel industry in Argentina, exports have "played a very important role, averaging 70 percent of Argentina's total biodiesel production."  *Id.*

16.    The National Biodiesel Board received information indicating that the soybean biodiesel industry in Argentina had initiated discussions with EPA, seeking to alleviate the regulatory requirements associated with the renewable biomass requirements under the Renewable Fuel Standard.  In November of 2013, the National Biodiesel Board submitted a request to EPA, seeking more information regarding the proposed program and requesting EPA provide the public with an opportunity to comment on the proposal prior to EPA making a final decision (R-40).

17.    On January 27, 2015, EPA issued a "Decision Document," which allows the CARBIO alternative renewable biomass tracking program to establish compliance with the renewable biomass provisions of the Renewable Fuel Standard (R-98).  On the same date, EPA denied the request of the National Biodiesel Board to provide the public with an opportunity to comment on the proposed program (R-39).

8

*Impacts of the Approval on the U.S. Biodiesel Industry*

18.     The volume mandates in the Renewable Fuel Standard have supported the domestic renewable fuels industry, particularly biodiesel.  Biodiesel is the only U.S. commercial scale fuel approved as an advanced biofuel under the Renewable Fuel Standard program, and thus has been used to meet the biomass-based diesel and advanced biofuel portions of the program.  In light of the Renewable Fuel Standard program, members of the National Biodiesel Board have expended substantial resources and money to increase biodiesel production capacity, to further innovate feedstock production through increased yields and diversification rather than expansion of cropland, and to improve infrastructure to meet the mandated volumes of the program.

19.     Reports indicate that Argentina has been looking for new markets for its biodiesel exports due to the recent loss of its markets in the European Union and North Africa.  GAIN Report at 13-14.  USDA noted that "[i]n 2015 and 2016 local exporters will focus on the U.S. biodiesel market, which currently presents the best export market potential."  *Id.* at 2; *see also id.* at 1 ("The U.S. biodiesel market is expected to be the most active destination, with exports in 2016 at 750 million liters and 625 million liters in 2015.")  USDA noted that traders "indicate[d] that the strict segregation system and tight controls increase production costs and make

exports grow slower." *Id.* at 2.  The alternative approach was anticipated to be "less costly than an individual compliance demonstration."  75 Fed. Reg. at 14,700.

20.     Based on discussions with marketers and traders, it is expected that imports of soybean biodiesel from Argentina will grow with EPA's January 2015 decision regarding CARBIO.  USDA found, while several local large biodiesel plants in Argentina were registered with EPA, only one exported about 20 million liters of biodiesel to the United States generating RINs in 2013, noting the costs associated with EPA's requirements.    USDA Foreign Agricultural Service, *Argentina:  Biofuels Annual 2014*, GAIN Report, July 1, 2014, at 13, *available at* http://gain.fas.usda.gov/Recent%20GAIN%20Publications/Biofuels%20Annual_B uenos%20Aires_Argentina_7-1-2014.pdf.  USDA noted that "Local traders believe that if Carbio's scheme is allowed, exports could range between 400-800 million liters of biodiesel to the US, especially to the east and west coasts as they are further away from the biodiesel production area." *Id.*

21.     The required biomass-based volumes set in the statute and by EPA for 2009 through 2013 have been below total capacity of U.S. biodiesel plants.  As of today, EPA has yet to implement the 2014 Renewable Fuel Standard and has not finalized the volumes for biomass-based diesel for 2014 or 2015.  Rather, in November of 2013, EPA proposed to reduce the advanced biofuel volume requirement in the statute for 2014 and also proposed not to increase the biomass-

based diesel volume for 2014 and 2015 from the 2013 requirement of 1.28 billion gallons. 78 Fed. Reg. 71,732, 71,737 (Nov. 29, 2013).

22.     EPA issued a new proposal in June of 2015, proposing to reduce the statutory volume for advanced biofuel volumes to 2.68 for 2014, 2.90 for 2015 and 3.40 for 2016 and to set the biomass-based diesel volumes at 1.63 for 2014, 1.7 for 2015, 1.8 for 2016 and 1.9 for 2017. 80 Fed. Reg. 33,100, 33,106, 33,109 (June 10, 2015). EPA has estimated that there is 2.8 billion gallons of EPA-registered biodiesel production capacity in the United States, *id*. at 33,116, and thus domestic production can easily meet these proposed volumes and the National Biodiesel Board believes it can provide more. For the advanced biofuel category, biodiesel is counted as ethanol-equivalent gallons by multiplying the physical gallons by a 1.5 equivalence value. 40 C.F.R. § 80.1415(b)(2). Using EPA's estimate, the U.S. biodiesel industry can generate 4.2 billion ethanol-equivalent gallons, which exceeds even the proposed advanced biofuel volumes.

23.     Based on discussions with marketers and participants in the industry, with the approval of the alternative compliance approach in EPA's Decision Document, Argentina biodiesel producers can reduce their production costs and export more biodiesel into the United States, affecting the ability of U.S. producers to participate in the program and impairing the investments made by and anticipated for the U.S. biodiesel industry.

11

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on October 8, 2015 in Washington, DC.

Anne Slurl

_____

# STATUTORY ADDENDUM

5 U.S.C. § 553

42 U.S.C. § 7545(o)

42 U.S.C. § 7607

40 C.F.R. § 80.1401

40 C.F.R. § 80.1454

40 C.F.R. § 80.1457

out below] shall take effect 180 days after the date of its enactment [Sept. 13, 1976].

''(b) Subsection (g) of section 552b of title 5, United States Code, as added by section 3(a) of this Act, shall take effect upon enactment [Sept. 13, 1976].''

SHORT TITLE OF 1976 AMENDMENT

Pub. L. 94–409, § 1, Sept. 13, 1976, 90 Stat. 1241, provided: ''That this Act [enacting this section, amending sections 551, 552, 556, and 557 of this title, section 10 of Pub. L. 92–463, set out in the Appendix to this title, and section 410 of Title 39, and enacting provisions set out as notes under this section] may be cited as the 'Government in the Sunshine Act'.''

TERMINATION OF REPORTING REQUIREMENTS

For termination, effective May 15, 2000, of provisions of law requiring submittal to Congress of any annual, semiannual, or other regular periodic report listed in House Document No. 103–7 (in which the report required by subsec. (j) of this section is listed on page 151), see section 3003 of Pub. L. 104–66, as amended, set out as a note under section 1113 of Title 31, Money and Finance.

TERMINATION OF ADMINISTRATIVE CONFERENCE OF UNITED STATES

For termination of Administrative Conference of United States, see provision of title IV of Pub. L. 104–52, set out as a note preceding section 591 of this title.

DECLARATION OF POLICY AND STATEMENT OF PURPOSE

Pub. L. 94–409, § 2, Sept. 13, 1976, 90 Stat. 1241, provided that: ''It is hereby declared to be the policy of the United States that the public is entitled to the fullest practicable information regarding the decisionmaking processes of the Federal Government. It is the purpose of this Act [see Short Title note set out above] to provide the public with such information while protecting the rights of individuals and the ability of the Government to carry out its responsibilities.''

## § 553. Rule making

(a) This section applies, according to the provisions thereof, except to the extent that there is involved—

(1) a military or foreign affairs function of the United States; or

(2) a matter relating to agency management or personnel or to public property, loans, grants, benefits, or contracts.

(b) General notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law. The notice shall include—

(1) a statement of the time, place, and nature of public rule making proceedings;

(2) reference to the legal authority under which the rule is proposed; and

(3) either the terms or substance of the proposed rule or a description of the subjects and issues involved.

Except when notice or hearing is required by statute, this subsection does not apply—

(A) to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice; or

(B) when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are

impracticable, unnecessary, or contrary to the public interest.

(c) After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose. When rules are required by statute to be made on the record after opportunity for an agency hearing, sections 556 and 557 of this title apply instead of this subsection.

(d) The required publication or service of a substantive rule shall be made not less than 30 days before its effective date, except—

(1) a substantive rule which grants or recognizes an exemption or relieves a restriction;

(2) interpretative rules and statements of policy; or

(3) as otherwise provided by the agency for good cause found and published with the rule.

(e) Each agency shall give an interested person the right to petition for the issuance, amendment, or repeal of a rule.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 383.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| .................. | 5 U.S.C. 1003. | June 11, 1946, ch. 324, § 4, 60 Stat. 238. |

In subsection (a)(1), the words ''or naval'' are omitted as included in ''military''.

In subsection (b), the word ''when'' is substituted for ''in any situation in which''.

In subsection (c), the words ''for oral presentation'' are substituted for ''to present the same orally in any manner''. The words ''sections 556 and 557 of this title apply instead of this subsection'' are substituted for ''the requirements of sections 1006 and 1007 of this title shall apply in place of the provisions of this subsection''.

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface to the report.

CODIFICATION

Section 553 of former Title 5, Executive Departments and Government Officers and Employees, was transferred to section 2245 of Title 7, Agriculture.

EXECUTIVE ORDER NO. 12044

Ex. Ord. No. 12044, Mar. 23, 1978, 43 F.R. 12661, as amended by Ex. Ord. No. 12221, June 27, 1980, 45 F.R. 44249, which related to the improvement of Federal regulations, was revoked by Ex. Ord. No. 12291, Feb. 17, 1981, 46 F.R. 13193, formerly set out as a note under section 601 of this title.

## § 554. Adjudications

(a) This section applies, according to the provisions thereof, in every case of adjudication required by statute to be determined on the record after opportunity for an agency hearing, except to the extent that there is involved—

(1) a matter subject to a subsequent trial of the law and the facts de novo in a court;

areas with a carbon monoxide design value of 9.5 ppm or more of [7] November 15, 1990, the revision shall provide that such requirement shall take effect no later than November 1, 1992 (or at such other date during 1992 as the Administrator establishes under the preceding provisions of this paragraph). For other areas, the revision shall provide that such requirement shall take effect no later than November 1 of the third year after the last year of the applicable 2-year period referred to in paragraph (1) (or at such other date during such third year as the Administrator establishes under the preceding provisions of this paragraph) and shall include a program for implementation and enforcement of the requirement consistent with guidance to be issued by the Administrator.

**(3) Waivers**

(A) The Administrator shall waive, in whole or in part, the requirements of paragraph (2) upon a demonstration by the State to the satisfaction of the Administrator that the use of oxygenated gasoline would prevent or interfere with the attainment by the area of a national primary ambient air quality standard (or a State or local ambient air quality standard) for any air pollutant other than carbon monoxide.

(B) The Administrator shall, upon demonstration by the State satisfactory to the Administrator, waive the requirement of paragraph (2) where the Administrator determines that mobile sources of carbon monoxide do not contribute significantly to carbon monoxide levels in an area.

(C)(i) Any person may petition the Administrator to make a finding that there is, or is likely to be, for any area, an inadequate domestic supply of, or distribution capacity for, oxygenated gasoline meeting the requirements of paragraph (2) or fuel additives (oxygenates) necessary to meet such requirements. The Administrator shall act on such petition within 6 months after receipt of the petition.

(ii) If the Administrator determines, in response to a petition under clause (i), that there is an inadequate supply or capacity described in clause (i), the Administrator shall delay the effective date of paragraph (2) for 1 year. Upon petition, the Administrator may extend such effective date for one additional year. No partial delay or lesser waiver may be granted under this clause.

(iii) In granting waivers under this subparagraph the Administrator shall consider distribution capacity separately from the adequacy of domestic supply and shall grant such waivers in such manner as will assure that, if supplies of oxygenated gasoline are limited, areas having the highest design value for carbon monoxide will have a priority in obtaining oxygenated gasoline which meets the requirements of paragraph (2).

(iv) As used in this subparagraph, the term distribution capacity includes capacity for transportation, storage, and blending.

**(4) Fuel dispensing systems**

Any person selling oxygenated gasoline at retail pursuant to this subsection shall be required under regulations promulgated by the Administrator to label the fuel dispensing system with a notice that the gasoline is oxygenated and will reduce the carbon monoxide emissions from the motor vehicle.

**(5) Guidelines for credit**

The Administrator shall promulgate guidelines, within 9 months after November 15, 1990, allowing the use of marketable oxygen credits from gasolines during that portion of the year specified in paragraph (2) with higher oxygen content than required to offset the sale or use of gasoline with a lower oxygen content than required. No credits may be transferred between nonattainment areas.

**(6) Attainment areas**

Nothing in this subsection shall be interpreted as requiring an oxygenated gasoline program in an area which is in attainment for carbon monoxide, except that in a carbon monoxide nonattainment area which is redesignated as attainment for carbon monoxide, the requirements of this subsection shall remain in effect to the extent such program is necessary to maintain such standard thereafter in the area.

**(7) Failure to attain CO standard**

If the Administrator determines under section 7512(b)(2) of this title that the national primary ambient air quality standard for carbon monoxide has not been attained in a Serious Area by the applicable attainment date, the State shall submit a plan revision for the area within 9 months after the date of such determination. The plan revision shall provide that the minimum oxygen content of gasoline referred to in paragraph (2) shall be 3.1 percent by weight unless such requirement is waived in accordance with the provisions of this subsection.

**(n) Prohibition on leaded gasoline for highway use**

After December 31, 1995, it shall be unlawful for any person to sell, offer for sale, supply, offer for supply, dispense, transport, or introduce into commerce, for use as fuel in any motor vehicle (as defined in section 7554(2) [8] of this title) any gasoline which contains lead or lead additives.

**(o) Renewable fuel program**

**(1) Definitions**

In this section:

**(A) Additional renewable fuel**

The term ''additional renewable fuel'' means fuel that is produced from renewable biomass and that is used to replace or reduce the quantity of fossil fuel present in home heating oil or jet fuel.

**(B) Advanced biofuel**

**(i) In general**

The term ''advanced biofuel'' means renewable fuel, other than ethanol derived

---

[7] So in original. Probably should be ''as of''.

[8] So in original. Probably should be section ''7550(2)''.

from corn starch, that has lifecycle greenhouse gas emissions, as determined by the Administrator, after notice and opportunity for comment, that are at least 50 percent less than baseline lifecycle greenhouse gas emissions.

**(ii) Inclusions**

The types of fuels eligible for consideration as ''advanced biofuel'' may include any of the following:

    (I) Ethanol derived from cellulose, hemicellulose, or lignin.

    (II) Ethanol derived from sugar or starch (other than corn starch).

    (III) Ethanol derived from waste material, including crop residue, other vegetative waste material, animal waste, and food waste and yard waste.

    (IV) Biomass-based diesel.

    (V) Biogas (including landfill gas and sewage waste treatment gas) produced through the conversion of organic matter from renewable biomass.

    (VI) Butanol or other alcohols produced through the conversion of organic matter from renewable biomass.

    (VII) Other fuel derived from cellulosic biomass.

**(C) Baseline lifecycle greenhouse gas emissions**

The term ''baseline lifecycle greenhouse gas emissions'' means the average lifecycle greenhouse gas emissions, as determined by the Administrator, after notice and opportunity for comment, for gasoline or diesel (whichever is being replaced by the renewable fuel) sold or distributed as transportation fuel in 2005.

**(D) Biomass-based diesel**

The term ''biomass-based diesel'' means renewable fuel that is biodiesel as defined in section 13220(f) of this title and that has lifecycle greenhouse gas emissions, as determined by the Administrator, after notice and opportunity for comment, that are at least 50 percent less than the baseline lifecycle greenhouse gas emissions. Notwithstanding the preceding sentence, renewable fuel derived from co-processing biomass with a petroleum feedstock shall be advanced biofuel if it meets the requirements of subparagraph (B), but is not biomass-based diesel.

**(E) Cellulosic biofuel**

The term ''cellulosic biofuel'' means renewable fuel derived from any cellulose, hemicellulose, or lignin that is derived from renewable biomass and that has lifecycle greenhouse gas emissions, as determined by the Administrator, that are at least 60 percent less than the baseline lifecycle greenhouse gas emissions.

**(F) Conventional biofuel**

The term ''conventional biofuel'' means renewable fuel that is ethanol derived from corn starch.

**(G) Greenhouse gas**

The term ''greenhouse gas'' means carbon dioxide, hydrofluorocarbons, methane, nitrous oxide, perfluorocarbons,[9] sulfur hexafluoride. The Administrator may include any other anthropogenically-emitted gas that is determined by the Administrator, after notice and comment, to contribute to global warming.

**(H) Lifecycle greenhouse gas emissions**

The term ''lifecycle greenhouse gas emissions'' means the aggregate quantity of greenhouse gas emissions (including direct emissions and significant indirect emissions such as significant emissions from land use changes), as determined by the Administrator, related to the full fuel lifecycle, including all stages of fuel and feedstock production and distribution, from feedstock generation or extraction through the distribution and delivery and use of the finished fuel to the ultimate consumer, where the mass values for all greenhouse gases are adjusted to account for their relative global warming potential.

**(I) Renewable biomass**

The term ''renewable biomass'' means each of the following:

    (i) Planted crops and crop residue harvested from agricultural land cleared or cultivated at any time prior to December 19, 2007, that is either actively managed or fallow, and nonforested.

    (ii) Planted trees and tree residue from actively managed tree plantations on nonfederal[10] land cleared at any time prior to December 19, 2007, including land belonging to an Indian tribe or an Indian individual, that is held in trust by the United States or subject to a restriction against alienation imposed by the United States.

    (iii) Animal waste material and animal byproducts.

    (iv) Slash and pre-commercial thinnings that are from non-federal[10] forestlands, including forestlands belonging to an Indian tribe or an Indian individual, that are held in trust by the United States or subject to a restriction against alienation imposed by the United States, but not forests or forestlands that are ecological communities with a global or State ranking of critically imperiled, imperiled, or rare pursuant to a State Natural Heritage Program, old growth forest, or late successional forest.

    (v) Biomass obtained from the immediate vicinity of buildings and other areas regularly occupied by people, or of public infrastructure, at risk from wildfire.

    (vi) Algae.

    (vii) Separated yard waste or food waste, including recycled cooking and trap grease.

**(J) Renewable fuel**

The term ''renewable fuel'' means fuel that is produced from renewable biomass and that is used to replace or reduce the quantity of fossil fuel present in a transportation fuel.

---

[9] So in original. The word ''and'' probably should appear.

[10] So in original. Probably should be ''non-Federal''.

**(K) Small refinery**

The term ''small refinery'' means a refinery for which the average aggregate daily crude oil throughput for a calendar year (as determined by dividing the aggregate throughput for the calendar year by the number of days in the calendar year) does not exceed 75,000 barrels.

**(L) Transportation fuel**

The term ''transportation fuel'' means fuel for use in motor vehicles, motor vehicle engines, nonroad vehicles, or nonroad engines (except for ocean-going vessels).

**(2) Renewable fuel program**

**(A) Regulations**

**(i) In general**

Not later than 1 year after August 8, 2005, the Administrator shall promulgate regulations to ensure that gasoline sold or introduced into commerce in the United States (except in noncontiguous States or territories), on an annual average basis, contains the applicable volume of renewable fuel determined in accordance with subparagraph (B). Not later than 1 year after December 19, 2007, the Administrator shall revise the regulations under this paragraph to ensure that transportation fuel sold or introduced into commerce in the United States (except in noncontiguous States or territories), on an annual average basis, contains at least the applicable volume of renewable fuel, advanced biofuel, cellulosic biofuel, and biomass-based diesel, determined in accordance with subparagraph (B) and, in the case of any such renewable fuel produced from new facilities that commence construction after December 19, 2007, achieves at least a 20 percent reduction in lifecycle greenhouse gas emissions compared to baseline lifecycle greenhouse gas emissions.

**(ii) Noncontiguous State opt-in**

**(I) In general**

On the petition of a noncontiguous State or territory, the Administrator may allow the renewable fuel program established under this subsection to apply in the noncontiguous State or territory at the same time or any time after the Administrator promulgates regulations under this subparagraph.

**(II) Other actions**

In carrying out this clause, the Administrator may—

(aa) issue or revise regulations under this paragraph;

(bb) establish applicable percentages under paragraph (3);

(cc) provide for the generation of credits under paragraph (5); and

(dd) take such other actions as are necessary to allow for the application of the renewable fuels program in a noncontiguous State or territory.

**(iii) Provisions of regulations**

Regardless of the date of promulgation, the regulations promulgated under clause (i)—

(I) shall contain compliance provisions applicable to refineries, blenders, distributors, and importers, as appropriate, to ensure that the requirements of this paragraph are met; but

(II) shall not—

(aa) restrict geographic areas in which renewable fuel may be used; or

(bb) impose any per-gallon obligation for the use of renewable fuel.

**(iv) Requirement in case of failure to promulgate regulations**

If the Administrator does not promulgate regulations under clause (i), the percentage of renewable fuel in gasoline sold or dispensed to consumers in the United States, on a volume basis, shall be 2.78 percent for calendar year 2006.

**(B) Applicable volumes**

**(i) Calendar years after 2005**

**(I) Renewable fuel**

For the purpose of subparagraph (A), the applicable volume of renewable fuel for the calendar years 2006 through 2022 shall be determined in accordance with the following table:

| Calendar year: | Applicable volume of renewable fuel (in billions of gallons): |
|---|---|
| 2006 | 4.0 |
| 2007 | 4.7 |
| 2008 | 9.0 |
| 2009 | 11.1 |
| 2010 | 12.95 |
| 2011 | 13.95 |
| 2012 | 15.2 |
| 2013 | 16.55 |
| 2014 | 18.15 |
| 2015 | 20.5 |
| 2016 | 22.25 |
| 2017 | 24.0 |
| 2018 | 26.0 |
| 2019 | 28.0 |
| 2020 | 30.0 |
| 2021 | 33.0 |
| 2022 | 36.0 |

**(II) Advanced biofuel**

For the purpose of subparagraph (A), of the volume of renewable fuel required under subclause (I), the applicable volume of advanced biofuel for the calendar years 2009 through 2022 shall be determined in accordance with the following table:

| Calendar year: | Applicable volume of advanced biofuel (in billions of gallons): |
|---|---|

| | |
|---|---|
| 2009 ........................................... | 0.6 |
| 2010 ........................................... | 0.95 |
| 2011 ........................................... | 1.35 |
| 2012 ........................................... | 2.0 |
| 2013 ........................................... | 2.75 |
| 2014 ........................................... | 3.75 |
| 2015 ........................................... | 5.5 |
| 2016 ........................................... | 7.25 |
| 2017 ........................................... | 9.0 |
| 2018 ........................................... | 11.0 |
| 2019 ........................................... | 13.0 |
| 2020 ........................................... | 15.0 |
| 2021 ........................................... | 18.0 |
| 2022 ........................................... | 21.0 |

**(III) Cellulosic biofuel**

For the purpose of subparagraph (A), of the volume of advanced biofuel required under subclause (II), the applicable volume of cellulosic biofuel for the calendar years 2010 through 2022 shall be determined in accordance with the following table:

| Calendar year: | Applicable volume of cellulosic biofuel (in billions of gallons): |
|---|---|
| 2010 ........................................... | 0.1 |
| 2011 ........................................... | 0.25 |
| 2012 ........................................... | 0.5 |
| 2013 ........................................... | 1.0 |
| 2014 ........................................... | 1.75 |
| 2015 ........................................... | 3.0 |
| 2016 ........................................... | 4.25 |
| 2017 ........................................... | 5.5 |
| 2018 ........................................... | 7.0 |
| 2019 ........................................... | 8.5 |
| 2020 ........................................... | 10.5 |
| 2021 ........................................... | 13.5 |
| 2022 ........................................... | 16.0 |

**(IV) Biomass-based diesel**

For the purpose of subparagraph (A), of the volume of advanced biofuel required under subclause (II), the applicable volume of biomass-based diesel for the calendar years 2009 through 2012 shall be determined in accordance with the following table:

| Calendar year: | Applicable volume of biomass-based diesel (in billions of gallons): |
|---|---|
| 2009 ........................................... | 0.5 |
| 2010 ........................................... | 0.65 |
| 2011 ........................................... | 0.80 |
| 2012 ........................................... | 1.0 |

**(ii) Other calendar years**

For the purposes of subparagraph (A), the applicable volumes of each fuel specified in the tables in clause (i) for calendar years after the calendar years specified in the tables shall be determined by the Administrator, in coordination with the Secretary of Energy and the Secretary of Agriculture, based on a review of the implementation of the program during calendar years specified in the tables, and an analysis of—

(I) the impact of the production and use of renewable fuels on the environment, including on air quality, climate change, conversion of wetlands, ecosystems, wildlife habitat, water quality, and water supply;

(II) the impact of renewable fuels on the energy security of the United States;

(III) the expected annual rate of future commercial production of renewable fuels, including advanced biofuels in each category (cellulosic biofuel and biomass-based diesel);

(IV) the impact of renewable fuels on the infrastructure of the United States, including deliverability of materials, goods, and products other than renewable fuel, and the sufficiency of infrastructure to deliver and use renewable fuel;

(V) the impact of the use of renewable fuels on the cost to consumers of transportation fuel and on the cost to transport goods; and

(VI) the impact of the use of renewable fuels on other factors, including job creation, the price and supply of agricultural commodities, rural economic development, and food prices.

The Administrator shall promulgate rules establishing the applicable volumes under this clause no later than 14 months before the first year for which such applicable volume will apply.

**(iii) Applicable volume of advanced biofuel**

For the purpose of making the determinations in clause (ii), for each calendar year, the applicable volume of advanced biofuel shall be at least the same percentage of the applicable volume of renewable fuel as in calendar year 2022.

**(iv) Applicable volume of cellulosic biofuel**

For the purpose of making the determinations in clause (ii), for each calendar year, the applicable volume of cellulosic biofuel established by the Administrator shall be based on the assumption that the Administrator will not need to issue a waiver for such years under paragraph (7)(D).

**(v) Minimum applicable volume of biomass-based diesel**

For the purpose of making the determinations in clause (ii), the applicable volume of biomass-based diesel shall not be less than the applicable volume listed in clause (i)(IV) for calendar year 2012.

**(3) Applicable percentages**

**(A) Provision of estimate of volumes of gasoline sales**

Not later than October 31 of each of calendar years 2005 through 2021, the Administrator of the Energy Information Administration shall provide to the Administrator of the Environmental Protection Agency an es-

timate, with respect to the following calendar year, of the volumes of transportation fuel, biomass-based diesel, and cellulosic biofuel projected to be sold or introduced into commerce in the United States.

**(B) Determination of applicable percentages**

**(i) In general**

Not later than November 30 of each of calendar years 2005 through 2021, based on the estimate provided under subparagraph (A), the Administrator of the Environmental Protection Agency shall determine and publish in the Federal Register, with respect to the following calendar year, the renewable fuel obligation that ensures that the requirements of paragraph (2) are met.

**(ii) Required elements**

The renewable fuel obligation determined for a calendar year under clause (i) shall—

(I) be applicable to refineries, blenders, and importers, as appropriate;

(II) be expressed in terms of a volume percentage of transportation fuel sold or introduced into commerce in the United States; and

(III) subject to subparagraph (C)(i), consist of a single applicable percentage that applies to all categories of persons specified in subclause (I).

**(C) Adjustments**

In determining the applicable percentage for a calendar year, the Administrator shall make adjustments—

(i) to prevent the imposition of redundant obligations on any person specified in subparagraph (B)(ii)(I); and

(ii) to account for the use of renewable fuel during the previous calendar year by small refineries that are exempt under paragraph (9).

**(4) Modification of greenhouse gas reduction percentages**

**(A) In general**

The Administrator may, in the regulations under the last sentence of paragraph (2)(A)(i), adjust the 20 percent, 50 percent, and 60 percent reductions in lifecycle greenhouse gas emissions specified in paragraphs (2)(A)(i) (relating to renewable fuel), (1)(D) (relating to biomass-based diesel), (1)(B)(i) (relating to advanced biofuel), and (1)(E) (relating to cellulosic biofuel) to a lower percentage. For the 50 and 60 percent reductions, the Administrator may make such an adjustment only if he determines that generally such reduction is not commercially feasible for fuels made using a variety of feedstocks, technologies, and processes to meet the applicable reduction.

**(B) Amount of adjustment**

In promulgating regulations under this paragraph, the specified 50 percent reduction in greenhouse gas emissions from advanced biofuel and in biomass-based diesel may not be reduced below 40 percent. The specified 20

percent reduction in greenhouse gas emissions from renewable fuel may not be reduced below 10 percent, and the specified 60 percent reduction in greenhouse gas emissions from cellulosic biofuel may not be reduced below 50 percent.

**(C) Adjusted reduction levels**

An adjustment under this paragraph to a percent less than the specified 20 percent greenhouse gas reduction for renewable fuel shall be the minimum possible adjustment, and the adjusted greenhouse gas reduction shall be established by the Administrator at the maximum achievable level, taking cost in consideration, for natural gas fired corn-based ethanol plants, allowing for the use of a variety of technologies and processes. An adjustment in the 50 or 60 percent greenhouse gas levels shall be the minimum possible adjustment for the fuel or fuels concerned, and the adjusted greenhouse gas reduction shall be established at the maximum achievable level, taking cost in consideration, allowing for the use of a variety of feedstocks, technologies, and processes.

**(D) 5-year review**

Whenever the Administrator makes any adjustment under this paragraph, not later than 5 years thereafter he shall review and revise (based upon the same criteria and standards as required for the initial adjustment) the regulations establishing the adjusted level.

**(E) Subsequent adjustments**

After the Administrator has promulgated a final rule under the last sentence of paragraph (2)(A)(i) with respect to the method of determining lifecycle greenhouse gas emissions, except as provided in subparagraph (D), the Administrator may not adjust the percent greenhouse gas reduction levels unless he determines that there has been a significant change in the analytical methodology used for determining the lifecycle greenhouse gas emissions. If he makes such determination, he may adjust the 20, 50, or 60 percent reduction levels through rulemaking using the criteria and standards set forth in this paragraph.

**(F) Limit on upward adjustments**

If, under subparagraph (D) or (E), the Administrator revises a percent level adjusted as provided in subparagraphs (A), (B), and (C) to a higher percent, such higher percent may not exceed the applicable percent specified in paragraph (2)(A)(i), (1)(D), (1)(B)(i), or (1)(E).

**(G) Applicability of adjustments**

If the Administrator adjusts, or revises a percent level referred to in this paragraph or makes a change in the analytical methodology used for determining the lifecycle greenhouse gas emissions, such adjustment, revision, or change (or any combination thereof) shall only apply to renewable fuel from new facilities that commence construction after the effective date of such adjustment, revision, or change.

**(5) Credit program**

**(A) In general**

The regulations promulgated under paragraph (2)(A) shall provide—

(i) for the generation of an appropriate amount of credits by any person that refines, blends, or imports gasoline that contains a quantity of renewable fuel that is greater than the quantity required under paragraph (2);

(ii) for the generation of an appropriate amount of credits for biodiesel; and

(iii) for the generation of credits by small refineries in accordance with paragraph (9)(C).

**(B) Use of credits**

A person that generates credits under subparagraph (A) may use the credits, or transfer all or a portion of the credits to another person, for the purpose of complying with paragraph (2).

**(C) Duration of credits**

A credit generated under this paragraph shall be valid to show compliance for the 12 months as of the date of generation.

**(D) Inability to generate or purchase sufficient credits**

The regulations promulgated under paragraph (2)(A) shall include provisions allowing any person that is unable to generate or purchase sufficient credits to meet the requirements of paragraph (2) to carry forward a renewable fuel deficit on condition that the person, in the calendar year following the year in which the renewable fuel deficit is created—

(i) achieves compliance with the renewable fuel requirement under paragraph (2); and

(ii) generates or purchases additional renewable fuel credits to offset the renewable fuel deficit of the previous year.

**(E) Credits for additional renewable fuel**

The Administrator may issue regulations providing: (i) for the generation of an appropriate amount of credits by any person that refines, blends, or imports additional renewable fuels specified by the Administrator; and (ii) for the use of such credits by the generator, or the transfer of all or a portion of the credits to another person, for the purpose of complying with paragraph (2).

**(6) Seasonal variations in renewable fuel use**

**(A) Study**

For each of calendar years 2006 through 2012, the Administrator of the Energy Information Administration shall conduct a study of renewable fuel blending to determine whether there are excessive seasonal variations in the use of renewable fuel.

**(B) Regulation of excessive seasonal variations**

If, for any calendar year, the Administrator of the Energy Information Administration, based on the study under subparagraph (A), makes the determinations specified in subparagraph (C), the Administrator of the Environmental Protection Agency shall promulgate regulations to ensure that 25 percent or more of the quantity of renewable fuel necessary to meet the requirements of paragraph (2) is used during each of the 2 periods specified in subparagraph (D) of each subsequent calendar year.

**(C) Determinations**

The determinations referred to in subparagraph (B) are that—

(i) less than 25 percent of the quantity of renewable fuel necessary to meet the requirements of paragraph (2) has been used during 1 of the 2 periods specified in subparagraph (D) of the calendar year;

(ii) a pattern of excessive seasonal variation described in clause (i) will continue in subsequent calendar years; and

(iii) promulgating regulations or other requirements to impose a 25 percent or more seasonal use of renewable fuels will not prevent or interfere with the attainment of national ambient air quality standards or significantly increase the price of motor fuels to the consumer.

**(D) Periods**

The 2 periods referred to in this paragraph are—

(i) April through September; and

(ii) January through March and October through December.

**(E) Exclusion**

Renewable fuel blended or consumed in calendar year 2006 in a State that has received a waiver under section 7543(b) of this title shall not be included in the study under subparagraph (A).

**(F) State exemption from seasonality requirements**

Notwithstanding any other provision of law, the seasonality requirement relating to renewable fuel use established by this paragraph shall not apply to any State that has received a waiver under section 7543(b) of this title or any State dependent on refineries in such State for gasoline supplies.

**(7) Waivers**

**(A) In general**

The Administrator, in consultation with the Secretary of Agriculture and the Secretary of Energy, may waive the requirements of paragraph (2) in whole or in part on petition by one or more States, by any person subject to the requirements of this subsection, or by the Administrator on his own motion by reducing the national quantity of renewable fuel required under paragraph (2)—

(i) based on a determination by the Administrator, after public notice and opportunity for comment, that implementation of the requirement would severely harm the economy or environment of a State, a region, or the United States; or

(ii) based on a determination by the Administrator, after public notice and oppor-

tunity for comment, that there is an inadequate domestic supply.

**(B) Petitions for waivers**

The Administrator, in consultation with the Secretary of Agriculture and the Secretary of Energy, shall approve or disapprove a petition for a waiver of the requirements of paragraph (2) within 90 days after the date on which the petition is received by the Administrator.

**(C) Termination of waivers**

A waiver granted under subparagraph (A) shall terminate after 1 year, but may be renewed by the Administrator after consultation with the Secretary of Agriculture and the Secretary of Energy.

**(D) Cellulosic biofuel**

(i) For any calendar year for which the projected volume of cellulosic biofuel production is less than the minimum applicable volume established under paragraph (2)(B), as determined by the Administrator based on the estimate provided under paragraph (3)(A), not later than November 30 of the preceding calendar year, the Administrator shall reduce the applicable volume of cellulosic biofuel required under paragraph (2)(B) to the projected volume available during that calendar year. For any calendar year in which the Administrator makes such a reduction, the Administrator may also reduce the applicable volume of renewable fuel and advanced biofuels requirement established under paragraph (2)(B) by the same or a lesser volume.

(ii) Whenever the Administrator reduces the minimum cellulosic biofuel volume under this subparagraph, the Administrator shall make available for sale cellulosic biofuel credits at the higher of $0.25 per gallon or the amount by which $3.00 per gallon exceeds the average wholesale price of a gallon of gasoline in the United States. Such amounts shall be adjusted for inflation by the Administrator for years after 2008.

(iii) Eighteen months after December 19, 2007, the Administrator shall promulgate regulations to govern the issuance of credits under this subparagraph. The regulations shall set forth the method for determining the exact price of credits in the event of a waiver. The price of such credits shall not be changed more frequently than once each quarter. These regulations shall include such provisions, including limiting the credits' uses and useful life, as the Administrator deems appropriate to assist market liquidity and transparency, to provide appropriate certainty for regulated entities and renewable fuel producers, and to limit any potential misuse of cellulosic biofuel credits to reduce the use of other renewable fuels, and for such other purposes as the Administrator determines will help achieve the goals of this subsection. The regulations shall limit the number of cellulosic biofuel credits for any calendar year to the minimum applicable volume (as reduced under this subparagraph) of cellulosic biofuel for that year.

**(E) Biomass-based diesel**

**(i) Market evaluation**

The Administrator, in consultation with the Secretary of Energy and the Secretary of Agriculture, shall periodically evaluate the impact of the biomass-based diesel requirements established under this paragraph on the price of diesel fuel.

**(ii) Waiver**

If the Administrator determines that there is a significant renewable feedstock disruption or other market circumstances that would make the price of biomass-based diesel fuel increase significantly, the Administrator, in consultation with the Secretary of Energy and the Secretary of Agriculture, shall issue an order to reduce, for up to a 60-day period, the quantity of biomass-based diesel required under subparagraph (A) by an appropriate quantity that does not exceed 15 percent of the applicable annual requirement for biomass-based diesel. For any calendar year in which the Administrator makes a reduction under this subparagraph, the Administrator may also reduce the applicable volume of renewable fuel and advanced biofuels requirement established under paragraph (2)(B) by the same or a lesser volume.

**(iii) Extensions**

If the Administrator determines that the feedstock disruption or circumstances described in clause (ii) is continuing beyond the 60-day period described in clause (ii) or this clause, the Administrator, in consultation with the Secretary of Energy and the Secretary of Agriculture, may issue an order to reduce, for up to an additional 60-day period, the quantity of biomass-based diesel required under subparagraph (A) by an appropriate quantity that does not exceed an additional 15 percent of the applicable annual requirement for biomass-based diesel.

**(F) Modification of applicable volumes**

For any of the tables in paragraph (2)(B), if the Administrator waives—

(i) at least 20 percent of the applicable volume requirement set forth in any such table for 2 consecutive years; or

(ii) at least 50 percent of such volume requirement for a single year,

the Administrator shall promulgate a rule (within 1 year after issuing such waiver) that modifies the applicable volumes set forth in the table concerned for all years following the final year to which the waiver applies, except that no such modification in applicable volumes shall be made for any year before 2016. In promulgating such a rule, the Administrator shall comply with the processes, criteria, and standards set forth in paragraph (2)(B)(ii).

**(8) Study and waiver for initial year of program**

**(A) In general**

Not later than 180 days after August 8, 2005, the Secretary of Energy shall conduct

for the Administrator a study assessing whether the renewable fuel requirement under paragraph (2) will likely result in significant adverse impacts on consumers in 2006, on a national, regional, or State basis.

**(B) Required evaluations**

The study shall evaluate renewable fuel—
(i) supplies and prices;
(ii) blendstock supplies; and
(iii) supply and distribution system capabilities.

**(C) Recommendations by the Secretary**

Based on the results of the study, the Secretary of Energy shall make specific recommendations to the Administrator concerning waiver of the requirements of paragraph (2), in whole or in part, to prevent any adverse impacts described in subparagraph (A).

**(D) Waiver**

**(i) In general**

Not later than 270 days after August 8, 2005, the Administrator shall, if and to the extent recommended by the Secretary of Energy under subparagraph (C), waive, in whole or in part, the renewable fuel requirement under paragraph (2) by reducing the national quantity of renewable fuel required under paragraph (2) in calendar year 2006.

**(ii) No effect on waiver authority**

Clause (i) does not limit the authority of the Administrator to waive the requirements of paragraph (2) in whole, or in part, under paragraph (7).

**(9) Small refineries**

**(A) Temporary exemption**

**(i) In general**

The requirements of paragraph (2) shall not apply to small refineries until calendar year 2011.

**(ii) Extension of exemption**

**(I) Study by Secretary of Energy**

Not later than December 31, 2008, the Secretary of Energy shall conduct for the Administrator a study to determine whether compliance with the requirements of paragraph (2) would impose a disproportionate economic hardship on small refineries.

**(II) Extension of exemption**

In the case of a small refinery that the Secretary of Energy determines under subclause (I) would be subject to a disproportionate economic hardship if required to comply with paragraph (2), the Administrator shall extend the exemption under clause (i) for the small refinery for a period of not less than 2 additional years.

**(B) Petitions based on disproportionate economic hardship**

**(i) Extension of exemption**

A small refinery may at any time petition the Administrator for an extension of the exemption under subparagraph (A) for the reason of disproportionate economic hardship.

**(ii) Evaluation of petitions**

In evaluating a petition under clause (i), the Administrator, in consultation with the Secretary of Energy, shall consider the findings of the study under subparagraph (A)(ii) and other economic factors.

**(iii) Deadline for action on petitions**

The Administrator shall act on any petition submitted by a small refinery for a hardship exemption not later than 90 days after the date of receipt of the petition.

**(C) Credit program**

If a small refinery notifies the Administrator that the small refinery waives the exemption under subparagraph (A), the regulations promulgated under paragraph (2)(A) shall provide for the generation of credits by the small refinery under paragraph (5) beginning in the calendar year following the date of notification.

**(D) Opt-in for small refineries**

A small refinery shall be subject to the requirements of paragraph (2) if the small refinery notifies the Administrator that the small refinery waives the exemption under subparagraph (A).

**(10) Ethanol market concentration analysis**

**(A) Analysis**

**(i) In general**

Not later than 180 days after August 8, 2005, and annually thereafter, the Federal Trade Commission shall perform a market concentration analysis of the ethanol production industry using the Herfindahl-Hirschman Index to determine whether there is sufficient competition among industry participants to avoid price-setting and other anticompetitive behavior.

**(ii) Scoring**

For the purpose of scoring under clause (i) using the Herfindahl-Hirschman Index, all marketing arrangements among industry participants shall be considered.

**(B) Report**

Not later than December 1, 2005, and annually thereafter, the Federal Trade Commission shall submit to Congress and the Administrator a report on the results of the market concentration analysis performed under subparagraph (A)(i).

**(11) Periodic reviews**

To allow for the appropriate adjustment of the requirements described in subparagraph (B) of paragraph (2), the Administrator shall conduct periodic reviews of—
(A) existing technologies;
(B) the feasibility of achieving compliance with the requirements; and
(C) the impacts of the requirements described in subsection (a)(2)[11] on each individual and entity described in paragraph (2).

---

[11] So in original. Subsection (a) does not contain a par. (2).

**(12) Effect on other provisions**

Nothing in this subsection, or regulations issued pursuant to this subsection, shall affect or be construed to affect the regulatory status of carbon dioxide or any other greenhouse gas, or to expand or limit regulatory authority regarding carbon dioxide or any other greenhouse gas, for purposes of other provisions (including section 7475) of this chapter. The previous sentence shall not affect implementation and enforcement of this subsection.

**(q) [12] Analyses of motor vehicle fuel changes and emissions model**

**(1) Anti-backsliding analysis**

**(A) Draft analysis**

Not later than 4 years after August 8, 2005, the Administrator shall publish for public comment a draft analysis of the changes in emissions of air pollutants and air quality due to the use of motor vehicle fuel and fuel additives resulting from implementation of the amendments made by the Energy Policy Act of 2005.

**(B) Final analysis**

After providing a reasonable opportunity for comment but not later than 5 years after August 8, 2005, the Administrator shall publish the analysis in final form.

**(2) Emissions model**

For the purposes of this section, not later than 4 years after August 8, 2005, the Administrator shall develop and finalize an emissions model that reflects, to the maximum extent practicable, the effects of gasoline characteristics or components on emissions from vehicles in the motor vehicle fleet during calendar year 2007.

**(3) Permeation effects study**

**(A) In general**

Not later than 1 year after August 8, 2005, the Administrator shall conduct a study, and report to Congress the results of the study, on the effects of ethanol content in gasoline on permeation, the process by which fuel molecules migrate through the elastomeric materials (rubber and plastic parts) that make up the fuel and fuel vapor systems of a motor vehicle.

**(B) Evaporative emissions**

The study shall include estimates of the increase in total evaporative emissions likely to result from the use of gasoline with ethanol content in a motor vehicle, and the fleet of motor vehicles, due to permeation.

**(r) Fuel and fuel additive importers and importation**

For the purposes of this section, the term "manufacturer" includes an importer and the term "manufacture" includes importation.

**(s) Conversion assistance for cellulosic biomass, waste-derived ethanol, approved renewable fuels**

**(1) In general**

The Secretary of Energy may provide grants to merchant producers of cellulosic biomass ethanol, waste-derived ethanol, and approved renewable fuels in the United States to assist the producers in building eligible production facilities described in paragraph (2) for the production of ethanol or approved renewable fuels.

**(2) Eligible production facilities**

A production facility shall be eligible to receive a grant under this subsection if the production facility—

(A) is located in the United States; and

(B) uses cellulosic or renewable biomass or waste-derived feedstocks derived from agricultural residues, wood residues, municipal solid waste, or agricultural byproducts.

**(3) Authorization of appropriations**

There are authorized to be appropriated the following amounts to carry out this subsection:

(A) $100,000,000 for fiscal year 2006.

(B) $250,000,000 for fiscal year 2007.

(C) $400,000,000 for fiscal year 2008.

**(4) Definitions**

For the purposes of this subsection:

(A) The term "approved renewable fuels" are fuels and components of fuels that have been approved by the Department of Energy, as defined in section 13211 of this title, which have been made from renewable biomass.

(B) The term "renewable biomass" is, as defined in Presidential Executive Order 13134, published in the Federal Register on August 16, 1999, any organic matter that is available on a renewable or recurring basis (excluding old-growth timber), including dedicated energy crops and trees, agricultural food and feed crop residues, aquatic plants, animal wastes, wood and wood residues, paper and paper residues, and other vegetative waste materials. Old-growth timber means timber of a forest from the late successional stage of forest development.

**(t) Blending of compliant reformulated gasolines**

**(1) In general**

Notwithstanding subsections (h) and (k) of this section and subject to the limitations in paragraph (2) of this subsection, it shall not be a violation of this part [13] for a gasoline retailer, during any month of the year, to blend at a retail location batches of ethanol-blended and non-ethanol-blended reformulated gasoline, provided that—

(A) each batch of gasoline to be blended has been individually certified as in compliance with subsections (h) and (k) of this section prior to being blended;

(B) the retailer notifies the Administrator prior to such blending, and identifies the exact location of the retail station and the specific tank in which such blending will take place;

(C) the retailer retains and, as requested by the Administrator or the Administrator's designee, makes available for inspection such certifications accounting for all gasoline at the retail outlet; and

---

[12] So in original. No subsec. (p) has been enacted.

[13] See References in Text note below.

SEC. 2. *Designation of Facilities.* (a) The Administrator of the Environmental Protection Agency (hereinafter referred to as ''the Administrator'') shall be responsible for the attainment of the purposes and objectives of this Order.

(b) In carrying out his responsibilities under this Order, the Administrator shall, in conformity with all applicable requirements of law, designate facilities which have given rise to a conviction for an offense under section 113(c)(1) of the Air Act [42 U.S.C. 7413(c)(1)] or section 309(c) of the Water Act [33 U.S.C. 1319(c)]. The Administrator shall, from time to time, publish and circulate to all Federal agencies lists of those facilities, together with the names and addresses of the persons who have been convicted of such offenses. Whenever the Administrator determines that the condition which gave rise to a conviction has been corrected, he shall promptly remove the facility and the name and address of the person concerned from the list.

SEC. 3. *Contracts, Grants, or Loans.* (a) Except as provided in section 8 of this Order, no Federal agency shall enter into any contract for the procurement of goods, materials, or services which is to be performed in whole or in part in a facility then designated by the Administrator pursuant to section 2.

(b) Except as provided in section 8 of this Order, no Federal agency authorized to extend Federal assistance by way of grant, loan, or contract shall extend such assistance in any case in which it is to be used to support any activity or program involving the use of a facility then designated by the Administrator pursuant to section 2.

SEC. 4. *Procurement, Grant, and Loan Regulations.* The Federal Procurement Regulations, the Armed Services Procurement Regulations, and to the extent necessary, any supplemental or comparable regulations issued by any agency of the Executive Branch shall, following consultation with the Administrator, be amended to require, as a condition of entering into, renewing, or extending any contract for the procurement of goods, materials, or services or extending any assistance by way of grant, loan, or contract, inclusion of a provision requiring compliance with the Air Act, the Water Act, and standards issued pursuant thereto in the facilities in which the contract is to be performed, or which are involved in the activity or program to receive assistance.

SEC. 5. *Rules and Regulations.* The Administrator shall issue such rules, regulations, standards, and guidelines as he may deem necessary or appropriate to carry out the purposes of this Order.

SEC. 6. *Cooperation and Assistance.* The head of each Federal agency shall take such steps as may be necessary to insure that all officers and employees of this agency whose duties entail compliance or comparable functions with respect to contracts, grants, and loans are familiar with the provisions of this Order. In addition to any other appropriate action, such officers and employees shall report promptly any condition in a facility which may involve noncompliance with the Air Act or the Water Act or any rules, regulations, standards, or guidelines issued pursuant to this Order to the head of the agency, who shall transmit such reports to the Administrator.

SEC. 7. *Enforcement.* The Administrator may recommend to the Department of Justice or other appropriate agency that legal proceedings be brought or other appropriate action be taken whenever he becomes aware of a breach of any provision required, under the amendments issued pursuant to section 4 of this Order, to be included in a contract or other agreement.

SEC. 8. *Exemptions—Reports to Congress.* (a) Upon a determination that the paramount interest of the United States so requires—

(1) The head of a Federal agency may exempt any contract, grant, or loan, and, following consultation with the Administrator, any class of contracts, grants or loans from the provisions of this Order. In any such case, the head of the Federal agency granting such exemption shall (A) promptly notify the Administrator of such exemption and the justification therefor; (B) review the necessity for each such exemption annually; and (C) report to the Administrator annually all such exemptions in effect. Exemptions granted pursuant to this section shall be for a period not to exceed one year. Additional exemptions may be granted for periods not to exceed one year upon the making of a new determination by the head of the Federal agency concerned.

(2) The Administrator may, by rule or regulation, exempt any or all Federal agencies from any or all of the provisions of this Order with respect to any class or classes of contracts, grants, or loans, which (A) involve less than specified dollar amounts, or (B) have a minimal potential impact upon the environment, or (C) involve persons who are not prime contractors or direct recipients of Federal assistance by way of contracts, grants, or loans.

(b) Federal agencies shall reconsider any exemption granted under subsection (a) whenever requested to do so by the Administrator.

(c) The Administrator shall annually notify the President and the Congress of all exemptions granted, or in effect, under this Order during the preceding year.

SEC. 9. *Related Actions.* The imposition of any sanction or penalty under or pursuant to this Order shall not relieve any person of any legal duty to comply with any provisions of the Air Act or the Water Act.

SEC. 10. *Applicability.* This Order shall not apply to contracts, grants, or loans involving the use of facilities located outside the United States.

SEC. 11. *Uniformity.* Rules, regulations, standards, and guidelines issued pursuant to this order and section 508 of the Water Act [33 U.S.C. 1368] shall, to the maximum extent feasible, be uniform with regulations issued pursuant to this order, Executive Order No. 11602 of June 29, 1971 [formerly set out above], and section 306 of the Air Act [this section].

SEC. 12. *Order Superseded.* Executive Order No. 11602 of June 29, 1971, is hereby superseded.

RICHARD NIXON.

## § 7607. Administrative proceedings and judicial review

### (a) Administrative subpenas; confidentiality; witnesses

In connection with any determination under section 7410(f) of this title, or for purposes of obtaining information under section 7521(b)(4)[1] or 7545(c)(3) of this title, any investigation, monitoring, reporting requirement, entry, compliance inspection, or administrative enforcement proceeding under the[2] chapter (including but not limited to section 7413, section 7414, section 7420, section 7429, section 7477, section 7524, section 7525, section 7542, section 7603, or section 7606 of this title),[3] the Administrator may issue subpenas for the attendance and testimony of witnesses and the production of relevant papers, books, and documents, and he may administer oaths. Except for emission data, upon a showing satisfactory to the Administrator by such owner or operator that such papers, books, documents, or information or particular part thereof, if made public, would divulge trade secrets or secret processes of such owner or operator, the Administrator shall consider such record, report, or information or particular portion thereof confidential in accordance with the purposes of section 1905 of title 18, except that such paper, book, document, or information may be dis-

---

[1] See References in Text note below.
[2] So in original. Probably should be ''this''.
[3] So in original.

closed to other officers, employees, or authorized representatives of the United States concerned with carrying out this chapter, to persons carrying out the National Academy of Sciences' study and investigation provided for in section 7521(c) of this title, or when relevant in any proceeding under this chapter. Witnesses summoned shall be paid the same fees and mileage that are paid witnesses in the courts of the United States. In case of contumacy or refusal to obey a subpena served upon any person under this subparagraph,[4] the district court of the United States for any district in which such person is found or resides or transacts business, upon application by the United States and after notice to such person, shall have jurisdiction to issue an order requiring such person to appear and give testimony before the Administrator to appear and produce papers, books, and documents before the Administrator, or both, and any failure to obey such order of the court may be punished by such court as a contempt thereof.

**(b) Judicial review**

(1) A petition for review of action of the Administrator in promulgating any national primary or secondary ambient air quality standard, any emission standard or requirement under section 7412 of this title, any standard of performance or requirement under section 7411 of this title,[3] any standard under section 7521 of this title (other than a standard required to be prescribed under section 7521(b)(1) of this title), any determination under section 7521(b)(5)[1] of this title, any control or prohibition under section 7545 of this title, any standard under section 7571 of this title, any rule issued under section 7413, 7419, or under section 7420 of this title, or any other nationally applicable regulations promulgated, or final action taken, by the Administrator under this chapter may be filed only in the United States Court of Appeals for the District of Columbia. A petition for review of the Administrator's action in approving or promulgating any implementation plan under section 7410 of this title or section 7411(d) of this title, any order under section 7411(j) of this title, under section 7412 of this title, under section 7419 of this title, or under section 7420 of this title, or his action under section 1857c–10(c)(2)(A), (B), or (C) of this title (as in effect before August 7, 1977) or under regulations thereunder, or revising regulations for enhanced monitoring and compliance certification programs under section 7414(a)(3) of this title, or any other final action of the Administrator under this chapter (including any denial or disapproval by the Administrator under subchapter I of this chapter) which is locally or regionally applicable may be filed only in the United States Court of Appeals for the appropriate circuit. Notwithstanding the preceding sentence a petition for review of any action referred to in such sentence may be filed only in the United States Court of Appeals for the District of Columbia if such action is based on a determination of nationwide scope or effect and if in taking such action the Administrator finds and pub-

lishes that such action is based on such a determination. Any petition for review under this subsection shall be filed within sixty days from the date notice of such promulgation, approval, or action appears in the Federal Register, except that if such petition is based solely on grounds arising after such sixtieth day, then any petition for review under this subsection shall be filed within sixty days after such grounds arise. The filing of a petition for reconsideration by the Administrator of any otherwise final rule or action shall not affect the finality of such rule or action for purposes of judicial review nor extend the time within which a petition for judicial review of such rule or action under this section may be filed, and shall not postpone the effectiveness of such rule or action.

(2) Action of the Administrator with respect to which review could have been obtained under paragraph (1) shall not be subject to judicial review in civil or criminal proceedings for enforcement. Where a final decision by the Administrator defers performance of any nondiscretionary statutory action to a later time, any person may challenge the deferral pursuant to paragraph (1).

**(c) Additional evidence**

In any judicial proceeding in which review is sought of a determination under this chapter required to be made on the record after notice and opportunity for hearing, if any party applies to the court for leave to adduce additional evidence, and shows to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for the failure to adduce such evidence in the proceeding before the Administrator, the court may order such additional evidence (and evidence in rebuttal thereof) to be taken before the Administrator, in such manner and upon such terms and conditions as to[5] the court may deem proper. The Administrator may modify his findings as to the facts, or make new findings, by reason of the additional evidence so taken and he shall file such modified or new findings, and his recommendation, if any, for the modification or setting aside of his original determination, with the return of such additional evidence.

**(d) Rulemaking**

(1) This subsection applies to—

(A) the promulgation or revision of any national ambient air quality standard under section 7409 of this title,

(B) the promulgation or revision of an implementation plan by the Administrator under section 7410(c) of this title,

(C) the promulgation or revision of any standard of performance under section 7411 of this title, or emission standard or limitation under section 7412(d) of this title, any standard under section 7412(f) of this title, or any regulation under section 7412(g)(1)(D) and (F) of this title, or any regulation under section 7412(m) or (n) of this title,

(D) the promulgation of any requirement for solid waste combustion under section 7429 of this title,

---

[4] So in original. Probably should be "subsection,".

[5] So in original. The word "to" probably should not appear.

(E) the promulgation or revision of any regulation pertaining to any fuel or fuel additive under section 7545 of this title,

(F) the promulgation or revision of any aircraft emission standard under section 7571 of this title,

(G) the promulgation or revision of any regulation under subchapter IV–A of this chapter (relating to control of acid deposition),

(H) promulgation or revision of regulations pertaining to primary nonferrous smelter orders under section 7419 of this title (but not including the granting or denying of any such order),

(I) promulgation or revision of regulations under subchapter VI of this chapter (relating to stratosphere and ozone protection),

(J) promulgation or revision of regulations under part C of subchapter I of this chapter (relating to prevention of significant deterioration of air quality and protection of visibility),

(K) promulgation or revision of regulations under section 7521 of this title and test procedures for new motor vehicles or engines under section 7525 of this title, and the revision of a standard under section 7521(a)(3) of this title,

(L) promulgation or revision of regulations for noncompliance penalties under section 7420 of this title,

(M) promulgation or revision of any regulations promulgated under section 7541 of this title (relating to warranties and compliance by vehicles in actual use),

(N) action of the Administrator under section 7426 of this title (relating to interstate pollution abatement),

(O) the promulgation or revision of any regulation pertaining to consumer and commercial products under section 7511b(e) of this title,

(P) the promulgation or revision of any regulation pertaining to field citations under section 7413(d)(3) of this title,

(Q) the promulgation or revision of any regulation pertaining to urban buses or the clean-fuel vehicle, clean-fuel fleet, and clean fuel programs under part C of subchapter II of this chapter,

(R) the promulgation or revision of any regulation pertaining to nonroad engines or nonroad vehicles under section 7547 of this title,

(S) the promulgation or revision of any regulation relating to motor vehicle compliance program fees under section 7552 of this title,

(T) the promulgation or revision of any regulation under subchapter IV–A of this chapter (relating to acid deposition),

(U) the promulgation or revision of any regulation under section 7511b(f) of this title pertaining to marine vessels, and

(V) such other actions as the Administrator may determine.

The provisions of section 553 through 557 and section 706 of title 5 shall not, except as expressly provided in this subsection, apply to actions to which this subsection applies. This subsection shall not apply in the case of any rule or circumstance referred to in subparagraphs (A) or (B) of subsection 553(b) of title 5.

(2) Not later than the date of proposal of any action to which this subsection applies, the Administrator shall establish a rulemaking docket for such action (hereinafter in this subsection referred to as a ''rule''). Whenever a rule applies only within a particular State, a second (identical) docket shall be simultaneously established in the appropriate regional office of the Environmental Protection Agency.

(3) In the case of any rule to which this subsection applies, notice of proposed rulemaking shall be published in the Federal Register, as provided under section 553(b) of title 5, shall be accompanied by a statement of its basis and purpose and shall specify the period available for public comment (hereinafter referred to as the ''comment period''). The notice of proposed rulemaking shall also state the docket number, the location or locations of the docket, and the times it will be open to public inspection. The statement of basis and purpose shall include a summary of—

(A) the factual data on which the proposed rule is based;

(B) the methodology used in obtaining the data and in analyzing the data; and

(C) the major legal interpretations and policy considerations underlying the proposed rule.

The statement shall also set forth or summarize and provide a reference to any pertinent findings, recommendations, and comments by the Scientific Review Committee established under section 7409(d) of this title and the National Academy of Sciences, and, if the proposal differs in any important respect from any of these recommendations, an explanation of the reasons for such differences. All data, information, and documents referred to in this paragraph on which the proposed rule relies shall be included in the docket on the date of publication of the proposed rule.

(4)(A) The rulemaking docket required under paragraph (2) shall be open for inspection by the public at reasonable times specified in the notice of proposed rulemaking. Any person may copy documents contained in the docket. The Administrator shall provide copying facilities which may be used at the expense of the person seeking copies, but the Administrator may waive or reduce such expenses in such instances as the public interest requires. Any person may request copies by mail if the person pays the expenses, including personnel costs to do the copying.

(B)(i) Promptly upon receipt by the agency, all written comments and documentary information on the proposed rule received from any person for inclusion in the docket during the comment period shall be placed in the docket. The transcript of public hearings, if any, on the proposed rule shall also be included in the docket promptly upon receipt from the person who transcribed such hearings. All documents which become available after the proposed rule has been published and which the Administrator determines are of central relevance to the rulemaking shall be placed in the docket as soon as possible after their availability.

(ii) The drafts of proposed rules submitted by the Administrator to the Office of Management

and Budget for any interagency review process prior to proposal of any such rule, all documents accompanying such drafts, and all written comments thereon by other agencies and all written responses to such written comments by the Administrator shall be placed in the docket no later than the date of proposal of the rule. The drafts of the final rule submitted for such review process prior to promulgation and all such written comments thereon, all documents accompanying such drafts, and written responses thereto shall be placed in the docket no later than the date of promulgation.

(5) In promulgating a rule to which this subsection applies (i) the Administrator shall allow any person to submit written comments, data, or documentary information; (ii) the Administrator shall give interested persons an opportunity for the oral presentation of data, views, or arguments, in addition to an opportunity to make written submissions; (iii) a transcript shall be kept of any oral presentation; and (iv) the Administrator shall keep the record of such proceeding open for thirty days after completion of the proceeding to provide an opportunity for submission of rebuttal and supplementary information.

(6)(A) The promulgated rule shall be accompanied by (i) a statement of basis and purpose like that referred to in paragraph (3) with respect to a proposed rule and (ii) an explanation of the reasons for any major changes in the promulgated rule from the proposed rule.

(B) The promulgated rule shall also be accompanied by a response to each of the significant comments, criticisms, and new data submitted in written or oral presentations during the comment period.

(C) The promulgated rule may not be based (in part or whole) on any information or data which has not been placed in the docket as of the date of such promulgation.

(7)(A) The record for judicial review shall consist exclusively of the material referred to in paragraph (3), clause (i) of paragraph (4)(B), and subparagraphs (A) and (B) of paragraphs (6).

(B) Only an objection to a rule or procedure which was raised with reasonable specificity during the period for public comment (including any public hearing) may be raised during judicial review. If the person raising an objection can demonstrate to the Administrator that it was impracticable to raise such objection within such time or if the grounds for such objection arose after the period for public comment (but within the time specified for judicial review) and if such objection is of central relevance to the outcome of the rule, the Administrator shall convene a proceeding for reconsideration of the rule and provide the same procedural rights as would have been afforded had the information been available at the time the rule was proposed. If the Administrator refuses to convene such a proceeding, such person may seek review of such refusal in the United States court of appeals for the appropriate circuit (as provided in subsection (b) of this section). Such reconsideration shall not postpone the effectiveness of the rule. The effectiveness of the rule may be stayed during such reconsideration, however, by the Administrator or the court for a period not to exceed three months.

(8) The sole forum for challenging procedural determinations made by the Administrator under this subsection shall be in the United States court of appeals for the appropriate circuit (as provided in subsection (b) of this section) at the time of the substantive review of the rule. No interlocutory appeals shall be permitted with respect to such procedural determinations. In reviewing alleged procedural errors, the court may invalidate the rule only if the errors were so serious and related to matters of such central relevance to the rule that there is a substantial likelihood that the rule would have been significantly changed if such errors had not been made.

(9) In the case of review of any action of the Administrator to which this subsection applies, the court may reverse any such action found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; or

(D) without observance of procedure required by law, if (i) such failure to observe such procedure is arbitrary or capricious, (ii) the requirement of paragraph (7)(B) has been met, and (iii) the condition of the last sentence of paragraph (8) is met.

(10) Each statutory deadline for promulgation of rules to which this subsection applies which requires promulgation less than six months after date of proposal may be extended to not more than six months after date of proposal by the Administrator upon a determination that such extension is necessary to afford the public, and the agency, adequate opportunity to carry out the purposes of this subsection.

(11) The requirements of this subsection shall take effect with respect to any rule the proposal of which occurs after ninety days after August 7, 1977.

**(e) Other methods of judicial review not authorized**

Nothing in this chapter shall be construed to authorize judicial review of regulations or orders of the Administrator under this chapter, except as provided in this section.

**(f) Costs**

In any judicial proceeding under this section, the court may award costs of litigation (including reasonable attorney and expert witness fees) whenever it determines that such award is appropriate.

**(g) Stay, injunction, or similar relief in proceedings relating to noncompliance penalties**

In any action respecting the promulgation of regulations under section 7420 of this title or the administration or enforcement of section 7420 of this title no court shall grant any stay, injunctive, or similar relief before final judgment by such court in such action.

**(h) Public participation**

It is the intent of Congress that, consistent with the policy of subchapter II of chapter 5 of

title 5, the Administrator in promulgating any regulation under this chapter, including a regulation subject to a deadline, shall ensure at least 30 days, except as otherwise expressly provided in section [6] 7407(d), 7502(a), 7511(a) and (b), and 7512(a) and (b) of this title.

(July 14, 1955, ch. 360, title III, §307, as added Pub. L. 91–604, §12(a), Dec. 31, 1970, 84 Stat. 1707; amended Pub. L. 92–157, title III, §302(a), Nov. 18, 1971, 85 Stat. 464; Pub. L. 93–319, §6(c), June 22, 1974, 88 Stat. 259; Pub. L. 95–95, title III, §§303(d), 305(a), (c), (f)–(h), Aug. 7, 1977, 91 Stat. 772, 776, 777; Pub. L. 95–190, §14(a)(79), (80), Nov. 16, 1977, 91 Stat. 1404; Pub. L. 101–549, title I, §§108(p), 110(5), title III, §302(g), (h), title VII, §§702(c), 703, 706, 707(h), 710(b), Nov. 15, 1990, 104 Stat. 2469, 2470, 2574, 2681–2684.)

### REFERENCES IN TEXT

Section 7521(b)(4) of this title, referred to in subsec. (a), was repealed by Pub. L. 101–549, title II, §230(2), Nov. 15, 1990, 104 Stat. 2529.

Section 7521(b)(5) of this title, referred to in subsec. (b)(1), was repealed by Pub. L. 101–549, title II, §230(3), Nov. 15, 1990, 104 Stat. 2529.

Section 1857c–10(c)(2)(A), (B), or (C) of this title (as in effect before August 7, 1977, referred to in subsec. (b)(1), was in the original "section 119(c)(2)(A), (B), or (C) (as in effect before the date of enactment of the Clean Air Act Amendments of 1977)", meaning section 119 of act July 14, 1955, ch. 360, title I, as added June 22, 1974, Pub. L. 93–319, §3, 88 Stat. 248, (which was classified to section 1857c–10 of this title) as in effect prior to the enactment of Pub. L. 95–95, Aug. 7, 1977, 91 Stat. 691, effective Aug. 7, 1977. Section 112(b)(1) of Pub. L. 95–95 repealed section 119 of act July 14, 1955, ch. 360, title I, as added by Pub. L. 93–319, and provided that all references to such section 119 in any subsequent enactment which supersedes Pub. L. 93–319 shall be construed to refer to section 113(d) of the Clean Air Act and to paragraph (5) thereof in particular which is classified to subsec. (d)(5) of section 7413 of this title. Section 7413(d) of this title was subsequently amended generally by Pub. L. 101–549, title VII, §701, Nov. 15, 1990, 104 Stat. 2672, and, as so amended, no longer relates to final compliance orders. Section 117(b) of Pub. L. 95–95 added a new section 119 of act July 14, 1955, which is classified to section 7419 of this title.

Part C of subchapter I of this chapter, referred to in subsec. (d)(1)(J), was in the original "subtitle C of title I", and was translated as reading "part C of title I" to reflect the probable intent of Congress, because title I does not contain subtitles.

### CODIFICATION

In subsec. (h), "subchapter II of chapter 5 of title 5" was substituted for "the Administrative Procedures Act" on authority of Pub. L. 89–554, §7(b), Sept. 6, 1966, 80 Stat. 631, the first section of which enacted Title 5, Government Organization and Employees.

Section was formerly classified to section 1857h–5 of this title.

### PRIOR PROVISIONS

A prior section 307 of act July 14, 1955, was renumbered section 314 by Pub. L. 91–604 and is classified to section 7614 of this title.

Another prior section 307 of act July 14, 1955, ch. 360, title III, formerly §14, as added Dec. 17, 1963, Pub. L. 88–206, §1, 77 Stat. 401, was renumbered section 307 by Pub. L. 89–272, renumbered section 310 by Pub. L. 90–148, and renumbered section 317 by Pub. L. 91–604, and is set out as a Short Title note under section 7401 of this title.

---

[6] So in original. Probably should be "sections".

### AMENDMENTS

1990—Subsec. (a). Pub. L. 101–549, §703, struck out par. (1) designation at beginning, inserted provisions authorizing issuance of subpoenas and administration of oaths for purposes of investigations, monitoring, reporting requirements, entries, compliance inspections, or administrative enforcement proceedings under this chapter, and struck out "or section 7521(b)(5)" after "section 7410(f)".

Subsec. (b)(1). Pub. L. 101–549, §706(2), which directed amendment of second sentence by striking "under section 7413(d) of this title" immediately before "under section 7419 of this title", was executed by striking "under section 7413(d) of this title," before "under section 7419 of this title", to reflect the probable intent of Congress.

Pub. L. 101–549, §706(1), inserted at end: "The filing of a petition for reconsideration by the Administrator of any otherwise final rule or action shall not affect the finality of such rule or action for purposes of judicial review nor extend the time within which a petition for judicial review of such rule or action under this section may be filed, and shall not postpone the effectiveness of such rule or action."

Pub. L. 101–549, §702(c), inserted "or revising regulations for enhanced monitoring and compliance certification programs under section 7414(a)(3) of this title," before "or any other final action of the Administrator".

Pub. L. 101–549, §302(g), substituted "section 7412" for "section 7412(c)".

Subsec. (b)(2). Pub. L. 101–549, §707(h), inserted sentence at end authorizing challenge to deferrals of performance of nondiscretionary statutory actions.

Subsec. (d)(1)(C). Pub. L. 101–549, §110(5)(A), amended subpar. (C) generally. Prior to amendment, subpar. (C) read as follows: "the promulgation or revision of any standard of performance under section 7411 of this title or emission standard under section 7412 of this title,".

Subsec. (d)(1)(D), (E). Pub. L. 101–549, §302(h), added subpar. (D) and redesignated former subpar. (D) as (E). Former subpar. (E) redesignated (F).

Subsec. (d)(1)(F). Pub. L. 101–549, §302(h), redesignated subpar. (E) as (F). Former subpar. (F) redesignated (G).

Pub. L. 101–549, §110(5)(B), amended subpar. (F) generally. Prior to amendment, subpar. (F) read as follows: "promulgation or revision of regulations pertaining to orders for coal conversion under section 7413(d)(5) of this title (but not including orders granting or denying any such orders),".

Subsec. (d)(1)(G), (H). Pub. L. 101–549, §302(h), redesignated subpars. (F) and (G) as (G) and (H), respectively. Former subpar. (H) redesignated (I).

Subsec. (d)(1)(I). Pub. L. 101–549, §710(b), which directed that subpar. (H) be amended by substituting "subchapter VI of this chapter" for "part B of subchapter I of this chapter", was executed by making the substitution in subpar. (I), to reflect the probable intent of Congress and the intervening redesignation of subpar. (H) as (I) by Pub. L. 101–549, §302(h), see below.

Pub. L. 101–549, §302(h), redesignated subpar. (H) as (I). Former subpar. (I) redesignated (J).

Subsec. (d)(1)(J) to (M). Pub. L. 101–549, §302(h), redesignated subpars. (I) to (L) as (J) to (M), respectively. Former subpar. (M) redesignated (N).

Subsec. (d)(1)(N). Pub. L. 101–549, §302(h), redesignated subpar. (M) as (N). Former subpar. (N) redesignated (O).

Pub. L. 101–549, §110(5)(C), added subpar. (N) and redesignated former subpar. (N) as (U).

Subsec. (d)(1)(O) to (T). Pub. L. 101–549, §302(h), redesignated subpars. (N) to (S) as (O) to (T), respectively. Former subpar. (T) redesignated (U).

Pub. L. 101–549, §110(5)(C), added subpars. (O) to (T).

Subsec. (d)(1)(U). Pub. L. 101–549, §302(h), redesignated subpar. (T) as (U). Former subpar. (U) redesignated (V).

Pub. L. 101–549, §110(5)(C), redesignated former subpar. (N) as (U).

Subsec. (d)(1)(V). Pub. L. 101–549, §302(h), redesignated subpar. (U) as (V).

Subsec. (h). Pub. L. 101–549, §108(p), added subsec. (h).

1977—Subsec. (b)(1). Pub. L. 95–190 in text relating to filing of petitions for review in the United States Court of Appeals for the District of Columbia inserted provision respecting requirements under sections 7411 and 7412 of this title, and substituted provisions authorizing review of any rule issued under section 7413, 7419, or 7420 of this title, for provisions authorizing review of any rule or order issued under section 7420 of this title, relating to noncompliance penalties, and in text relating to filing of petitions for review in the United States Court of Appeals for the appropriate circuit inserted provision respecting review under section 7411(j), 7412(c), 7413(d), or 7419 of this title, provision authorizing review under section 1857c–10(c)(2)(A), (B), or (C) to the period prior to Aug. 7, 1977, and provisions authorizing review of denials or disapprovals by the Administrator under subchapter I of this chapter.

Pub. L. 95–95, §305(c), (h), inserted rules or orders issued under section 7420 of this title (relating to noncompliance penalties) and any other nationally applicable regulations promulgated, or final action taken, by the Administrator under this chapter to the enumeration of actions of the Administrator for which a petition for review may be filed only in the United States Court of Appeals for the District of Columbia, added the approval or promulgation by the Administrator of orders under section 7420 of this title, or any other final action of the Administrator under this chapter which is locally or regionally applicable to the enumeration of actions by the Administrator for which a petition for review may be filed only in the United States Court of Appeals for the appropriate circuit, inserted provision that petitions otherwise capable of being filed in the Court of Appeals for the appropriate circuit may be filed only in the Court of Appeals for the District of Columbia if the action is based on a determination of nationwide scope, and increased from 30 days to 60 days the period during which the petition must be filed.

Subsec. (d). Pub. L. 95–95, §305(a), added subsec. (d).

Subsec. (e). Pub. L. 95–95, §303(d), added subsec. (e).

Subsec. (f). Pub. L. 95–95, §305(f), added subsec. (f).

Subsec. (g). Pub. L. 95–95, §305(g), added subsec. (g).

1974—Subsec. (b)(1). Pub. L. 93–319 inserted reference to the Administrator's action under section 1857c–10(c)(2)(A), (B), or (C) of this title or under regulations thereunder and substituted reference to the filing of a petition within 30 days from the date of promulgation, approval, or action for reference to the filing of a petition within 30 days from the date of promulgation or approval.

1971—Subsec. (a)(1). Pub. L. 92–157 substituted reference to section ''7545(c)(3)'' for ''7545(c)(4)'' of this title.

#### EFFECTIVE DATE OF 1977 AMENDMENT

Amendment by Pub. L. 95–95 effective Aug. 7, 1977, except as otherwise expressly provided, see section 406(d) of Pub. L. 95–95, set out as a note under section 7401 of this title.

#### TERMINATION OF ADVISORY COMMITTEES

Advisory committees established after Jan. 5, 1973, to terminate not later than the expiration of the 2-year period beginning on the date of their establishment, unless, in the case of a committee established by the President or an officer of the Federal Government, such committee is renewed by appropriate action prior to the expiration of such 2-year period, or in the case of a committee established by the Congress, its duration is otherwise provided for by law. See section 14 of Pub. L. 92–463, Oct. 6, 1972, 86 Stat. 776, set out in the Appendix to Title 5, Government Organization and Employees.

#### PENDING ACTIONS AND PROCEEDINGS

Suits, actions, and other proceedings lawfully commenced by or against the Administrator or any other officer or employee of the United States in his official capacity or in relation to the discharge of his official duties under act July 14, 1955, the Clean Air Act, as in effect immediately prior to the enactment of Pub. L. 95–95 [Aug. 7, 1977], not to abate by reason of the taking effect of Pub. L. 95–95, see section 406(a) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

#### MODIFICATION OR RESCISSION OF RULES, REGULATIONS, ORDERS, DETERMINATIONS, CONTRACTS, CERTIFICATIONS, AUTHORIZATIONS, DELEGATIONS, AND OTHER ACTIONS

All rules, regulations, orders, determinations, contracts, certifications, authorizations, delegations, or other actions duly issued, made, or taken by or pursuant to act July 14, 1955, the Clean Air Act, as in effect immediately prior to the date of enactment of Pub. L. 95–95 [Aug. 7, 1977] to continue in full force and effect until modified or rescinded in accordance with act July 14, 1955, as amended by Pub. L. 95–95 [this chapter], see section 406(b) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

## § 7608. Mandatory licensing

Whenever the Attorney General determines, upon application of the Administrator—

(1) that—

(A) in the implementation of the requirements of section 7411, 7412, or 7521 of this title, a right under any United States letters patent, which is being used or intended for public or commercial use and not otherwise reasonably available, is necessary to enable any person required to comply with such limitation to so comply, and

(B) there are no reasonable alternative methods to accomplish such purpose, and

(2) that the unavailability of such right may result in a substantial lessening of competition or tendency to create a monopoly in any line of commerce in any section of the country,

the Attorney General may so certify to a district court of the United States, which may issue an order requiring the person who owns such patent to license it on such reasonable terms and conditions as the court, after hearing, may determine. Such certification may be made to the district court for the district in which the person owning the patent resides, does business, or is found.

(July 14, 1955, ch. 360, title III, §308, as added Pub. L. 91–604, §12(a), Dec. 31, 1970, 84 Stat. 1708.)

#### CODIFICATION

Section was formerly classified to section 1857h–6 of this title.

#### PRIOR PROVISIONS

A prior section 308 of act July 14, 1955, was renumbered section 315 by Pub. L. 91–604 and is classified to section 7615 of this title.

#### MODIFICATION OR RESCISSION OF RULES, REGULATIONS, ORDERS, DETERMINATIONS, CONTRACTS, CERTIFICATIONS, AUTHORIZATIONS, DELEGATIONS, AND OTHER ACTIONS

All rules, regulations, orders, determinations, contracts, certifications, authorizations, delegations, or other actions duly issued, made, or taken by or pursuant to act July 14, 1955, the Clean Air Act, as in effect

**Environmental Protection Agency**  §80.1401

part 80, subpart L, including 40 CFR 80.1363 apply to [insert name of foreign refiner]. Pursuant to Clean Air Act section 113(c) and 18 U.S.C. 1001, the penalty for furnishing false, incomplete or misleading information in this certification or submission is a fine of up to $10,000 U.S., and/or imprisonment for up to five years.

## Subpart M—Renewable Fuel Standard

SOURCE: 75 FR 14863, Mar. 26, 2010, unless otherwise noted.

### §80.1400  Applicability.

The provisions of this Subpart M shall apply for all renewable fuel produced on or after July 1, 2010, for all RINs generated on or after July 1, 2010, and for all renewable volume obligations and compliance periods starting with January 1, 2010. Except as provided otherwise in this Subpart M, the provisions of Subpart K of this Part 80 shall not apply for such renewable fuel, RINs, renewable volume obligations, or compliance periods.

### §80.1401  Definitions.

The definitions of §80.2 and of this section apply for the purposes of this Subpart M. The definitions of this section do not apply to other subparts unless otherwise noted. Note that many terms defined here are common terms that have specific meanings under this subpart M. The definitions follow:

*Actual peak capacity* means 105% of the maximum annual volume of renewable fuels produced from a specific renewable fuel production facility on a calendar year basis.

(1) For facilities that commenced construction prior to December 19, 2007, the actual peak capacity is based on the last five calendar years prior to 2008, unless no such production exists, in which case actual peak capacity is based on any calendar year after start-up during the first three years of operation.

(2) For facilities that commenced construction after December 19, 2007 and before January 1, 2010 that are fired with natural gas, biomass, or a combination thereof, the actual peak capacity is based on any calendar year

after startup during the first three years of operation.

(3) For all other facilities not included above, the actual peak capacity is based on the last five calendar years prior to the year in which the owner or operator registers the facility under the provisions of §80.1450, unless no such production exists, in which case actual peak capacity is based on any calendar year after startup during the first three years of operation.

*Advanced biofuel* means renewable fuel, other than ethanol derived from cornstarch, that has lifecycle greenhouse gas emissions that are at least 50 percent less than baseline lifecycle greenhouse gas emissions.

*Annual cover crop* means an annual crop, planted as a rotation between primary planted crops, or between trees and vines in orchards and vineyards, typically to protect soil from erosion and to improve the soil between periods of regular crops. An annual cover crop has no existing market to which it can be sold except for its use as feedstock for the production of renewable fuel.

*Areas at risk of wildfire* are those areas in the "wildland-urban interface", where humans and their development meet or intermix with wildland fuel. Note that, for guidance, the SILVIS laboratory at the University of Wisconsin maintains a Web site that provides a detailed map of areas meeting this criteria at: *http://www.silvis.forest.wisc.edu/projects/US_WUI_2000.asp*. The SILVIS laboratory is located at 1630 Linden Drive, Madison, Wisconsin 53706 and can be contacted at (608) 263–4349.

*Baseline lifecycle greenhouse gas emissions* means the average lifecycle greenhouse gas emissions for gasoline or diesel (whichever is being replaced by the renewable fuel) sold or distributed as transportation fuel in 2005.

*Baseline volume* means the permitted capacity or, if permitted capacity cannot be determined, the actual peak capacity of a specific renewable fuel production facility on a calendar year basis.

*Biodiesel* means a mono-alkyl ester that meets ASTM D 6751 (incorporated by reference, *see* §80.1468).

1099

§ 80.1401                                                40 CFR Ch. I (7–1–14 Edition)

*Biogas* means a mixture of hydrocarbons that is a gas at 60 degrees Fahrenheit and 1 atmosphere of pressure that is produced through the conversion of organic matter. Only biogas that is used as renewable fuel can generate RINs. Biogas includes propane, landfill gas, manure digester gas, and sewage waste treatment gas.

*Biomass-based diesel* means a renewable fuel that has lifecycle greenhouse gas emissions that are at least 50 percent less than baseline lifecycle greenhouse gas emissions and meets all of the requirements of paragraph (1) of this definition:

(1)(i) Is a transportation fuel, transportation fuel additive, heating oil, or jet fuel.

(ii) Meets the definition of either biodiesel or non-ester renewable diesel.

(iii) Is registered as a motor vehicle fuel or fuel additive under 40 CFR part 79, if the fuel or fuel additive is intended for use in a motor vehicle.

(2) Renewable fuel that is co-processed with petroleum is not biomass-based diesel.

*Cellulosic biofuel* means renewable fuel derived from any cellulose, hemicellulose, or lignin that has lifecycle greenhouse gas emissions that are at least 60 percent less than the baseline lifecycle greenhouse gas emissions.

*Cellulosic diesel* is any renewable fuel which meets both the definitions of cellulosic biofuel and biomass-based diesel, as defined in this section 80.1401. Cellulosic diesel includes heating oil and jet fuel made from cellulosic feedstocks.

*Combined heat and power (CHP)*, also known as cogeneration, refers to industrial processes in which waste heat from the production of electricity is used for process energy in the renewable fuel production facility.

*Co-processed* means that renewable biomass was simultaneously processed with fossil fuels or other non-renewable feedstock in the same unit or units to produce a fuel that is partially derived from renewable biomass.

*Corn oil extraction* means the recovery of corn oil from the thin stillage and/or the distillers grains and solubles produced by a dry mill corn ethanol plant, most often by mechanical separation.

*Corn oil fractionation* means a process whereby seeds are divided in various components and oils are removed prior to fermentation for the production of ethanol.

*Crop residue* is the biomass left over from the harvesting or processing of planted crops from existing agricultural land and any biomass removed from existing agricultural land that facilitates crop management (including biomass removed from such lands in relation to invasive species control or fire management), whether or not the biomass includes any portion of a crop or crop plant.

*Cropland* is land used for production of crops for harvest and includes cultivated cropland, such as for row crops or close-grown crops, and non-cultivated cropland, such as for horticultural or aquatic crops.

*Diesel*, for the purposes of this subpart, refers to any and all of the products specified at § 80.1407(e).

*Ecologically sensitive forestland* means forestland that meets either of the following criteria:

(1) An ecological community with a global or state ranking of critically imperiled, imperiled or rare pursuant to a State Natural Heritage Program. For examples of such ecological communities, see "Listing of Forest Ecological Communities Pursuant to 40 CFR 80.1401; S1–S3 communities," which is number EPA–HQ–OAR–2005–0161–1034.1 in the public docket, and "Listing of Forest Ecological Communities Pursuant to 40 CFR 80.1401; G1–G2 communities," which is number EPA–HQ–OAR–2005-0161–2906.1 in the public docket. This material is available for inspection at the EPA Docket Center, EPA/DC, EPA West, Room 3334, 1301 Constitution Ave., NW., Washington DC. The telephone number for the Air Docket is (202) 566–1742.

(2) Old growth or late successional, characterized by trees at least 200 years in age.

*Energy cane* means a complex hybrid in the Saccharum genus that has been bred to maximize cellulosic rather than sugar content. For the purposes of this section, energy cane excludes the species *Saccharum spontaneum*, but includes hybrids derived from *S.*

**Environmental Protection Agency** §80.1401

*spontaneum* that have been developed and publicly released by USDA.

*EPA Moderated Transaction System,* or EMTS, means a closed, EPA moderated system that provides a mechanism for screening and tracking Renewable Identification Numbers (RINs) as per §80.1452.

*Existing agricultural land* is cropland, pastureland, and land enrolled in the Conservation Reserve Program (administered by the U.S. Department of Agriculture's Farm Service Agency) that was cleared or cultivated prior to December 19, 2007, and that, on December 19, 2007, was:

(1) Nonforested; and

(2) Actively managed as agricultural land or fallow, as evidenced by records which must be traceable to the land in question, which must include one of the following:

(i) Records of sales of planted crops, crop residue, or livestock, or records of purchases for land treatments such as fertilizer, weed control, or seeding.

(ii) A written management plan for agricultural purposes.

(iii) Documented participation in an agricultural management program administered by a Federal, state, or local government agency.

(iv) Documented management in accordance with a certification program for agricultural products.

*Exporter of renewable fuel* means:

(1) A person that transfers any renewable fuel from a location within the contiguous 48 states or Hawaii to a location outside the contiguous 48 states and Hawaii; and

(2) A person that transfers any renewable fuel from a location in the contiguous 48 states or Hawaii to Alaska or a United States territory, unless that state or territory has received an approval from the Administrator to opt-in to the renewable fuel program pursuant to §80.1443.

*Facility* means all of the activities and equipment associated with the production of renewable fuel starting from the point of delivery of feedstock material to the point of final storage of the end product, which are located on one property, and are under the control of the same person (or persons under common control).

*Fallow* means cropland, pastureland, or land enrolled in the Conservation Reserve Program (administered by the U.S. Department of Agriculture's Farm Service Agency) that is intentionally left idle to regenerate for future agricultural purposes with no seeding or planting, harvesting, mowing, or treatment during the fallow period.

*Foreign ethanol producer* means a person from a foreign country or from an area that has not opted into the program requirements of this subpart who produces ethanol for use in transportation fuel, heating oil, or jet fuel but who does not add denaturant to their product as described in paragraph (2) of the definition of renewable fuel in this section.

*Forestland* is generally undeveloped land covering a minimum area of 1 acre upon which the primary vegetative species are trees, including land that formerly had such tree cover and that will be regenerated and tree plantations. Tree-covered areas in intensive agricultural crop production settings, such as fruit orchards, or tree-covered areas in urban settings, such as city parks, are not considered forestland.

*Fuel for use in an ocean-going vessel* means, for this subpart only:

(1) Any marine residual fuel (whether burned in ocean waters, Great Lakes, or other internal waters);

(2) Emission Control Area (ECA) marine fuel, pursuant to §§80.2(ttt) and 80.510(k) (whether burned in ocean waters, Great Lakes, or other internal waters); and

(3) Any other fuel intended for use only in ocean-going vessels.

*Gasoline,* for the purposes of this subpart, refers to any and all of the products specified at §80.1407(c).

*Heating oil* means:

(1) A fuel meeting the definition of heating oil set forth in §80.2(ccc); or

(2) A fuel oil that is used to heat interior spaces of homes or buildings to control ambient climate for human comfort. The fuel oil must be liquid at 60 degrees Fahrenheit and 1 atmosphere of pressure, and contain no more than 2.5% mass solids.

*Importers.* For the purposes of this subpart, an importer of transportation fuel or renewable fuel is any U.S. domestic person who:

§ 80.1401                                                    40 CFR Ch. I (7–1–14 Edition)

(1) Brings transportation fuel or renewable fuel into the 48 contiguous states of the United States or Hawaii, from a foreign country or from an area that has not opted in to the program requirements of this subpart pursuant to § 80.1443; or

(2) Brings transportation fuel or renewable fuel into an area that has opted in to the program requirements of this subpart pursuant to § 80.1443 from a foreign country or from an area that has not opted in to the program requirements of this subpart.

*Membrane separation* means the process of dehydrating ethanol to fuel grade (>99.5% purity) using a hydrophilic membrane.

*Motor vehicle* has the meaning given in Section 216(2) of the Clean Air Act (42 U.S.C. 7550(2)).

*Naphtha* means a blendstock falling within the boiling range of gasoline which is composed of only hydrocarbons, is commonly or commercially known as naphtha, and is used to produce gasoline.

*Neat renewable fuel* is a renewable fuel to which 1% or less of gasoline (as defined in this section) or diesel fuel has been added.

*Non-ester renewable diesel*, also known as renewable diesel, means renewable fuel which is all of the following:

(1) A fuel which can be used in an engine designed to operate on conventional diesel fuel, or be heating oil or jet fuel.

(2) Not a mono-alkyl ester.

*Nonforested land* means land that is not forestland.

*Nonroad vehicle* has the meaning given in Section 216(11) of the Clean Air Act (42 U.S.C. 7550(11)).

*Pastureland* is land managed for the production of select indigenous or introduced forage plants for livestock grazing or hay production, and to prevent succession to other plant types.

*Permitted capacity* means 105% of the maximum permissible volume output of renewable fuel that is allowed under operating conditions specified in the most restrictive of all applicable preconstruction, construction and operating permits issued by regulatory authorities (including local, regional, state or a foreign equivalent of a state, and federal permits, or permits issued by foreign governmental agencies) that govern the construction and/or operation of the renewable fuel facility, based on an annual volume output on a calendar year basis. If the permit specifies maximum rated volume output on an hourly basis, then annual volume output is determined by multiplying the hourly output by 8,322 hours per year.

(1) For facilities that commenced construction prior to December 19, 2007, the permitted capacity is based on permits issued or revised no later than December 19, 2007.

(2) For facilities that commenced construction after December 19, 2007 and before January 1, 2010 that are fired with natural gas, biomass, or a combination thereof, the permitted capacity is based on permits issued or revised no later than December 31, 2009.

(3) For facilities other than those described in paragraphs (1) and (2) of this definition, permitted capacity is based on the most recent applicable permits.

*Planted crops* are all annual or perennial agricultural crops from existing agricultural land that may be used as feedstocks for renewable fuel, such as grains, oilseeds, sugarcane, switchgrass, prairie grass, duckweed, and other species (but not including algae species or planted trees), providing that they were intentionally applied by humans to the ground, a growth medium, a pond or tank, either by direct application as seed or plant, or through intentional natural seeding or vegetative propagation by mature plants introduced or left undisturbed for that purpose.

*Planted trees* are trees harvested from a tree plantation.

*Pre-commercial thinnings* are trees, including unhealthy or diseased trees, removed to reduce stocking to concentrate growth on more desirable, healthy trees, or other vegetative material that is removed to promote tree growth.

*Raw starch hydrolysis* means the process of hydrolyzing corn starch into simple sugars at low temperatures, generally not exceeding 100 °F (38 °C), using enzymes designed to be effective under these conditions.

*Renewable biomass* means each of the following (including any incidental, *de*

1102

**Environmental Protection Agency**                                      **§ 80.1401**

*minimis* contaminants that are impractical to remove and are related to customary feedstock production and transport):

(1) Planted crops and crop residue harvested from existing agricultural land cleared or cultivated prior to December 19, 2007 and that was nonforested and either actively managed or fallow on December 19, 2007.

(2) Planted trees and tree residue from a tree plantation located on nonfederal land (including land belonging to an Indian tribe or an Indian individual that is held in trust by the U.S. or subject to a restriction against alienation imposed by the U.S.) that was cleared at any time prior to December 19, 2007 and actively managed on December 19, 2007.

(3) Animal waste material and animal byproducts.

(4) Slash and pre-commercial thinnings from non-federal forestland (including forestland belonging to an Indian tribe or an Indian individual, that are held in trust by the United States or subject to a restriction against alienation imposed by the United States) that is not ecologically sensitive forestland.

(5) Biomass (organic matter that is available on a renewable or recurring basis) obtained from the immediate vicinity of buildings and other areas regularly occupied by people, or of public infrastructure, in an area at risk of wildfire.

(6) Algae.

(7) Separated yard waste or food waste, including recycled cooking and trap grease, and materials described in § 80.1426(f)(5)(i).

*Renewable electricity* means electricity that meets the definition of renewable fuel.

*Renewable fuel* means a fuel which meets all of the requirements of paragraph (1) of this definition:

(1)(i) Fuel that is produced from renewable biomass.

(ii) Fuel that is used to replace or reduce the quantity of fossil fuel present in a transportation fuel, heating oil, or jet fuel.

(iii) Has lifecycle greenhouse gas emissions that are at least 20 percent less than baseline lifecycle greenhouse gas emissions, unless the fuel is exempt from this requirement pursuant to § 80.1403.

(2) Ethanol covered by this definition shall be denatured as required and defined in 27 CFR parts 19 through 21. Any volume of denaturant added to the undenatured ethanol by a producer or importer in excess of 2 volume percent shall not be included in the volume of ethanol for purposes of determining compliance with the requirements under this subpart.

*Renewable gasoline* means renewable fuel made from renewable biomass that is composed of only hydrocarbons and which meets the definition of gasoline in § 80.2(c).

*Renewable gasoline blendstock* means a blendstock made from renewable biomass that is composed of only hydrocarbons and which meets the definition of gasoline blendstock in § 80.2(s).

*Renewable Identification Number (RIN),* is a unique number generated to represent a volume of renewable fuel pursuant to §§ 80.1425 and 80.1426.

(1) *Gallon-RIN* is a RIN that represents an individual gallon of renewable fuel used for compliance purposes pursuant to § 80.1427 to satisfy a renewable volume obligation.

(2) *Batch-RIN* is a RIN that represents multiple gallon-RINs.

*Slash* is the residue, including treetops, branches, and bark, left on the ground after logging or accumulating as a result of a storm, fire, delimbing, or other similar disturbance.

*Small refinery,* for this subpart only, means a refinery for which the average aggregate daily crude oil throughput for calendar year 2006 (as determined by dividing the aggregate throughput for the calendar year by the number of days in the calendar year) does not exceed 75,000 barrels.

*Transportation fuel* means fuel for use in motor vehicles, motor vehicle engines, nonroad vehicles, or nonroad engines (except fuel for use in ocean-going vessels).

*Tree plantation* is a stand of no less than 1 acre composed primarily of trees established by hand- or machine-planting of a seed or sapling, or by coppice growth from the stump or root of a tree that was hand- or machine-planted. Tree plantations must have been cleared prior to December 19, 2007 and

1103

§ 80.1402                                            40 CFR Ch. I (7–1–14 Edition)

must have been actively managed on December 19, 2007, as evidenced by records which must be traceable to the land in question, which must include:

(1) Sales records for planted trees or tree residue together with other written documentation connecting the land in question to these purchases;

(2) Purchasing records for seeds, seedlings, or other nursery stock together with other written documentation connecting the land in question to these purchases;

(3) A written management plan for silvicultural purposes;

(4) Documentation of participation in a silvicultural program sponsored by a Federal, state or local government agency;

(5) Documentation of land management in accordance with an agricultural or silvicultural product certification program;

(6) An agreement for land management consultation with a professional forester that identifies the land in question; or

(7) Evidence of the existence and ongoing maintenance of a road system or other physical infrastructure designed and maintained for logging use, together with one of the above-mentioned documents.

*Tree residue* is slash and any woody residue generated during the processing of planted trees from tree plantations for use in lumber, paper, furniture or other applications, provided that such woody residue is not mixed with similar residue from trees that do not originate in tree plantations.

[75 FR 14863, Mar. 26, 2010, as amended at 75 FR 26035, May 10, 2010, and 75 FR 37733, June 30, 2010; 75 FR 79976, Dec. 21, 2010; 77 FR 1354, Jan. 9, 2012; 78 FR 14215, Mar. 5, 2013; 78 FR 62470, Oct. 22, 2013]

§ 80.1402   [Reserved]

§ 80.1403   Which fuels are not subject to the 20% GHG thresholds?

(a) For purposes of this section, the following definitions apply:

(1) *Commence construction*, as applied to facilities that produce renewable fuel, means that:

(i) The owner or operator has all necessary preconstruction approvals or permits (as defined at 40 CFR 52.21(b)(10)), and has satisfied either of the following:

(A) Begun, or caused to begin, a continuous program of actual construction on-site (as defined in 40 CFR 52.21(b)(11)).

(B) Entered into binding agreements or contractual obligations, which cannot be cancelled or modified without substantial loss to the owner or operator, to undertake a program of actual construction of the facility.

(ii) For multi-phased projects, the commencement of construction of one phase does not constitute commencement of construction of any later phase, unless each phase is mutually dependent for physical and chemical reasons only.

(2) [Reserved]

(b) The lifecycle greenhouse gas emissions from renewable fuels must be at least 20 percent less than baseline lifecycle greenhouse gas emissions, with the exception of the baseline volumes of renewable fuel produced from facilities described in paragraphs (c) and (d) of this section.

(c) The baseline volume of renewable fuel that is produced from facilities and any expansions, all of which commenced construction on or before December 19, 2007, shall not be subject to the requirement that lifecycle greenhouse gas emissions be at least 20 percent less than baseline lifecycle greenhouse gas emissions if the owner or operator:

(1) Did not discontinue construction for a period of 18 months after commencement of construction; and

(2) Completed construction by December 19, 2010.

(d) The baseline volume of ethanol that is produced from facilities and any expansions all of which commenced construction after December 19, 2007 and on or before December 31, 2009, shall not be subject to the requirement that lifecycle greenhouse gas emissions be at least 20 percent less than baseline lifecycle greenhouse gas emissions if such facilities are fired with natural gas, biomass, or a combination thereof at all times the facility operated between December 19, 2007 and December 31, 2009 and if:

(1) The owner or operator did not discontinue construction for a period of 18

1104

**Environmental Protection Agency**                                            **§ 80.1454**

uniquely is the information specified in paragraphs (a)(1) through (a)(10) of this section, the RIN generator company ID, the RIN generator facility ID, and the batch number.

(C) The identifying information for a RIN that is generated prior to July 1, 2010, is the 38-digit code pursuant to §80.1425, in its entirety.

(ii) If assigned RINs are being transferred on a separate PTD from that which is used to transfer ownership of the renewable fuel, then the PTD which is used to transfer ownership of the renewable fuel shall include all the following:

(A) The number of gallon-RINs being transferred.

(B) A unique reference to the PTD which is transferring the assigned RINs.

(C) The information specified in paragraphs (a)(11)(i)(A) through (a)(11)(i)(C) of this section, as appropriate.

(iii) If no assigned RINs are being transferred with the renewable fuel, the PTD which is used to transfer ownership of the renewable fuel shall state "No assigned RINs transferred.".

(iv) If RINs have been separated from the renewable fuel or fuel blend pursuant to §80.1429(b)(4), then all PTDs which are at any time used to transfer ownership of the renewable fuel or fuel blend shall state "This volume of fuel must be used in the designated form, without further blending.".

(b) Except for transfers to truck carriers, retailers, or wholesale purchaser-consumers, product codes may be used to convey the information required under paragraphs (a)(1) through (a)(11) of this section if such codes are clearly understood by each transferee.

(c) For renewable fuel, other than ethanol, that is not registered as motor vehicle fuel under 40 CFR part 79, the PTD which is used to transfer ownership of the renewable fuel shall state "This volume of renewable fuel may not be used as a motor vehicle fuel."

(d) For fuel oil meeting paragraph (2) of the definition of heating oil in §80.1401, the PTD of the fuel oil shall state: "This volume of renewable heating oil is designated and intended to be used to heat interior spaces of homes or buildings to control ambient climate for human comfort. Do NOT use

for process heat or any other purpose, as these uses are prohibited pursuant to 40 CFR 80.1460(g).".

[75 FR 14863, Mar. 26, 2010, as amended at 75 FR 26045, May 10, 2010; 78 FR 62471, Oct. 22, 2013]

**§ 80.1454  What are the recordkeeping requirements under the RFS program?**

(a) *Requirements for obligated parties and exporters.* Beginning July 1, 2010, any obligated party (as described at §80.1406) or exporter of renewable fuel (as described at §80.1401) must keep all of the following records:

(1) Product transfer documents consistent with §80.1453 and associated with the obligated party's or exporter's activity, if any, as transferor or transferee of renewable fuel or separated RINs.

(2) Copies of all reports submitted to EPA under §80.1451(a), as applicable.

(3) Records related to each RIN transaction, including all of the following:

(i) A list of the RINs owned, purchased, sold, separated, retired, or reinstated.

(ii) The parties involved in each RIN transaction including the transferor, transferee, and any broker or agent.

(iii) The date of the transfer of the RIN(s).

(iv) Additional information, including contracts, correspondence, and invoices, related to details of the RIN transaction and its terms.

(4) Records related to the use of RINs (by facility, if applicable) for compliance, including all of the following:

(i) Methods and variables used to calculate the Renewable Volume Obligations pursuant to §80.1407 or §80.1430.

(ii) List of RINs used to demonstrate compliance.

(iii) Additional information related to details of RIN use for compliance.

(5) Records related to the separation of assigned RINs from renewable fuel volume.

(6) For exported renewable fuel, invoices, bills of lading and other documents describing the exported renewable fuel.

(b) *Requirements for all producers of renewable fuel.* Beginning July 1, 2010,

1151

§ 80.1454                                           40 CFR Ch. I (7–1–14 Edition)

any domestic or RIN-generating foreign producer of a renewable fuel as defined in § 80.1401 must keep all of the following records in addition to those required under paragraphs (c) or (d) of this section:

(1) Product transfer documents consistent with § 80.1453 and associated with the renewable fuel producer's activity, if any, as transferor or transferee of renewable fuel or separated RINs.

(2) Copies of all reports submitted to EPA under §§ 80.1449 and 80.1451(b).

(3) Records related to the generation and assignment of RINs for each facility, including all of the following:

(i) Batch volume in gallons.

(ii) Batch number.

(iii) RIN as assigned under § 80.1426, if applicable.

(iv) Identification of batches by renewable category.

(v) Type and quantity of co-products produced.

(vi) Type and quantity of feedstocks used.

(vii) Type and quantity of fuel used for process heat.

(viii) Feedstock energy calculations per § 80.1426(f)(4).

(ix) Date of production.

(x) Results of any laboratory analysis of batch chemical composition or physical properties.

(xi) For RINs generated for ethanol produced from corn starch at a facility using a pathway in Table 1 to § 80.1426 that requires the use of one or more of the advanced technologies listed in Table 2 to § 80.1426, documentation to demonstrate that employment of the required advanced technology or technologies was conducted in accordance with the specifications in Tables 1 and 2 to § 80.1426, including any requirement for application to 90% of the production on a calendar year basis.

(xii) All commercial documents and additional information related to details of RIN generation.

(4) Records related to each RIN transaction, separately for each transaction, including all of the following:

(i) A list of the RINs owned, purchased, sold, retired, or reinstated.

(ii) The parties involved in each transaction including the transferor, transferee, and any broker or agent.

(iii) The date of the transfer of the RIN(s).

(iv) Additional information related to details of the transaction and its terms.

(5) Records related to the production, importation, ownership, sale or use of any volume of renewable fuel for which RINs were generated or blend of renewable fuel for which RINs were generated and gasoline or diesel fuel that any party designates for use as transportation fuel, jet fuel, or heating oil and the use of the fuel or blend as transportation fuel, jet fuel, or heating oil without further blending, in the designated form.

(6) Copies of registration documents required under § 80.1450, including information on fuels and products, feedstocks, facility production processes, process changes, and capacity, energy sources, and a copy of the independent third party engineering review submitted to EPA per § 80.1450(b)(2).

(7) For any producer of renewable fuel made from *Arundo donax* or *Pennisetum purpureum* per § 80.1426(f)(14), all the following:

(i) Records related to all requirements and duties set forth in the registration documents described in § 80.1450(b)(1)(x)(A), including but not limited to the Risk Mitigation Plan, monitoring records and reports, and adherence to state, local and federal invasive species requirements and permits.

(ii) Records associated with feedstock purchases and transfers that identify where the feedstocks were produced and are sufficient to verify that feedstocks used were produced and transported in accordance with an EPA approved Risk Mitigation Plan or were produced on land that the EPA determined does not present a significant likelihood of invasive spread beyond the planting area of the feedstock used for production of the renewable fuel, including all the following:

(*A*) Maps or electronic data identifying the boundaries of the land where each type of feedstock was produced.

(*B*) Bills of lading, product transfer documents, or other commercial documents showing the quantity of feedstock purchased from each area identified above, and showing each transfer

1152

**Environmental Protection Agency**                      **§ 80.1454**

of custody of the feedstock from the location where it was produced to the renewable fuel production facility.

(8) A producer of fuel oil meeting paragraph (2) of the definition of heating oil in § 80.1401 shall keep copies of all contracts which describe the fuel oil under contract with each end user.

(c) *Additional requirements for imports of renewable fuel.*—(1) Beginning July 1, 2010, any RIN-generating foreign producer of a renewable fuel or RIN-generating importer must keep records of feedstock purchases and transfers associated with renewable fuel for which RINs are generated, sufficient to verify that feedstocks used are renewable biomass (as defined in § 80.1401).

(i) RIN-generating foreign producers and importers of renewable fuel made from feedstocks that are planted crops or crop residue from existing foreign agricultural land, planted trees or tree residue from actively managed tree plantations, slash and pre-commercial thinnings from forestlands or biomass obtained from wildland-urban interface must maintain all the following records to verify the location where these feedstocks were produced:

(A) Maps or electronic data identifying the boundaries of the land where each type of feedstock was produced.

(B) Bills of lading, product transfer documents, or other commercial documents showing the quantity of feedstock purchased from each area identified in paragraph (c)(1)(i)(A) of this section, and showing each transfer of custody of the feedstock from the location where it was produced to the renewable fuel production facility.

(ii)(A) RIN-generating foreign producers and importers of renewable fuel made from planted crops or crop residue from existing foreign agricultural land must keep records that serve as evidence that the land from which the feedstock was obtained was cleared or cultivated prior to December 19, 2007 and actively managed or fallow, and nonforested on December 19, 2007. RIN-generating foreign producers or importers of renewable fuel made from planted trees or tree residue from actively managed tree plantations must keep records that serve as evidence that the land from which the feedstock was obtained was cleared prior to De-

cember 19, 2007 and actively managed on December 19, 2007.

(B) The records must be provided by the feedstock producer, traceable to the land in question, and consist of at least one of the following documents:

(*1*) Sales records for planted crops or trees, crop or tree residue, or livestock; purchasing records for fertilizer, weed control, or reseeding, including seeds, seedlings, or other nursery stock.

(*2*) A written management plan for agricultural or silvicultural purposes; documentation of participation in an agricultural or silvicultural program sponsored by a Federal, state, or local government agency.

(*3*) Documentation of land management in accordance with an agricultural or silvicultural product certification program, an agreement for land management consultation with a professional forester that identifies the land in question.

(*4*) Evidence of the existence and ongoing maintenance of a road system or other physical infrastructure designed and maintained for logging use, together with one of the aforementioned documents in this paragraph (c)(1)(ii)(B).

(iii) RIN-generating foreign producers and importers of renewable fuel made from any other type of renewable biomass must have documents from their feedstock supplier certifying that the feedstock qualifies as renewable biomass as defined in § 80.1401, describing the feedstock and identifying the process that was used to generate the feedstock.

(2) Beginning July 1, 2010, any RIN-generating importer of renewable fuel (as defined in § 80.1401) must keep all of the following records:

(i) Product transfer documents consistent with § 80.1453 and associated with the renewable fuel importer's activity, if any, as transferor or transferee of renewable fuel.

(ii) Copies of all reports submitted to EPA under §§ 80.1449 and 80.1451(b).

(iii) Records related to the generation and assignment of RINs for each facility, including all of the following:

(A) Batch volume in gallons.

(B) Batch number.

(C) RIN as assigned under § 80.1426.

1153

§ 80.1454                                                    40 CFR Ch. I (7–1–14 Edition)

(D) Identification of batches by renewable category.

(E) Type and quantity of feedstocks used.

(F) Type and quantity of fuel used for process heat.

(G) Date of import.

(H) Results of any laboratory analysis of batch chemical composition or physical properties.

(I) The EPA registration number of the foreign renewable fuel producers producing the fuel.

(J) Additional information related to details of RIN generation.

(iv) Records related to each RIN transaction, including all of the following:

(A) A list of the RINs owned, purchased, sold, separated, retired, or reinstated.

(B) The parties involved in each transaction including the transferor, transferee, and any broker or agent.

(C) The date of the transfer of the RIN(s).

(D) Additional information related to details of the transaction and its terms.

(v) Copies of registration documents required under § 80.1450.

(vi) Records related to the import of any volume of renewable fuel that the importer designates for use as transportation fuel, jet fuel, or heating oil.

(d) *Additional requirements for domestic producers of renewable fuel.* Except as provided in paragraphs (g) and (h) of this section, beginning July 1, 2010, any domestic producer of renewable fuel as defined in § 80.1401 that generates RINs for such fuel must keep documents associated with feedstock purchases and transfers that identify where the feedstocks were produced and are sufficient to verify that feedstocks used are renewable biomass (as defined in § 80.1401) if RINs are generated.

(1) Domestic producers of renewable fuel made from feedstocks that are planted trees or tree residue from actively managed tree plantations, slash and pre-commercial thinnings from forestlands or biomass obtained from areas at risk of wildfire must maintain all the following records to verify the location where these feedstocks were produced:

(i) Maps or electronic data identifying the boundaries of the land where each type of feedstock was produced.

(ii) Bills of lading, product transfer documents or other commercial documents showing the quantity of feedstock purchased from each area identified in paragraph (d)(1)(i) of this section, and showing each transfer of custody of the feedstock from the location where it was produced to the renewable fuel production facility.

(2) Domestic producers of renewable fuel made from planted trees or tree residue from actively managed tree plantations must keep records that serve as evidence that the land from which the feedstock was obtained was cleared prior to December 19, 2007 and actively managed on December 19, 2007. The records must be provided by the feedstock producer and must include at least one of the following documents, which must be traceable to the land in question:

(i) Sales records for planted trees or tree residue.

(ii) Purchasing records for fertilizer, weed control, or reseeding, including seeds, seedlings, or other nursery stock.

(iii) A written management plan for silvicultural purposes.

(iv) Documentation of participation in a silvicultural program sponsored by a Federal, state, or local government agency.

(v) Documentation of land management in accordance with a silvicultural product certification program, an agreement for land management consultation with a professional forester.

(vi) Evidence of the existence and ongoing maintenance of a road system or other physical infrastructure designed and maintained for logging use, together with one of the aforementioned documents.

(3) Domestic producers of renewable fuel made from planted crops or crop residue from existing foreign agricultural land must keep all the following records:

(i) Records that serve as evidence that the land from which the feedstock was obtained was cleared or cultivated prior to December 19, 2007 and actively managed or fallow, and nonforested on December 19, 2007. The records must be

1154

**Environmental Protection Agency**                                   **§ 80.1454**

provided by the feedstock producer and must include at least one of the following documents, which must be traceable to the land in question:

(A) Sales records for planted crops, crop residue, or livestock.

(B) Purchasing records for fertilizer, weed control, seeds, seedlings, or other nursery stock.

(C) A written management plan for agricultural purposes.

(D) Documentation of participation in an agricultural program sponsored by a Federal, State, or local government agency.

(E) Documentation of land management in accordance with an agricultural product certification program.

(ii) Records to verify the location where the feedstocks were produced:

(A) Maps or electronic data identifying the boundaries of the land where each type of feedstock was produced; and

(B) Bills of lading, product transfer documents or other commercial documents showing the quantity of feedstock purchased from each area identified in paragraph (d)(3)(ii)(A) of this section, and showing each transfer of custody of the feedstock from the location where it was produced to the renewable fuel facility.

(4) Domestic producers of renewable fuel made from any other type of renewable biomass must have documents from their feedstock supplier certifying that the feedstock qualifies as renewable biomass as defined in §80.1401, describing the feedstock. Separated yard and food waste and separated municipal solid waste are subject to the requirements in paragraph (j) of this section.

(e) *Additional requirements for producers of fuel exempt from the 20% GHG reduction requirement.* Beginning July 1, 2010, any production facility with a baseline volume of fuel that is not subject to the 20% GHG threshold, pursuant to §80.1403(c) and (d), must keep all of the following:

(1) Detailed engineering plans for the facility.

(2) Federal, State, and local (or foreign governmental) preconstruction approvals and permitting.

(3) Procurement and construction contracts and agreements.

(f) *Requirements for other parties that own RINs.* Beginning July 1, 2010, any party, other than those parties covered in paragraphs (a) and (b) of this section, that owns RINs must keep all of the following records:

(1) Product transfer documents consistent with §80.1453 and associated with the party's activity, if any, as transferor or transferee of renewable fuel or separated RINs.

(2) Copies of all reports submitted to EPA under §80.1451(c).

(3) Records related to each RIN transaction by renewable fuel category, including all of the following:

(i) A list of the RINs owned, purchased, sold, retired, or reinstated.

(ii) The parties involved in each RIN transaction including the transferor, transferee, and any broker or agent.

(iii) The date of the transfer of the RIN(s).

(iv) Additional information related to details of the transaction and its terms.

(4) Records related to any volume of renewable fuel that the party designated for use as transportation fuel, jet fuel, or heating oil and from which RINs were separated pursuant to §80.1429(b)(4).

(g) *Aggregate compliance with renewable biomass requirement.* Any producer or RIN-generating importer of renewable fuel made from planted crops or crop residue from existing U.S. agricultural land as defined in §80.1401, or from planted crops or crop residue from existing agricultural land in a country covered by a petition approved pursuant to §80.1457, is covered by the aggregate compliance approach and is not subject to the recordkeeping requirements for planted crops and crop residue at §80.1454(g)(2) unless EPA publishes a finding that the 2007 baseline amount of agricultural land in the U.S. has been exceeded or, for the aggregate compliance approach in a foreign country, that the withdrawal of EPA approval of the aggregate compliance approach is warranted pursuant to §80.1457(e).

(1) EPA will make findings concerning whether the 2007 baseline amount of agricultural land in the U.S. or other country covered by a petition approved pursuant to §80.1457 has been

1155

§80.1454                                                 40 CFR Ch. I (7–1–14 Edition)

exceeded and will publish these findings in the FEDERAL REGISTER by November 30 of the year preceding the compliance period.

(2) If EPA finds that the 2007 baseline amount of agricultural land in the U.S. or other country covered by a petition approved pursuant to §80.1457 has been exceeded, beginning on the first day of July of the compliance period in question any producer or RIN-generating importer of renewable fuel made from planted crops or crop residue in the country for which such a finding is made must keep all the following records:

(i) Records that serve as evidence that the land from which the feedstock was obtained was cleared or cultivated prior to December 19, 2007 and actively managed or fallow, and nonforested on December 19, 2007. The records must be provided by the feedstock producer and must include at least one of the following documents, which must be traceable to the land in question:

(A) Sales records for planted crops, crop residue or livestock.

(B) Purchasing records for fertilizer, weed control, seeds, seedlings, or other nursery stock.

(C) A written management plan for agricultural purposes.

(D) Documentation of participation in an agricultural program sponsored by a Federal, state, or local government agency.

(E) Documentation of land management in accordance with an agricultural product certification program.

(ii) Records to verify the location where the feedstocks were produced:

(A) Maps or electronic data identifying the boundaries of the land where each type of feedstock was produced; and

(B) Bills of lading, product transfer documents or other commercial documents showing the quantity of feedstock purchased from each area identified in paragraph (g)(2)(ii)(A) of this section, and showing each transfer of custody of the feedstock from the location where it was produced to the renewable fuel facility.

(h) *Alternative renewable biomass tracking requirement.* Any foreign or domestic renewable fuel producer or RIN-generating importer may comply with the following alternative renewable biomass tracking requirement instead of the recordkeeping requirements in paragraphs (c)(1), (d), and (g) of this section:

(1) To comply with the alternative renewable biomass tracking requirement under this paragraph (h), a renewable fuel producer or importer must either arrange to have an independent third party conduct a comprehensive program of annual compliance surveys, or participate in the funding of an organization which arranged to have a independent third party conduct a comprehensive program of annual compliance surveys, to be carried out in accordance with a survey plan which has been approved by EPA.

(2) The annual compliance surveys under this paragraph (h) must be all the following:

(i) Planned and conducted by an independent surveyor that meets the requirements in §80.68(c)(13)(i).

(ii) Conducted at renewable fuel production and import facilities and their feedstock suppliers.

(iii) Representative of all renewable fuel producers and importers in the survey area and representative of their feedstock suppliers.

(iv) Designed to achieve at least the same level of quality assurance required in paragraphs (c)(1), (d) and (g) of this section.

(3) The compliance survey program shall require the independent surveyor conducting the surveys to do all the following:

(i) Conduct feedstock audits of renewable fuel production and import facilities in accordance with the survey plan approved under this paragraph (h), or immediately notify EPA of any refusal of these facilities to allow an audit to be conducted.

(ii) Obtain the records and product transfer documents associated with the feedstocks being audited.

(iii) Determine the feedstock supplier(s) that supplied the feedstocks to the renewable fuel producer.

(iv) Confirm that feedstocks used to produce RIN-generating renewable fuels meet the definition of renewable biomass as defined in §80.1401.

1156

**Environmental Protection Agency**                    **§ 80.1454**

(v) Immediately notify EPA of any case where the feedstocks do not meet the definition of renewable biomass as defined in § 80.1401.

(vi) Immediately notify EPA of any instances where a renewable fuel producer, importer or feedstock supplier subject to review under the approved plan fails to cooperate in the manner described in this section.

(vii) Submit to EPA a report of each survey, within thirty days following the completion of each survey, such report to include all the following information:

(A) The identification of the person who conducted the survey.

(B) An attestation by the officer of the surveyor company that the survey was conducted in accordance with the survey plan and the survey results are accurate.

(C) Identification of the parties for whom the survey was conducted.

(D) Identification of the covered area surveyed.

(E) The dates on which the survey was conducted.

(F) The address of each facility at which the survey audit was conducted and the date of the audit.

(G) A description of the methodology used to select the locations for survey audits and the number of audits conducted.

(viii) Maintain all records relating to the survey audits conducted under this section (h) for a period of at least 5 years.

(ix) At any time permit any representative of EPA to monitor the conduct of the surveys, including observing audits, reviewing records, and analysis of the audit results.

(4) A survey plan under this paragraph (h) must include all the following:

(i) Identification of the parties for whom the survey is to be conducted.

(ii) Identification of the independent surveyor.

(iii) A methodology for determining all the following:

(A) When the audits will be conducted.

(B) The audit locations.

(C) The number of audits to be conducted during the annual compliance period.

(iv) Any other elements determined by EPA to be necessary to achieve the level of quality assurance required under paragraphs (c)(1), (d), and (g) of this section.

(5)(i) Each renewable fuel producer and importer who participates in the alternative renewable biomass tracking under this paragraph (h) must take all reasonable steps to ensure that each feedstock producer, aggregator, distributor, or supplier cooperates with this program by allowing the independent surveyor to audit their facility and by providing to the independent surveyor and/or EPA, upon request, copies of management plans, product transfer documents, and other records or information regarding the source of any feedstocks received.

(ii) Reasonable steps under paragraph (h)(5)(i) of this section must include, but typically should not be limited to: Contractual agreements with feedstock producers, aggregators, distributors, and suppliers, which require them to cooperate with the independent surveyor and/or EPA in the manner described in paragraph (h)(5)(i) of this section.

(6) The procedure for obtaining EPA approval of a survey plan under this paragraph (h), and for revocation of any such approval, are as follows:

(i) A detailed survey plan which complies with the requirements of this paragraph (h) must be submitted to EPA, no later than September 1 of the year preceding the calendar year in which the surveys will be conducted.

(ii) The survey plan must be signed by a responsible corporate officer of the renewable fuel producer or importer, or responsible officer of the organization which arranges to have an independent surveyor conduct a program of renewable biomass compliance surveys, as applicable.

(iii) The survey plan must be sent to the following address: Director, Compliance and Innovative Strategies Division, U.S. Environmental Protection Agency, 1200 Pennsylvania Ave., NW. (6406J), Washington, DC 20460.

(iv) EPA will send a letter to the party submitting a survey plan under this section, either approving or disapproving the survey plan.

**§ 80.1454**

**40 CFR Ch. I (7–1–14 Edition)**

(v) EPA may revoke any approval of a survey plan under this section for cause, including an EPA determination that the approved survey plan had proved inadequate in practice or that it was not fully implemented.

(vi) The approving official for an alternative quality assurance program under this section is the Director of the Compliance and Innovative Strategies Division, Office of Transportation and Air Quality.

(vii) Any notifications required under this paragraph (h) must be directed to the officer designated in paragraph (h)(6)(vi) of this section.

(7)(i) No later than December 1 of the year preceding the year in which the surveys will be conducted, the contract with the independent surveyor shall be in effect, and an amount of money necessary to carry out the entire survey plan shall be paid to the independent surveyor or placed into an escrow account with instructions to the escrow agent to pay the money to the independent surveyor during the course of the conduct of the survey plan.

(ii) No later than December 15 of the year preceding the year in which the surveys will be conducted, EPA must receive a copy of the contract with the independent surveyor, proof that the money necessary to carry out the survey plan has either been paid to the independent surveyor or placed into an escrow account, and, if placed into an escrow account, a copy of the escrow agreement, to be sent to the official designated in paragraph (h)(6)(iii) of this section.

(8) A failure of any renewable fuel producers or importer to fulfill or cause to be fulfilled any of the requirements of this paragraph (h) will cause the option for such party to use the alternative quality assurance requirements under this paragraph (h) to be void *ab initio*.

(i) Beginning July 1, 2010, all parties must keep transaction information sent to EMTS in addition to other records required under this section.

(j) A renewable fuel producer that produces fuel from separated yard and food waste as described in §80.1426(f)(5)(i)(A) and (B) and separated municipal solid waste as described in §80.1426(f)(5)(i)(C) shall keep all the following additional records:

(1) For separated yard and food waste as described in §80.1426(f)(5)(i)(A) and (B):

(i) Documents demonstrating the amounts, by weight, purchased of separated yard and food waste for use as a feedstock in producing renewable fuel.

(ii) Such other records as may be requested by the Administrator.

(2) For separated municipal solid waste as described in §80.1426(f)(5)(i)(C):

(i) Contracts and documents memorializing the sale of paper, cardboard, plastics, rubber, textiles, metals, and glass separated from municipal solid waste for recycling.

(ii) Documents demonstrating the amounts by weight purchased of post-recycled separated yard and food waste for use as a feedstock in producing renewable fuel.

(iii) Documents demonstrating the fuel sampling methods used pursuant to §80.1426(f)(9) and the results of all fuel analyses to determine the non-fossil fraction of fuel made from separated municipal solid waste.

(iv) Such other records as may be requested by the Administrator.

(k)(1) Biogas and electricity in pathways involving feedstocks other than grain sorghum. A renewable fuel producer that generates RINs for biogas or electricity produced from renewable biomass (renewable electricity) for fuels that are used for transportation pursuant to §80.1426(f)(10) and (11), or that uses process heat from biogas to generate RINs for renewable fuel pursuant to §80.1426(f)(12) shall keep all of the following additional records:

(i) Contracts and documents memorializing the sale of biogas or renewable electricity for use as transportation fuel relied upon in §80.1426(f)(10), §80.1426(f)(11), or for use of biogas for use as process heat to make renewable fuel as relied upon in §80.1426(f)(12), and the transfer of title of the biogas or renewable electricity and all associated environmental attributes from the point of generation to the facility which sells or uses the fuel for transportation purposes.

(ii) Documents demonstrating the volume and energy content of biogas, or kilowatts of renewable electricity,

**Environmental Protection Agency**                    **§ 80.1454**

relied upon under §80.1426(f)(10) that was delivered to the facility which sells or uses the fuel for transportation purposes.

(iii) Documents demonstrating the volume and energy content of biogas, or kilowatts of renewable electricity, relied upon under §80.1426(f)(11), or biogas relied upon under §80.1426(f)(12), that was placed into the common carrier pipeline (for biogas) or transmission line (for renewable electricity).

(iv) Documents demonstrating the volume and energy content of biogas, or kilowatts of renewable electricity, relied upon under §80.1426(f)(12) at the point of distribution.

(v) Affidavits from the biogas or renewable electricity producer and all parties that held title to the biogas or renewable electricity confirming that title and environmental attributes of the biogas or renewable electricity relied upon under §80.1426(f)(10) and (11) were used for transportation purposes only, and that the environmental attributes of the biogas relied upon under §80.1426(f)(12) were used for process heat at the renewable fuel producer's facility, and for no other purpose. The renewable fuel producer shall create and/or obtain these affidavits at least once per calendar quarter.

(vi) The biogas or renewable electricity producer's Compliance Certification required under Title V of the Clean Air Act.

(vii) The biogas or renewable electricity producer's Compliance Certification required under Title V of the Clean Air Act.

(viii) Such other records as may be requested by the Administrator.

(2) Biogas and electricity in pathways involving grain sorghum as feedstock. A renewable fuel producer that produces fuel pursuant to a pathway that uses grain sorghum as a feedstock shall keep all of the following additional records, as appropriate:

(i) Contracts and documents memorializing the purchase and sale of biogas and the transfer of biogas from the point of generation to the ethanol production facility.

(ii) If the advanced biofuel pathway is used, documents demonstrating the total kilowatt-hours (kWh) of electricity used from the grid, and the total kWh of grid electricity used on a per gallon of ethanol basis, pursuant to §80.1426(f)(13).

(iii) Affidavits from the producer of biogas used at the facility, and all parties that held title to the biogas, confirming that title and environmental attributes of the biogas relied upon under §80.1426(f)(13) were used for producing ethanol at the renewable fuel production facility and for no other purpose. The renewable fuel producer shall obtain these affidavits at least once per calendar quarter.

(iv) The biogas producer's Compliance Certification required under Title V of the Clean Air Act.

(v) Such other records as may be requested by the Administrator.

(l) The records required under paragraphs (a) through (d) and (f) through (k) of this section and under §80.1453 shall be kept for five years from the date they were created, except that records related to transactions involving RINs shall be kept for five years from the date of the RIN transaction.

(m) The records required under paragraph (e) of this section shall be kept through calendar year 2022.

(n) On request by EPA, the records required under this section and under §80.1453 must be made available to the Administrator or the Administrator's authorized representative. For records that are electronically generated or maintained, the equipment or software necessary to read the records shall be made available; or, if requested by EPA, electronic records shall be converted to paper documents.

(o) The records required in paragraphs (b)(3) and (c)(1) of this section must be transferred with any renewable fuel sent to the importer of that renewable fuel by any foreign producer not generating RINs for his renewable fuel.

(p) Copies of all reports required under §80.1464.

[75 FR 14863, Mar. 26, 2010, as amended at 75 FR 26046, May 10, 2010; 75 FR 76829, Dec. 9, 2010; 75 FR 79978, Dec. 21, 2010; 77 FR 74606, Dec. 17, 2012; 78 FR 22789, Apr. 17, 2013; 78 FR 41715, July 11, 2013; 78 FR 62471, Oct. 22, 2013]

**Environmental Protection Agency**                          **§ 80.1457**

are only valid for use in the compliance year that they are made available.

(2) Cellulosic biofuel waiver credits are nonrefundable.

(3) Cellulosic biofuel waiver credits are nontransferable.

(4) Cellulosic biofuel waiver credits may only be used for an obligated party's current year cellulosic biofuel RVO and not towards any prior year deficit cellulosic biofuel volume obligations.

(c) *Purchase of cellulosic biofuel waiver credits.*—(1) Only parties with an RVO for cellulosic biofuel may purchase cellulosic biofuel waiver credits.

(2) Cellulosic biofuel waiver credits shall be purchased from EPA at the time that a party submits its annual compliance report to EPA pursuant to §80.1451(a)(1).

(3) Parties may not purchase more cellulosic biofuel waiver credits than their current year cellulosic biofuel RVO minus cellulosic biofuel RINs with a D code of 3 that they own.

(4) Cellulosic biofuel waiver credits may only be used to meet an obligated party's cellulosic biofuel RVO.

(d) *Setting the price of cellulosic biofuel waiver credits.* (1) The price for cellulosic biofuel waiver credits shall be set equal to the greater of:

(i) $0.25 per cellulosic biofuel waiver credit, adjusted for inflation in comparison to calendar year 2008; or

(ii) $3.00 less the wholesale price of gasoline per cellulosic biofuel waiver credit, adjusted for inflation in comparison to calendar year 2008.

(2) The wholesale price of gasoline will be calculated by averaging the most recent twelve monthly values for U.S. Total Gasoline Bulk Sales (Price) by Refiners as provided by the Energy Information Administration that are available as of September 30 of the year preceding the compliance period.

(3) The inflation adjustment will be calculated by comparing the most recent Consumer Price Index for All Urban Consumers (CPI–U) for All Items expenditure category as provided by the Bureau of Labor Statistics that is available at the time EPA sets the cellulosic biofuel standard to the most recent comparable value reported after December 31, 2008. When EPA must set

the price of cellulosic biofuel waiver credits for a compliance year, EPA will calculate the new amounts for paragraphs (d)(1)(i) and (ii) of this section for each year after 2008 and every month where data is available for the year preceding the compliance period at the time EPA sets the cellulosic biofuel standard.

(e) Cellulosic biofuel waiver credits under this section will only be able to be purchased on forms and following procedures prescribed by EPA.

**§ 80.1457  Petition process for aggregate compliance approach for foreign countries.**

(a) EPA may approve a petition for application of the aggregate compliance approach to planted crops and crop residue from existing agricultural land in a foreign country if EPA determines that an aggregate compliance approach will provide reasonable assurance that planted crops and crop residue from the country in question meet the definition of renewable biomass and will continue to meet the definition of renewable biomass, based on the submission of credible, reliable, and verifiable data.

(1) As part of its evaluation, EPA will consider all of the following:

(i) Whether there has been a reasonable identification of the "2007 baseline area of land," defined as the total amount of cropland, pastureland, and land that is equivalent to U.S. Conservation Reserve Program land in the country in question that was actively managed or fallow and nonforested on December 19, 2007.

(ii) Whether information on the total amount of cropland, pastureland, and land that is equivalent to U.S. Conservation Reserve Program land in the country in question for years preceding and following calendar year 2007 shows that the 2007 baseline area of land identified in paragraph (a)(1)(i) of this section is not likely to be exceeded in the future.

(iii) Whether economic considerations, legal constraints, historical land use and agricultural practices and other factors show that it is likely that producers of planted crops and crop residue will continue to use agricultural land within the 2007 baseline area

1161

§ 80.1457                                                40 CFR Ch. I (7–1–14 Edition)

of land identified in paragraph (a)(1)(i) of this section into the future, as opposed to clearing and cultivating land not included in the 2007 baseline area of land.

(iv) Whether there is a reliable method to evaluate on an annual basis whether the 2007 baseline area of land identified in paragraph (a)(1)(i) of this section is being or has been exceeded.

(v) Whether a credible and reliable entity has been identified to conduct data gathering and analysis, including annual identification of the aggregate amount of cropland, pastureland, and land that is equivalent to U.S. Conservation Reserve Program land, needed for the annual EPA evaluation specified in § 80.1454(g)(1), and whether the data, analyses, and methodologies are publicly available.

(2) [Reserved]

(b) Any petition and all supporting materials submitted under paragraph (a) of this section must be submitted both in English and its original language (if other than English), and must include all of the following or an explanation of why it is not needed for EPA to consider the petition:

(1) Maps or electronic data identifying the boundaries of the land for which the petitioner seeks approval of an aggregate compliance approach.

(2) The total amount of land that is cropland, pastureland, or land equivalent to U.S. Conservation Reserve Program land within the geographic boundaries specified in paragraph (b)(1) of this section that was cleared or cultivated prior to December 19, 2007 and that was actively managed or fallow and nonforested on that date, and

(3) Land use data that demonstrates that the land identified in paragraph (b)(1) of this section is cropland, pastureland or land equivalent to U.S. Conservation Reserve Program land that was cleared or cultivated prior to December 19, 2007, and that was actively managed or fallow and nonforested on that date, which may include any of the following:

(i) Satellite imagery or data.
(ii) Aerial photography.
(iii) Census data.
(iv) Agricultural survey data.
(v) Agricultural economic modeling data.

(4) Historical land use data for the land within the geographic boundaries specified in paragraph (b)(1) of this section to the current year, which may include any of the following:

(i) Satellite imagery or data.
(ii) Aerial photography.
(iii) Census data.
(iv) Agricultural surveys.
(v) Agricultural economic modeling data.

(5) A description of any applicable laws, agricultural practices, economic considerations, or other relevant factors that had or may have an effect on the use of agricultural land within the geographic boundaries specified in paragraph (b)(1) of this section, including information regarding the efficacy and enforcement of relevant laws and regulations.

(6) A plan describing how the petitioner will identify a credible and reliable entity who will, on a continuing basis, conduct data gathering, analysis, and submittal to assist EPA in making an annual determination of whether the criteria specified in paragraph (a) of this section remains satisfied.

(7) A letter, signed by a national government representative at the ministerial level or equivalent, confirming that the petition and all supporting data have been reviewed and verified by the ministry (or ministries) or department(s) of the national government with primary expertise in agricultural land use patterns, practices, data, and statistics, that the data support a finding that planted crops and crop residue from the specified country meet the definition of renewable biomass and will continue to meet the definition of renewable biomass, and that the responsible national government ministry (or ministries) or department(s) will review and verify the data submitted on an annual basis to facilitate EPA's annual evaluation of the 2007 baseline area of land specified in § 80.1454(g)(1) for the country in question.

(8) Any additional information the Administrator may require.

(c) EPA will issue a FEDERAL REGISTER notice informing the public of receipt of any petition submitted pursuant to this section and will provide a 60-day period for public comment. If

**Environmental Protection Agency**                                    **§ 80.1460**

EPA approves a petition it will issue a FEDERAL REGISTER notice announcing its decision and specifying an effective date for the application of the aggregate compliance approach to planted crops and crop residue from the country. Thereafter, the planted crops and crop residue from the country will be covered by the aggregate compliance approach set forth in §80.1454(g), or as otherwise specified pursuant to paragraph (d) of this section.

(d) If EPA grants a petition to establish an aggregate compliance approach for planted crops and crop residue from a foreign country, it may include any conditions that EPA considers appropriate in light of the conditions and circumstances involved.

(e)(1) EPA may withdraw its approval of the aggregate compliance approach for the planted crops and crop residue from the country in question if:

(i) EPA determines that the data submitted pursuant to the plan described in paragraph (b)(6) of this section does not demonstrate that the amount of cropland, pastureland and land equivalent to U.S. Conservation Reserve Program land within the geographic boundaries covered by the approved petition does not exceed the 2007 baseline area of land;

(ii) EPA determines based on other information that the criteria specified in paragraph (a) of this section is no longer satisfied; or

(iii) EPA determines that the data needed for its annual evaluation has not been collected and submitted in a timely and appropriate manner.

(2) If EPA withdraws its approval for a given country, then producers using planted crops or crop residue from that country will be subject to the individual recordkeeping and reporting requirements of §80.1454(b) through (d) in accordance with the schedule specified in §80.1454(g).

[75 FR 76829, Dec. 9, 2010]

**§§ 80.1458–80.1459  [Reserved]**

**§ 80.1460  What acts are prohibited under the RFS program?**

(a) *Renewable fuels producer or importer violation.* Except as provided in §80.1455, no person shall produce or import a renewable fuel without complying with the requirements of §80.1426 regarding the generation and assignment of RINs.

(b) *RIN generation and transfer violations.* No person shall do any of the following:

(1) Generate a RIN for a fuel that is not a renewable fuel, or for which the applicable renewable fuel volume was not produced.

(2) Create or transfer to any person a RIN that is invalid under §80.1431.

(3) Transfer to any person a RIN that is not properly identified as required under §80.1425.

(4) Transfer to any person a RIN with a K code of 1 without transferring an appropriate volume of renewable fuel to the same person on the same day.

(5) Introduce into commerce any renewable fuel produced from a feedstock or through a process that is not described in the person's registration information.

(6) Generate a RIN for fuel for which RINs have previously been generated.

(c) *RIN use violations.* No person shall do any of the following:

(1) Fail to acquire sufficient RINs, or use invalid RINs, to meet the person's RVOs under §80.1427.

(2) Use a validly generated RIN to meet the person's RVOs under §80.1427, or separate and transfer a validly generated RIN, where the person using the RIN ultimately uses the renewable fuel volume associated with the RIN in an application other than for use as transportation fuel, jet fuel, or heating oil (as defined in §80.1401).

(3) Use a validly generated RIN to meet the person's RVOs under §80.1427, or separate and transfer a validly generated RIN, where the person ultimately uses the renewable fuel volume associated with the RIN in an application other than for use as transportation fuel, jet fuel, or heating oil (as defined in §80.1401).

(d) *RIN retention violation.* No person shall retain RINs in violation of the requirements in §80.1428(a)(5).

(e) *Causing a violation.* No person shall cause another person to commit an act in violation of any prohibited act under this section.